**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Daryal V. Clay | : |
| | : |
| et al. | : |
| | : |
|        Plaintiffs | : |
| | : |
|    v. | :   CV 06-0707 (RWR) |
| | : |
| SOCIALIST PEOPLE'S LIBYAN | : |
| ARAB JAMAHIRIYA (Libya) | : |
| | : |
| et al. | : |
| Defendants | : |
| _____ | : |

**PLAINTIFFS' STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO LIABILITY**

Plaintiffs submit the following exhibits, which were submitted in Beecham v. Socialist People's Libyan Arab Jamahiriya, CA 01-2243 (RWR) (D.D.C.):[1]

1.    Declaration of Andreas Schulz, German counsel who participated in German criminal trial against the terrorists who carried out actual La Belle Discotheque bombing in Berlin criminal court from November 18, 1997 to November 13, 2001.

1(a).    Verdict and factual findings of Berlin District Court in the criminal case against Yasser Mohamed Chraidi, et al, Reference Number: (539) 1 Js2/92 KLs (8/97).

1(b).    Confession of Libyan terrorist and agent Musbah Abulgasem Eter, September 10, 1996.

1(c).    Confession of Libyan terrorist and agent Musbah Abulgasem Eter, October 16, 1996.

---

[1] Exhibits 1(a) through 1(f) are submitted in both the original German and the English translation.

      1(d).    Cable communication from German Ambassador to the United States, March 31, 2001.

      1(e).    Intercepted Libyan cable communications, March 25, 1986-April 5, 1986.

      1(f).    Arrest Warrant for of Libyan terrorist and agent Said Rashid and others.

      2.    Declaration of David Long, Ph.D.

      3.    Declaration of Ambassador Robert Oakley.

      4.    Address to the Nation of President Ronald Reagan, April 14, 1986.

      5.    Letter to the Speaker of the House of Representatives and the President Pro Tempore of the Senate from President Ronald Reagan, April 16, 1986.

      6.    Statement by Principal Deputy Press Secretary Larry Speakes, April 14, 1986.

      7.    Statement by Principal Deputy Press Secretary Larry Speakes, April 15, 1986.

      8.    Testimony before the Senate Foreign Relations Subcommittee for Near Eastern and South Asian Affairs of Ronald E. Neumann, Deputy Assistant Secretary of State for Near Eastern Affairs, May 4, 2000.

      9.    <u>Patterns of Global Terrorism: 1986</u>, issued by United States Department of State, January 1988.

      10.    Declaration of Major General John H. Mitchell, U.S. Army (Retired).

      11.    Declaration of Lieutenant General Thomas N. Griffin, Jr., U.S. Army (Retired).

      The following facts are undisputed:

1. Lorenzo Alexander Harris was at the LaBelle Discothèque at the time of the attack and suffered permanent breathing abnormalities. He died four years later as a result of this physical injury. (Amended Complaint ¶3). From the time of the attack until before his death, Lorenzo Alexander Harris suffered permanent physical injury, physical suffering and mental anguish and suffering, entitling his estate to compensatory damages. (Amended Complaint ¶21). Lorenzo Alexander Harris' death was caused by a willful and deliberate act of extrajudicial killing and torture organized, planned and facilitated by Defendants Libya and JSO during the course of their terrorist act: bombing the discotheque. (Amended Complaint ¶24).

2. The Defendants participated in a conspiracy to commit the state-sponsored terrorist bomb attack at the LaBelle Discotheque, and in the execution thereof. Each of the Defendants acted through their officials, employees and agents, including the individuals named in the Amended Complaint. (Amended Complaint ¶6-7). The attack itself was carried out by persons associated with the Libyan secret intelligence service and the Jamahiriya Security Organization ("JSO"), including JSO member Musbah Abulgasem Eter. (Amended Complaint ¶6). Among the overt acts committed in furtherance of the conspiracy and the execution thereof were: in furtherance of this planned attack, a Libyan intelligence service courier transported sub-machine guns, hand grenades and approximately 12 kg of explosives from Tripoli to East Berlin as diplomatic luggage. (Amended Complaint ¶8).

3. Defendants selected the LaBelle Discotheque in West Berlin, known to be frequented by large numbers of United States military personnel, as the target of the terrorist

3

attack. (Amended Complaint ¶3).

4. On April 4, 1986, in preparation for the terrorist attack, Souad Chraidi transported approximately 3 kg of plastic explosive loaded with iron parts, a detonator and a delay timing device (timer) from the Libyan embassy in East Berlin to the apartment of Ali and Verena Chanaa in West Berlin. (Amended Complaint ¶8). On April 4, 1986, at approximately 9:00 p.m. Yasser Chraidi, Ali Chanaa, Verena Chanaa and Eter made the final preparations for the terrorist attack at which time the detonator and timer were fitted into the explosive. (Amended Complaint ¶9). The explosive was concealed in a bag. (Amended Complaint ¶9). After this, Eter said, "This is the answer to the Americans, a gift from Gadhafi [sic] to Reagan." (Amended Complaint ¶9).

5. At around 11:00 p.m., Verena Chanaa and Andrea Häusler brought the bomb into the LaBelle Discotheque, where the electrical delay timing device of the explosive was activated. (Amended Complaint ¶10). The bag containing the bomb was placed at a seat in the center of the dance floor. (Amended Complaint ¶10). On April 5, 1986 at approximately 1:35 a.m., Verena Chanaa and Andrea Häusler left the LaBelle Discotheque. (Amended Complaint ¶10). There were approximately 260 people in the discotheque at the time. (Amended Complaint ¶10).

6. The bomb exploded with great and destructive force at approximately 1:40 a.m. Three persons--Kenneth Terence Ford, James E. Goins, and Nermin Haney, a female Turkish citizen--were killed in the immediate aftermath of the bombing. (Amended Complaint ¶11). The explosive pressure tore off Mr. Ford's genitals, and separated

4

his left lower-leg and his left arm from the trunk of his body. (Amended Complaint ¶11). He sustained severe burns on his face and body. (Amended Complaint ¶11). He died of shock and loss of blood. (Amended Complaint ¶11). Both of Mr. Goins' lower-legs were ripped open and his bones shattered. (Amended Complaint ¶11). Metal parts of the bomb penetrated his body and he sustained severe burns on his face and body. (Amended Complaint ¶11). Despite an emergency operation in which both legs were amputated, he later died from his injuries. Nermin Haney had her left eye torn out and her left lower-leg cut to pieces by the explosion. She bled to death at the scene. At least 229 persons suffered severe personal injuries as a result of the bomb explosion. (Amended Complaint ¶11).

7. Both before and after the terrorist bomb attack on the LaBelle Discotheque, the telex communications between the Libyan intelligence service switchboard in Tripoli and the Libyan embassy in East Berlin record that the officials, employees and agents of Libya, MFIS, JSO and ESO were responsible for the planning, preparation and execution of this terrorist act. (Amended Complaint ¶12). Immediately after this terrorist bomb attack, the Libyan embassy in East Berlin sent a message to the Libyan government stating that the execution of this terrorist act had been carried out successfully. (Amended Complaint ¶12). The communication stated that "at 1:30 early this morning the performance of one of the actions took place with success, without leaving behind any clues . . . . " (Amended Complaint ¶12).

8. In April 1986, Major General John H. Mitchell was the United States Commander in Berlin. (Amended Complaint ¶13). He received secret national defense information

5

from reliable sources. (Amended Complaint ¶13). He learned that before the LaBelle bomb attack, instructions had been sent from the Libyan government in Tripoli to the Libyan People's Office in East Berlin to perform terrorist attacks against Americans and that the Libyan People's Office in East Berlin communicated to the Libyan government in Tripoli immediately after the bomb attack that the operation had been successfully performed. (Amended Complaint ¶13).

9. On September 10, 1996, Eter visited the German embassy in Malta. During questioning in the presence of the German ambassador, Eter made a detailed confession by disclosing the planning, preparation and execution of the terrorist attack on La Belle; his own actions; and the actions of the other perpetrators, as set forth above. (Amended Complaint ¶14). During further questioning conducted by the senior state prosecutor in Berlin, Eter described in detail the execution of the LaBelle terrorist act by officials, employees and agents of Libya, MFIS, JSO and ESO. (Amended Complaint ¶14).

10. On March 17, 2001, al-Qadhafi, in a secret meeting in Tripoli, Libya, admitted to Mr. Steiner, the foreign policy adviser to German Federal Chancellor Schroeder that Libya and he (Al-Qadhafi) participated in the terrorist bomb attack at the LaBelle Discotheque as well as the "Lockerbie" terrorist act. (Amended Complaint ¶15). On March 29, 2001, at a meeting in Washington, D.C. between the leaders of Germany and the United States, Mr. Steiner reported to President George W. Bush, Secretary of State Colin Powell, and National Security Advisor Condoleezza Rice these admissions of al-Qadhafi. (Amended Complaint ¶15).

11. Several Libyan agents were tried from November 18, 1997 to November 13, 2001 in a German criminal court and convicted of various crimes in connection with the LaBelle bombing. Andreas Schulz served as counselor in that trial and produced a sworn affidavit. (Attachment A, Ex. 1 at pp. 1-2).

12. Libyan terrorists and agents Yasser Mohammed Chraidi, Musbah Abulgasem Eter, Verena Chanaa and Ali Channa were all convicted and found criminally liable for the LaBelle Discotheque bombing by a German criminal court on November 13, 2001. (Attachment A, Ex. 1(a) at p. 14).

13. Libyan secret service agents worked at the Libyan embassy as diplomats in Berlin during the relevant time frame. (Attachment A at p. 20).

14. Concrete attack plans and preparations were made in the Libyan Embassy in Berlin. (Attachment A at p. 22).

15. In March 1986, the Libyan Central Secret Service in Tripoli contacted foreign agents and the Libyan Embassy in Berlin to prepare an attack against American facilities in Berlin. (Attachment A at p. 22).

16. A telex arrived in the Libyan Embassy in Berlin stating emphatic approval had been obtained for conducting an attack against American facilities. (Attachment A at p. 22).

17. In the beginning of March 1986, Libya exercised pressure on its foreign representatives to undertake "something" against the Americans. All staffers in the Libyan Embassy discussed plans to attack an American installation and the LaBelle

        attack was planned on this basis in the Libyan Embassy.  (Attachment A at p. 24).

18. The Libyan Secret Service planned and carried out the LaBelle bombing from the Libyan Embassy.  (Attachment A at p. 27).

19. Personnel in the Libyan Embassy organized the LaBelle bombing due to the conflict between the United States and Libya.  (Attachment A at p. 32).

20. The equipment for the attack came from Libya, including 12 kg of explosives brought to the Libyan Embassy in diplomatic luggage.  (Attachment A at p. 34, 45).  A Libyan explosives specialist arrived from Libya to carry out the attack.  (Attachment A at p. 34).

21. Payments of 15,000DM were made to the terrorists who carried out the bombing attack by the Libyan Embassy.  (Attachment A at p. 34).

22. Instructions to plan and carry out the attack came over telex from Tripoli to the Libyan Embassy in Berlin.  (Attachment A at p. 37).

23. Al-Qadhafi admitted Libya's role in the LaBelle bombing.  (Attachment A at p. 62, 64).

24. A Libyan telex arrived at the Libyan Embassy in Berlin from the Libyan Intelligence service in Tripoli that stated: "It is only possible with the path [help] of the Palestinians to hit the Americans with the weapons, which they have.  At the same time it is possible to use all Arabs and friends likewise for the same issue."  (Attachment A at p. 67).  A senior member of the Libyan Intelligence service in Tripoli instructed members of the Libyan Embassy in Berlin to carry out a terrorist attack against the American Army in West Berlin.  (Attachment A at p. 74).

25. Further telexes were exchanged prior to and after the attack regarding the timing of the attack and its success. (Attachment A at p. 69).

26. David Long, Ph. D., a member of the U.S. Foreign Service from 1962 to 1993, specialized in the Middle East and was a Deputy Director of the State Department's Office of Counterterrorism for Regional Affairs in the 1980s. Dr. Long made the following sworn statements, (Attachment A at p. 81-82):

- By the time of the LaBelle disco bombing on April 5, 1986, the Qaddafi regime had long been a major concern to the United States, not only for its terrorist activities but also for its close relations with the Soviet Union. In the wake of the Libyan-supported Rome and Vienna airport terrorist attacks by the Abu Nidal Organization the previous December, senior members of the Reagan Administration considered military reprisals against Libya for the loss of life of American citizens.

- The decision was made first to invoke economic sanctions against Libya based on the International Emergency Economic Powers Act, but to warn Qaddafi that the United States would deal harshly with any subsequent Libyan terrorist activities. Defense Department planners began immediately preparing for such a contingency, and intelligence surveillance of Libyan covert activities continued at a high level.

- The United States, as well as Britain, Germany and other NATO allies, had access to Libyan diplomatic cable traffic through communications intelligence. On March 25, intercepted cables from Libya's intelligence service to Libyan

9

diplomatic missions in Europe instructed them to carry out terrorist attacks against Americans. These instructions were corroborated by subsequent intelligence of Libyan plans to attack targets in East Berlin, Bonn, Ankara, Paris, and in Yugoslavia, Switzerland and Italy. Further intercepted cable traffic between the Libyan diplomatic mission in East Berlin and Libya linked the Libyan government directly to the commission of the LaBelle Discotheque bombing.

- I personally viewed these communication intercepts and they left no doubt in my mind that Libya ordered its agents in Germany to commit the terrorist attack commonly referred to as the LaBelle Discotheque bombing. I would have no hesitation in testifying in a court of law that the government of Libya ordered its intelligence personnel located in the Libyan embassy in East Germany to carry out the LaBelle Discotheque bombing.

27. Ambassador Robert Oakley served in the U.S. Foreign Service from 1957 to 1991. His assignments included embassies in a number of countries, including Lebanon, Somalia and the Palestinian territories, where terrorist operations were prevented. From 1984 to 1986, he was the Coordinator for Counterterrorism, following which, from 1986 to 1988, he was Special Assistant to the President for the Middle East and South Asia on the staff of the National Security Counsel. In the latter two assignments, Libya and Libyan involvement in terrorism was a major issue to which he paid particular attention. This included U.S. policy, plans and actions toward Libya, preceding, during and after the events of this case.

28. Ambassador Oakley made the following sworn statements, (Attachment A at p. 88-89):

- Qaddafi decided to retaliate against the United States. Instructions were issued to Libyan Peoples Bureaus in East Berlin, France, Turkey and a number of other countries to carry out attacks against Americans. The United States intercepted those Libyan communications, which it had been doing for several years. The Reagan Administration shared this intelligence with the governments in question. In France and Turkey their intelligence services detected and placed under surveillance Libyan "hit teams" coming in from Tripoli, tracked them to Libyan Peoples Bureaus, and then to U.S. embassies. They were arrested before carrying out the planned attacks. In West Berlin, no target was specified in the instructions from Tripoli and it was not possible to detect the Libyan "hit team" which infiltrated from East Berlin.

- After LaBelle Discotheque was bombed, the Libyan Peoples Bureau in East Berlin sent a message to Tripoli, "mission accomplished."

- The magnitude of the planned Libyan attacks as well as the bombing of the LaBelle Discotheque caused the Reagan Administration to decide upon military action against Libya. Military and civilian government targets in Tripoli and Benghazi were selected for their involvement in Libyan terrorist activities. In order to maximize support from European governments the White House decided to share with Newsweek Magazine selected intercepts of Libyan communications.

11

- Several weeks after the raids upon Tripoli and Benghazi, I went to a meeting of the European Union Ministers of Justice and Interior, together with Attorney-General Meese and FBI Director Webster. The EU Ministers told us that the bombing raids had caused them to review for the first time, at the senior level, all available intelligence on Libyan terrorism. Their conclusion was that the threat was even worse than the U.S. had been telling them.
- I testify that these communication intercepts left no doubt that Libya ordered its agents in Germany to commit the terrorist attack commonly referred to as the LaBelle Discotheque bombing.

29. President Ronald Reagan addressed the people of the United States on April 14, 1986 and stated the United States had direct and irrefutable evidence of Libya's responsibility for the LaBelle bombing. (Attachment A at p. 91)

30. President Ronald Reagan sent a letter to the Speaker of the United States House of Representatives on April 16, 1986 stating the United States had direct and irrefutable evidence of Libya's responsibility for the LaBelle bombing. (Attachment A at p. 94).

31. Larry Speakes, the White House Deputy Press Secretary, stated the United States had direct and irrefutable evidence of Libya's responsibility for the LaBelle bombing, which resulted in the US bombing of Tripoli. (Attachment A at p. 96).

32. Ronald Neumann, Deputy Assistant Secretary of State for Near Eastern Affairs, testified to Congress on May 4, 2000 that the US government identified Libya as responsible for the La Belle Discotheque bombing, which was further supported by the proceedings in German criminal court against the LaBelle bombing suspects.

(Attachment A at p. 102).

33. The January 1988 edition of the US State Department government publication entitled <u>Patterns of Global Terrorism: 1986</u> states the bombing was a "Libyan-instigated attack" and the US government had incontrovertible proof of Libyan involvement. (Attachment A at p. 111).

34. John H. Mitchell, Major General, US Army (retired), the US commander of Berlin during the relevant time frame, made the following sworn statements:

- On March 25, 1986, the Libyan government in Tripoli ordered the Libyan Embassy in East Berlin, Germany to conduct a terrorist attack against Americans.

- On March 27, 1986, he received reports that the Libyan Embassy in East Berlin was on alert and was prepared to carry out terrorist attacks against American installations in West Berlin.

- On April 4, 1986, a Libyan government agent of the Libyan Embassy in East Berlin informed a senior Libyan intelligence officer in Tripoli that the attack would be carried out the following morning.

- On April 5, 1986, a Libyan government agent of the Libyan Embassy in East Berlin informed a senior Libyan intelligence officer in Tripoli that the attack has been carried out successfully. (Attachment A at p. 117-119).

35. These statements were seconded and corroborated by Thomas Griffin, Jr., Lt. General, US Army, (retired). (Attachment A at p. 121-23).

March 12, 2008                                  Respectfully submitted,

                                                /s/ *Steven R. Perles*_____

                                                Steven R. Perles      (D.C. Bar# 326975)
                                                Edward MacAllister   (D.C. Bar# 494558)
                                                Perles Law Firm, PC
                                                1146 19th Street, NW
                                                Suite 500
                                                Washington, DC 20036
                                                202.955.9055
                                                202.955.3806 (facsimile)