# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Daryal V. Clay | : |
| et al. | : |
|     Plaintiffs | : |
|     v. | : |
| | :   CV 06-0707 (RWR) |
| SOCIALIST PEOPLE'S LIBYAN ARAB JAMAHIRIYA (Libya) | : |
| et al. | : |
|     Defendants | : |

## PLAINTIFFS' MOTION FOR PARTIAL
## SUMMARY JUDGMENT AS TO LIABILITY

COME NOW, the Plaintiffs, by and through counsel, pursuant to Fed. R. Civ. P. 56 and Local Rule 56.1 to hereby file this Motion for Partial Summary Judgment as to Liability. The facts establish that Defendants are clearly responsible and should be held civilly liable for the death and injuries to United States citizens resulting from the April 5, 1986 bombing of the La Belle Discotheque. In support of said Motion, Plaintiffs rely on the following Memorandum of Points and Authorities, with exhibits, and arguments to be made at a hearing on this matter.

Plaintiffs also submit a statement of material facts as required by Local Rule 56.1 as to which there is no genuine issue.

Plaintiffs respectfully request the Court grant their Motion for Partial Summary Judgment as to Liability and set a briefing schedule for the Parties' arguments as to the choice-of-law for the substantive causes of action and damages.

Dated: March 12, 2008                              Respectfully submitted,

**/s/ Steven R. Perles**
Steven R. Perles
Perles Law Firm, PC
1146 19th Street, NW, Fifth Floor
Washington, DC 20036
Telephone: 202-955-9055
Telefax: 202-955-3806

Counsel for Plaintiffs

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Daryal V. Clay | : |
| et al. | : |
|     Plaintiffs | : |
| v. | : |
| | :   CV 06-0707 (RWR) |
| SOCIALIST PEOPLE'S LIBYAN ARAB JAMAHIRIYA (Libya) | : |
| et al. | : |
|     Defendants | : |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO LIABILITY**

## FACTUAL BACKGROUND

On April 5, 1986, a bomb was detonated by terrorists inside the LaBelle Discotheque, a nightclub in West Berlin, Germany. Two American soldiers were killed by the blast and scores of American servicemen and servicewomen were severely and permanently injured. Plaintiffs include two injured US nationals and several John Does US nationals service personnel.

Plaintiffs brought suit seeking compensatory and punitive damages against the Defendant Socialist People's Libyan Arab Jamahiriya ("Libya") and its relevant ministries. Plaintiffs allege that Libya supported, trained and directed its agents as they planned, prepared and executed a plot to bomb the LaBelle Discotheque and that Libya's agents subsequently carried out the bombing with its attendant devastating suffering and loss of life.

The bombing was carried out April 5, 1986 at the direction of Colonel Muammar Abu Minar al-Qadhafi, ("al-Qadhafi") the de-facto head of the Libyan government, by and through the Libyan government's officials, employees and agents, Libyan government-sponsored terrorist groups and Libyan government agents of Libyan and German nationality. (Amended Complaint ¶6-7). Libya sponsored the perpetrators, within the meaning of 28 U.S.C. § 1605A, by providing them with funding, planning, direction, and training for their terrorist activities. (Amended Complaint ¶6). Al-Qadhafi provided material support and resources to those directly involved in the attack through the provision of funding, planning, direction, and training. (Amended Complaint ¶6-7).

Plaintiffs Daryal V. Clay and William Douglas Johnson were at the discothèque at the time of the attack and suffered permanent injury including partial loss of hearing,

suffered severe mental and emotional distress as a result of the bombing. (Amended Complaint ¶21, 23). Their injuries were caused by a willful and deliberate act of attempted extrajudicial killing organized, planned and facilitated by Defendants Libya and Jamahiriya Security Organization ("JSO") during the course of their terrorist act: bombing the discotheque. (Amended Complaint ¶24).

The Defendants participated in a conspiracy to commit the state-sponsored terrorist bomb attack at the LaBelle Discotheque, and in the execution thereof. Each of the Defendants acted through their officials, employees and agents, including the individuals named in the Amended Complaint. (Amended Complaint ¶6-7). The attack itself was carried out by persons associated with the Libyan secret intelligence service and the JSO, including JSO member Musbah Abulgasem Eter. (Amended Complaint ¶6). Among the overt acts committed in furtherance of the conspiracy and the execution thereof were:

- In furtherance of this planned attack, a Libyan intelligence service courier transported sub-machine guns, hand grenades and approximately 12 kg of explosives from Tripoli to East Berlin as diplomatic luggage. (Amended Complaint ¶8).

- Defendants selected the LaBelle Discotheque in West Berlin, known to be frequented by large numbers of United States military personnel, as the target of the terrorist attack. (Amended Complaint ¶3).

- On April 4, 1986, in preparation of the terrorist attack, Souad Chraidi transported approximately 3 kg of plastic explosive loaded with iron parts, a detonator and a delay timing device (timer) from the Libyan embassy in East Berlin to the apartment of Ali and Verena Chanaa in West Berlin. (Amended Complaint ¶8). On April 4,

5

1986 at approximately 9:00 p.m., Yasser Chraidi, Ali Chanaa, Verena Chanaa and Eter made the final preparations for the terrorist attack at which time the detonator and timer were fitted into the explosive. (Amended Complaint ¶9). The explosive was concealed in a bag. (Amended Complaint ¶9). After this, Eter said, "This is the answer to the Americans, a gift from Gadhafi [sic] to Reagan." (Amended Complaint ¶9).

- At around 11:00 p.m., Verena Chanaa and Andrea Häusler brought the bomb into the LaBelle Discotheque, where the electrical delay timing device of the explosive was activated. (Amended Complaint ¶10). The bag containing the bomb was placed at a seat in the center of the dance floor. (Amended Complaint ¶10). On April 5, 1986 at approximately 1:35 a.m., Verena Chanaa and Andrea Häusler left the LaBelle Discotheque. (Amended Complaint ¶10). There were approximately 260 people in the discotheque at the time. (Amended Complaint ¶10).

- The bomb exploded with great and destructive force at approximately 1:40 a.m. Three persons--Kenneth Terence Ford, James E. Goins, and Nermin Haney, a female Turkish citizen--were killed in the immediate aftermath of the bombing. (Amended Complaint ¶11). The explosive pressure tore off Mr. Ford's genitals, and separated his left lower-leg and his left arm from the trunk of his body. (Amended Complaint ¶11). He sustained severe burns on his face and body. (Amended Complaint ¶11). He died of shock and loss of blood. (Amended Complaint ¶11). Both of Mr. Goins' lower-legs were ripped open and his bones shattered. (Amended Complaint ¶11). Metal parts of the bomb penetrated his body and he sustained severe burns on his face and body. (Amended Complaint ¶11). Despite an emergency operation, in which

both legs were amputated, he later died from his injuries. Nermin Haney had her left eye torn out and her left lower-leg cut to pieces by the explosion. She bled to death at the scene. At least 229 persons suffered severe personal injuries as a result of the bomb explosion. (Amended Complaint ¶11).

- Both before and after the terrorist bomb attack on the LaBelle Discotheque, the telex communications between the Libyan intelligence service switchboard in Tripoli and the Libyan embassy in East Berlin record that the officials, employees and agents of Defendants were responsible for the planning, preparation and execution of this terrorist act. (Amended Complaint ¶12). Immediately after this terrorist bomb attack, the Libyan embassy in East Berlin sent a message to the Libyan government stating that the execution of this terrorist act had been carried out successfully. (Amended Complaint ¶12). The communication stated that "at 1:30 early this morning the performance of one of the actions took place with success, without leaving behind any clues . . . ." (Amended Complaint ¶12).

- In April 1986 Major General John H. Mitchell was the United States Commander in Berlin. (Amended Complaint ¶13). He received secret national defense information from reliable sources. (Amended Complaint ¶13). He learned that before the LaBelle bomb attack, instructions had been sent from the Libyan government in Tripoli to the Libyan People's Office in East Berlin to perform terrorist attacks against Americans and that the Libyan People's Office in East Berlin communicated to the Libyan government in Tripoli immediately after the bomb attack that the operation had been successfully performed. (Amended Complaint ¶13).

- On September 10, 1996, Eter visited the German embassy in Malta. During questioning in the presence of the German ambassador, Eter made a detailed confession by disclosing the planning, preparation and execution of the terrorist attack on La Belle; his own actions; and the actions of the other perpetrators, as set forth above. (Amended Complaint ¶14). During further questioning conducted by the senior state prosecutor in Berlin, Eter described in detail the execution of the LaBelle terrorist act by officials, employees and agents of Defendants. (Amended Complaint ¶14).

- On March 17, 2001, al-Qadhafi, in a secret meeting in Tripoli, Libya, admitted to Mr. Steiner, the foreign policy adviser to German Federal Chancellor Schroeder that Libya and he (Al- Qadhafi) participated in the terrorist bomb attack at the LaBelle Discotheque as well as the "Lockerbie" terrorist act. (Amended Complaint ¶15). On March 29, 2001, at a meeting in Washington, D.C. between the leaders of Germany and the United States, Mr. Steiner reported to President George W. Bush, Secretary of State Colin Powell, and National Security Advisor Condoleezza Rice these admissions of al-Qadhafi. (Amended Complaint ¶15).

Plaintiffs invoked the district court's subject matter jurisdiction under the 1996 and 2008 amendments to the Foreign Sovereign Immunities Act ("FSIA") of 1976, codified at 28 U.S.C. § 1605A.

## PROCEDURAL BACKGROUND

This case arises from the same nexus of events that resulted in the Libyan bombing of the LaBelle Discotheque, which occurred in 1986 and includes the same Defendants (but not the same Plaintiffs) as <u>Beecham v. Socialist People's Libyan Arab</u>

Jamahiriya, CA 01-2243 (RWR).

The complaint in this case was filed on April 21, 2006 and the complaint and summons were served on July 6, 2006. Defendants filed a Motion to Dismiss Plaintiffs' complaint on January 15, 2007. After the expiration of several consent motions to stay the litigation while settlement talks proceeded, Plaintiffs timely filed their Opposition to Libya's Motion to Dismiss on September 19, 2007.

On January 31, 2008, Plaintiffs moved the Court for leave to amend their complaint based upon a change in controlling law and to expeditiously deny Defendants' Motion to Dismiss. On January 28, 2008, Congress amended the FSIA and created a viable and uniform claim for damages under federal law by passing the National Defense Authorization Act for Fiscal Year 2008. Pub. L. No. 110-181, § 1083 (2008). ("Defense Authorization Act"). Section 1083 of that Act amends the Foreign Sovereign Immunities Act by deleting 28 U.S.C. § 1605(a)(7), which was previously known as, the "state sponsored terrorism" exception to sovereign immunity, and under which this case was brought, and replacing it with 28 U.S.C. § 1605A. The new law provides a federal cause of action against the foreign state itself and makes available punitive damages against the foreign state. On March 3, 2008 the Court directed the Clerk of the Court to file the Amended Complaint.

Plaintiffs hereby move the Court to enter partial summary judgment as to the liability of the Defendants based on the undisputed facts that establish Defendants' planning, support of and execution of the bombing.

**ARGUMENT**

**LEGAL STANDARD**

A motion for summary judgment is governed by Fed. R. Civ. P. 56. "'Summary judgment is appropriate only where there is no genuine issue of material fact, and, viewing the evidence in the light most favorable to the nonmoving party, the movant is entitled to prevail as a matter of law.'" Diamond v. Atwood, 43 F.3d 1538, 1540 (D.C. Cir. 1995) (quoting Beckett v. Air Line Pilots Ass'n, 995 F.2d 280, 284 (D.C. Cir. 1993)). The substantive law establishes which facts should be considered material. Heartland Reg'l Med. Ctr. v. Leavitt, 2007 U.S. Dist. LEXIS 64704 at *7 (D.D.C. 2007) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). The facts identified by the moving party in its statement of material facts are deemed admitted unless contravened by a statement of genuine issues submitted by the non-moving party. Local Rule 56.1.

**I.   LEGAL FRAMEWORK**

The Foreign Sovereign Immunities Act ("FSIA")[1] provides the sole basis for the exercise of jurisdiction over a foreign state in a United States Court. Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 420, 434 (1989). Under the FSIA, subject matter jurisdiction and personal jurisdiction over a sovereign defendant are established by (1) proper service of the foreign state and (2) satisfaction of one of the statutory exceptions to sovereign immunity. Price v. Socialist People's Libyan Arab Jamahiriya,

---

[1] The FSIA recently underwent its first wide scale legislative revision since 1996. On January 28, 2008, the President signed into law the National Defense Authorization Act of 2008, which replaced 28 U.S.C. § 1605(a)(7), which was previously known as, the "state sponsored terrorism" exception to sovereign immunity, with 28 U.S.C. § 1605A. Further amendments to the FSIA from the National Defense Authorization Act of 2008 are taken up in due course in this Memorandum.

10

294 F.3d 82, 89 (D.C. Cir. 2002). Section 1605A of the FSIA enumerates a specific exception to sovereign immunity, for cases:

> in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

28 U.S.C. § 1605A. For the purposes of this case, it is relevant to note that the FSIA adopts the definitions of "torture" and "extrajudicial killing" contained in section 3 of the Torture Victim Protection Act ("TVPA")[2], and the definition of "material support or resources" contained in the Antiterrorism Act ("ATA"), 18 U.S.C. § 2339A.[3] See 28 U.S.C. § 1605A(h)(3), (h)(7).

---

[2] The TVPA defines "extrajudicial killing" as "a deliberate killing not authorized by a previous judgment pronounced by a regularly constituted court affording all judicial guarantees . . . ." 28 U.S.C. § 1350, note; Pub. L. 102-256 (1991); 106 Stat. 73 (1992).

"Torture" is defined by the TVPA as

> any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering . . . whether physical or mental, is intentionally inflicted on that individual for such purposes as . . . punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind; and
> (2) mental pain or suffering refers to prolonged mental harm caused by or resulting from (A) the intentional infliction or threatened infliction of severe physical pain or suffering; (B) the administration or application, or threatened administration or application, of mind altering substances or other procedures calculated to disrupt profoundly the senses or the personality; (C) the threat of imminent death; or (D) the threat that another individual will imminently be subjected to death, severe physical pain or suffering, or the administration or application of mind altering substances or other procedures calculated to disrupt profoundly the senses or personality.

28 U.S.C. § 1350 note.

[3] The ATA defines "material support of resources" as

> any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert

Once a foreign sovereign's immunity has been lifted under 28 U.S.C. § 1605A of the FSIA, 28 U.S.C. § 1606 provides that "the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 1606. Plaintiffs have asserted federal statutory law and state statutory and common law causes-of-action against Defendants. "Section 1606 acts as a 'pass through' to substantive causes of actions against private individuals that exist in federal, state or international law." Price v. Socialist People's Libyan Arab Jamahiriya, 384 F. Supp. 2d 120, 132 (D.D.C. 2005). As set forth below, once sovereign immunity has been pierced, a private individual may bring a federal cause of action against the foreign state as well as state common law and statutory causes of action.

II.     THE FACTS OVERWHELMINGLY ESTABLISH THAT DEFENDANTS ARE CIVILLY LIABLE FOR THEIR SUPPORT TO AND CONSPIRACY WITH THE TERRORISTS WHO CONDUCTED THE LABELLE DISCOTHEQUE BOMBING

The undisputed facts that establish Defendants' conspiracy with and assistance and support of the terrorists who bombed the LaBelle Discothèque themselves creates civil liability for Plaintiffs' injuries. Plaintiffs' statement of undisputed facts provides a record of Defendants' support for the bombing and firmly confirms Defendants' culpability for the resulting damages to Plaintiffs under both a conspiracy and aiding and abetting theory.

---

advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials.

18 U.S.C. § 2339A(b)(1).

Defendants are liable for aiding and abetting the bombing and all of the associated intentional torts, which caused all of Plaintiffs' injuries. Halberstam v. Welch is considered the seminal case on aiding and abetting liability:

> Aiding-abetting includes the following elements: (1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; (3) the defendant must knowingly and substantially assist the principal violation.

705 F.2d 472, 478 (D.C. Cir. 1983) (citing Investors Research Corp. v. SEC, 628 F.2d 168, 178 (D.C. Cir. 1980)). Defendants are clearly liable for the deaths and injuries caused by the La Belle Discotheque bombing under an aiding and abetting theory of liability. Defendants ordered, planned, organized and then provided critical material assistance to the terrorists who performed the bombing:

- The Libyan Embassy in East Berlin, Germany was ordered by the Libyan intelligence service in Tripoli, Libya to plan terrorist attacks against American installations in West Berlin. (Statement of Facts pg. 7-8).

- The Libyan intelligence service transported the bomb and other equipment for the bombing to the Libyan Embassy in East Berlin, Germany. (Statement of Facts pg. 8).

- The staff of the Libyan Embassy in East Berlin, Germany included members of the Libyan intelligence service. (Statement of Facts pg. 7).

- The staff of the Libyan Embassy in East Berlin planned and organized the bombing. Payments were made from the embassy to the actual terrorists who carried out the bombing. (Statement of Facts pg. 8).

- Telexes were exchanged between the Libyan Embassy in East Berlin, Germany and the Libyan intelligence service in Tripoli, Libya that documented the Libyan government's knowledge of the bombing prior to its execution. After the bombing, the Libyan Embassy instructed the Libyan intelligence service in Tripoli that the operation was a success. (Statement of Facts pg. 8-9, 10-13).

- Al-Qadhafi admitted Libya's role in the LaBelle bombing. (Statement of Facts pg. 8).

The sources upon which Plaintiffs rely in support of these allegations include, but are not limited to, the following: (1) sworn statements of David Long, Ph. D. and Ambassador Robert Oakley, former State Department officials who worked in the counter-terrorism bureau during the relevant time frame, (2) the German and English translation version of the records of the conviction of several of the terrorists in the German criminal court for their role in the bombing, (3) US government records regarding Libyan responsibility for the La Belle bombing and (4) sworn statements of the US Army commander of Berlin during the relevant time frame, and his subordinate. As these sources confirm, the LaBelle discotheque bombing was planned, ordered and supported by Libya, committed by individuals and organizations that were agents of Libya, following Libya's commands. Plaintiffs' evidence overwhelmingly demonstrates that Libya provided direct, material and actual support and resources for the purpose of the bombing.

Libya is also liable under a conspiracy theory for its joint planning and execution of the bombing plot. Halberstam v. Welch also provides the framework for civil conspiracy liability:

> the separate elements of civil conspiracy includes: (1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act in an unlawful manner; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; (4) which overt act was done pursuant to and in furtherance of the common scheme.

705 F.2d 472, 477 (D.C. Cir. 1983). In this case, Defendants ordered, planned, organized and supported the bombing of the La Belle Discotheque. The scope of Defendants' liability will be established by Plaintiffs' federal and state law causes of action.

### III. THE NATIONAL DEFENSE AUTHORIZATION ACT OF 2008 PROVIDES FOR A FEDERAL STATUTORY PRIVATE RIGHT OF ACTION TO PLAINTIFFS AGAINST DEFENDANTS

The new law has codified a federal statutory right to a uniform set of damages for claimants in lawsuits brought under 28 U.S.C. § 1605A(c):

> Private Right of Action- A foreign state that is or was a state sponsor of terrorism as described in subsection (a)(2)(A)(i), and any official, employee, or agent of that foreign state while acting within the scope of his or her office, employment, or agency, shall be liable to--
> `(1) a national of the United States,
> `(2) a member of the armed forces,
> `(3) an employee of the Government of the United States, or of an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment, or
> `(4) the legal representative of a person described in paragraph (1), (2), or (3),
> for personal injury or death caused by acts described in subsection (a)(1) of that foreign state, or of an official, employee, or agent of that foreign state, for which the courts of the United States may maintain jurisdiction under this section for money damages. In any such action, damages may include economic damages, solatium, pain and suffering, and punitive damages. In any such action, a foreign state shall be vicariously liable for the acts of its officials, employees, or agents.

As seen above, the scope of available damages includes punitive damages. This federal statutorily-based cause of action with a uniform standard of damages is now available to each plaintiff who suffered a personal injury or for the estate of those who were murdered.

The statutory prerequisites for the use of the federal cause of action include a requirement that the "foreign state that is or was a state sponsor of terrorism as described in subsection (a)(2)(A)(i)". 28 U.S.C. § 1605A(c). The sovereign defendants were properly listed as a state sponsor of terrorism at the time of the bombing. The statute creates liability for such a state to a US national who has suffered a personal injury or

15

death or to the US national's legal representative.  Plaintiffs are two US nationals who suffered a personal injury during the bombing.

A foreign state is liable for "for personal injury or death caused by acts described in subsection (a)(1) of that foreign state . . . ."  Subsection (a)(1) includes the following acts:  "act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act . . . ."  28 U.S.C. § 1605A.  Plaintiffs have shown that the defendant foreign sovereigns provided material support for the extrajudicial killings and attempted extrajudicial killings that occurred at the LaBelle Discothèque.  The Defendant foreign sovereigns are therefore liable to plaintiffs under the federal cause-of-action for the resulting personal injuries.

## IV.  THE LAW OF THE PLAINTIFFS' DOMICILE AT THE TIME OF THE ATTACK ALSO PROVIDES A CAUSE-OF-ACTION AGAINST DEFENDANTS

In addition to the new federal cause of action, claimants may still maintain their state law causes of action, as were available under 28 U.S.C. § 1605(a)(7).  The subject matter jurisdiction provision contained within the FSIA strips the foreign state's immunity, thereby allowing the assertion of state law causes of action against the foreign state.  See e.g., Nikbin v. Islamic Republic of Iran, 517 F. Supp. 2d 416, 426 (D.D.C. 2007).  The next question to be answered is which state's law should be utilized.

The statutory language of the FSIA compels the usage of the same choice-of-law provisions as would be used in litigation against a private party, rather than a foreign state.  28 U.S.C. § 1606.  The District of Columbia, the forum state here, utilizes choice-of-law principles that analyze the "'governmental interests', under which [the court] evaluate[s] the governmental policies underlying the applicable laws and determine[s]

16

which jurisdiction's policy would be more advanced by the application of its law to the facts of the case under review." District of Columbia v. Coleman, 667 A.2d 811, 816 (D.C. 1995).

The law of the forum, the District of Columbia, therefore provides the operative choice-of-law analysis for this case. E.g., Peterson v. Islamic Republic of Iran, 2007 U.S. Dist. LEXIS 65820 at *5 (D.D.C. 2007). The District of Columbia choice-of-law rules employ "a refined government interest analysis under which courts 'evaluate the governmental policies underlying the applicable laws and determine which jurisdiction's policy would be most advanced by having its law applied to the facts of the case under review.'" Id. (citing to Hercules & Co. v. Shama Rest. Corp., 566 A.2d 31, 41 (D.C. 1989)). The recent decisions that have analyzed the application of the D.C. choice-of-law rules to cases brought under 28 U.S.C. § 1605(a)(7) have routinely drawn upon the state common law of the plaintiff's domicile at the time of the attack. E.g., Damarrell v. Islamic Republic of Iran, 2005 U.S. Dist. LEXIS 5343 at **57-67 (D.D.C. March 29, 2005). Plaintiffs' decedent's domicile at the time of the attack was the State of Georgia.

Each plaintiff may assert a state cause-of-action in addition to the federal cause of action under the new law. The state cause of action for the estate of the injured US nationals will be provided by the domicile of his residence at the time of the attack. Id. at *67-68. Plaintiffs suffered physical injuries from the assault and battery caused by the intentional acts of Defendants, as well as severe emotional injuries.

The Defendants are liable for intentional infliction of emotional distress upon Plaintiffs through conduct which was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious,

17

and utterly intolerable in a civilized community."  Abourezk v. New York Airlines, Inc., 895 F.2d 1456, 1459 (D.C. Cir. 1990).  There are few acts that fit the definition of extreme and outrageous conduct as completely and perfectly as the deliberate and willful execution of a plot to detonate explosives among hundreds of innocent persons.  The Defendants intended to terrorize and thereby emotionally injure those injured in the bombing as surely as they intended to murder anyone at the LaBelle discotheque:

> As a general rule, to state a claim for intentional infliction of emotional distress, the outrageous and extreme conduct must be directed at the plaintiff, although there may also be a cause of action when the conduct causes severe emotional distress "'to a member of such person's immediate family who is present at the time.'" See Green v. Chicago Tribune Co., 286 Ill. App. 3d 1, 675 N.E.2d 249, 257-58, 221 Ill. Dec. 342 (Ill. 1st Dist. 1996) (quoting Restatement (Second) of Torts § 46(2)(a)). Courts have uniformly held that a terrorist attack -- by its nature -- is directed not only at the victims but also at the victims' families. See Burnett v. Al Baraka Inv. and Dev. Corp., 274 F. Supp. 2d 86, 10[8] (D.D.C. 2003) ("A terrorist attack on civilians is of course intended to cause emotional distress to the victims' families."); Jenco v. Islamic Republic of Iran, 154 F. Supp. 2d 27, 35 (D.D.C. 2001) ("'If the defendants' conduct is sufficiently outrageous and intended to inflict severe emotional harm upon a person which is not present, no essential reason of logic or policy prevents liability.'"). In this case, the evidence demonstrates that defendant's campaign of attacks against Westerners was intended not only to harm the victims, but to instill terror in their loved ones and others in the United States. See Dammarell, 281 F. Supp. 2d at 109-113.

Salazar v. Islamic Republic of Iran, 370 F. Supp. 2d 105, 115 (D.D.C. 2005).  The raison d'etre of an act of terrorism is to terrorize innocent civilians with acts of horrifying and mind-numbing brutality.  As a direct and proximate consequence of the actions of the Defendants, as aforesaid, Plaintiffs suffered severe emotional injuries as a result of the outrageous and intentional conduct of the defendants resulting in great pain and emotional trauma and suffering following the attack

The full extent of Plaintiffs' injuries should be explored in briefing and a hearing on Plaintiffs' causes-of-action and the extent of their damages.

## CONCLUSION

For the reasons set forth above and in Plaintiffs' Rule 56.1 Statement of Undisputed Facts, Plaintiffs respectfully request the Court grant their Motion for Partial Summary Judgment as to Liability and set a briefing schedule for the Parties' arguments as to the choice-of-law for the substantive causes of action and damages.

March 12, 2008                                              Respectfully submitted,

                                                            /s/ *Steven R. Perles*

                                                            Steven R. Perles      (D.C. Bar# 326975)
                                                            Edward MacAllister    (D.C. Bar# 494558)
                                                            Perles Law Firm, PC
                                                            1146 19th Street, NW
                                                            Suite 500
                                                            Washington, DC 20036
                                                            202.955.9055
                                                            202.955.3806 (facsimile)