# EXHIBIT 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ROBERT LEE BEECHAM, et al.

        Plaintiffs

        v.

SOCIALIST PEOPLE'S LIBYAN
ARAB JAMAHIRIYA, et al.

        Defendants

Civil Action No. 01-2243
(RWR)

## DECLARATION OF ANDREAS SCHULZ

I, Andreas Schulz, hereby affirm and swear as follows:

1. I am over 18 years of age and have personal knowledge of the following facts:

2. I am a practicing attorney admitted to practice in the Federal Republic of Germany.

3. German is my native language and I am also fluent in English.

4. The criminal case against Yasser Mohamed Chraidi, et al., Reference Number: (539) 1 Js2/92 KLs (8/97), was tried from November 18, 1997 to November 13, 2001 before the Berlin District Court. I appeared as counselor for plaintiffs Harald Mirosch, et al.

5. Attached to this Declaration are authentic copies of the following:

2

- Verdict and factual findings of the Berlin District Court in the criminal case against Yasser Mohamed Chraidi, et al, Reference Number: (539) 1 Js2/92 KLs (8/97), November 13, 2001.

- Confession of defendant Musbah Abulgasem Eter, September 10, 1996, the contents of which were placed before the Court through Eter's testimony in the criminal case against Yasser Mohamed Chraidi, et al.

- Confession of defendant Musbah Abulgasem Eter, October 16, 1996, the contents of which were placed before the Court through Eter's testimony in the criminal case against Yasser Mohamed Chraidi, et al.

- Cable communication from German Ambassador to the United States, March 31, 2001, of which the contents dealing MD Steiner's talks in Libya with Gaddafi were admitted into evidence in the criminal case against Yasser Mohamed Chraidi, et al.

- Intercepted Libyan cable communications, March 25, 1986-April 5, 1986, admitted into evidence in the criminal case against Yasser Mohamed Chraidi, et al.

- Arrest Warrant for defendant Said Rashid, et al.

6.    I have also reviewed the attached English translation of the documents identified in paragraph 5.  To the best of my knowledge and ability, the English translation is a true and accurate translation from German into English.

3

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on _Octbr 5, 2007_

Andreas Schulz

# EXHIBIT 1(a)

# The Language Link of Connecticut

Translation, DTP and Foreign Language Typesetting

I hereby certify to the best of my knowledge and ability that the 40 English pages are a true and accurate translation from German to English of the 40 pages of German court texts. The translated pages are on The Language Link of Connecticut letterhead and the German pages which were faxed to us are printed on the reverse.

The translations were performed by translators qualified by experience and education to perform the translation and were proofread and reviewed at the Language Link of Connecticut.

_____     9-28-07
Ana Burr                    Date
Translation Department Project Coordinator
The Language Link of Connecticut

_____     Sept 28 2007
Notary Public               Date

ANDREAS F. WERNER
NOTARY PUBLIC
MY COMMISSION EXPIRES NOV. 30, 2011

6

# *The Language Link of Connecticut*

Translation, DTP and Foreign Language Typesetting

Copy of Page /
~~Notarized Transcript~~



BERLIN DISTRICT COURT

In the Name of the People

Reference Number: 539) 1 Js 2/92 KLs (8/97) .

Criminal Case

A g a i n s t:          1. <u>Yasser</u> Mohamed C h r a i d i ,
Born September 9, 1959 in Ain El Helweh/Lebanon
Stateless Palestinian,
Also known as Youssef Salam,
Born 1953 in Tobrak/Libya,
Libyan Citizenship,
Alias Abdul Salam Bachir Mokh,
Born 1956 in Bruitel, Lebanon,
Lebanese Citizenship,
Currently in the Moabit Penal Facility,
Prisoner ID Nr. 246/96-2,

2. Ali Chanaa,
Born April 18, 1959 in Ain El Helweh, Lebanon,
currently in the Moabil Penal Facility,
Prisoner ID Nr. 4826/96-6,

3. <u>Verena</u> Helga Chanaa Nee Hampel,
Born January 8, 1959 in Berlin,
currently in the Berlin Penal Facility for Women in Berlin,
Prisoner ID  Nr. 652/96.

354 Main Street, Suite 8, Newington, CT  06111  •  860-561-5438  •  fax 425-988-7688
www.aptranslation.com  •  languagelink@cox.net

Ausfertigung /
~~Beglaubigte Abschrift~~



# LANDGERICHT BERLIN

## Im Namen des Volkes

Geschäftsnummer:   (539) 1 Js 2/92 KLs (8/97)

### Strafsache

gegen        1. <u>Yasser</u> Mohamed C h r a i d i ,
             geboren am 8. September 1959 in Ain El Helweh/Libanon,
             staatenloser Palästinenser,
             alias Youssef Salam,
             geboren 1953 in Tobrak/Libyen,
             libyscher Staatsbürger,
             alias Abdul Salam Bachir Mokh,
             geboren 1956 in Bruitel/Libanon,
             libanesischer Staatsbürger,
             zurzeit in der Justizvollzugsanstalt Moabit,
             Gef.B.Nr. 246/96-2,

             2. Ali C h a n a a ,
             geboren am 18. April 1959 in Ain El Helweh/Libanon,
             zurzeit in der Justizvollzugsanstalt Moabit,
             Gef.B.Nr. 4626/96-6,

             3. <u>Verena</u> Helga C h a n a a
             geborene Hampel,
             geboren am 8. Januar 1959 in Berlin,
             zurzeit in der Justizvollzugsanstalt für Frauen in Berlin,
             Gef.B.Nr. 652/96,

8

2

4. Musbah Omar Abulgasem E t e r ,
geboren am 17. Februar 1957 in Tripolis/Libyen,
Libyer,
zurzeit in der Justizvollzugsanstalt Moabit,
Gef.B.Nr. 4466/97,

5. Andrea  H ä u s l e r
geborene Hampel,
geboren am 14. April 1965 in Berlin,
wohnhaft in 12215 Berlin, Hauptstraße 74,

w e g e n          Mordes u. a.

Die 39. große Strafkammer - Jugendkammer - des Landgerichts Berlin hat in der vom

18. November 1997 bis 13. November 2001 andauernden Hauptverhandlung, an der teilge-

nommen haben:

Vorsitzender Richter am Landgericht Marhofer
als Vorsitzender,

Richterin am Landgericht Heinen,
Richter am Landgericht Th. Groß
als beisitzende Richter,

Schlosser Frank Lange,
Erzieherin Angela Dobroschelski
als Jugendschöffen,

Oberstaatsanwalt Mehlis,
Oberstaatsanwalt Harder,
Staatsanwalt Hahne,
Oberstaatsanwalt Reusch,
leitender Oberstaatsanwalt Feißel,
Generalstaatsanwalt beim Kammergericht Neumann,
Staatsanwalt Neifer,
als Beamte der Staatsanwaltschaft,

Rechtsanwalt Kolloge,
Rechtsanwalt Dr. Lammer,
Rechtsanwalt Ströbele
als Verteidiger des Angeklagten Chraidi,

Rechtsanwalt Portius,
Rechtsanwalt Kaup,
Rechtsanwalt Schwarzmann
als Verteidiger des Angeklagten Ali Chanaa,

9

# *The Language Link of Connecticut*

Translation, DTP and Foreign Language Typesetting

**3**

Attorney Gräfin von Galen,
Attorney Krumbein
As Counselor for the Defense Verena Chanaa,

Attorney Lischewski,
Attorney Reich.
Attorney Dr. Klüsener,
Attorney Becker-Flügel,
Attorney Heinemann as Defender of the Accused, Eter,

Attorney Spangenberg,
Attorney Wurdinger
As Counselor for the Defense Häusler,,

Attorney Friedenstab
As counselor for the joint plaintiff Allen

Attorney Wagenführ
As counselor for the joint plaintiff Breuer,

Attorney Just
As counselor for the joint plaintiff Dahlke.

Attorney Dr. Lehnert:
As counselor for the joint plaintiff Flemming,

Attorney Ehrig
As counselor for the joint plaintiff di Nunno, Möhring, Kanja, Edris, Monika Negraschus, Illona Negraschus, Becker, Laube,

Attorney Maigne
As counselor for the joint plaintiff Grange, Freiwald, Mason, Bahadori, El-Ahmar, Pflantz, Marzinckak,

Attorney Kaleck,
As counselor for the joint plaintiff Schneider,

Attorney Schulz
As counselor for the joint plaintiff Mirosch, Pöhlchen, Spencer, Alfred E, Jackson, Young, Wilson, Gantke, Simic, Alice Faye Ford, Beecham, Rambo,

Attorney Lodowicks
As counselor for the joint plaintiff Gehrick and Cedano,,

Attorney Laistikow
As counselor for the joint plaintiff Seiler, Göttert, Kantorowicz, Politowski, Hill, Winzer-Davis, Fischer, Verrett,

Attorney Hodok
As counselor for the joint plaintiff George, Henry Carl Smith, Hamila, Bernstein, Pierce, Simpson, Todorovic, Meier,

354 Main Street, Suite 8, Newington, CT 06111 • 860-561-5438 • fax 425-988-7688
www.aptranslation.com • languagelink@cox.net

10

3

Rechtsanwältin Gräfin von Galen,
Rechtsanwältin Krumbein
als Verteidigerinnen der Angeklagten Verena Chanaa,

Rechtsanwalt Lischewski,
Rechtsanwalt Reich,
Rechtsanwalt Prof. Dr. Klüsener,
Rechtsanwalt Becker-Flügel,
Rechtsanwalt Heinemann
als Verteidiger des Angeklagten Eter,

Rechtsanwalt Spangenberg,
Rechtsanwältin Würdinger
als Verteidiger der Angeklagten Häusler,

Rechtsanwalt Friedenstab
als Vertreter der Nebenklägerin Allen,

Rechtsanwalt Wagenführ
als Vertreter der Nebenklägerin Breuer,

Rechtsanwalt Just
als Vertreter der Nebenklägerin Dahlke,

Rechtsanwältin Dr. Lehnert
als Vertreterin der Nebenklägerin Flemming,

Rechtsanwalt Ehrig
als Vertreter der Nebenkläger di Nunno, Möhring, Kanja, Edris, Monika Negraschus, Ilona
Negraschus, Becker, Laube,

Rechtsanwalt Maigné
als Vertreter der Nebenkläger Grange, Freiwald, Mason, Bahadori, El-Ahmar, Pflantz, Mar-
zinzcak,

Rechtsanwalt Kaleck
als Vertreter des Nebenklägers Schneider,

Rechtsanwalt Schulz
als Vertreter der Nebenkläger Mirosch, Pöhlchen, Spencer, Alfred E. Jackson, Young, Wil-
son, Gantke, Simic, Alice Faye Ford, Beecham, Rambo,

Rechtsanwalt Lodowicks
als Vertreter der Nebenklägerinnen Gehrick und Cedano,

Rechtsanwalt Leistikow
als Vertreter der Nebenklägerinnen Seiler, Göttert, Kantorowicz, Politowski, Hill, Winzer-
Davis, Fischer, Verrett,

Rechtsanwalt Hodok
als Vertreter der Nebenkläger George, Henry Carl Smith, Hamila, Bernstein, Pierce, Simp-
son, Todorovic, Meier,

# The Language Link of Connecticut
Translation, DTP and Foreign Language Typesetting

4

Attorney Ploger
As counselor for the joint plaintiff Brooks, Ruhm,,

Attorney Karnetzki
As counselor for the joint plaintiff Stumpe-Kamara, Noos,

Attorney Müller
As counselor for the joint plaintiff Gerry Steve Smith, Gerald Ford, Jefferson, Sailor, Schade, Sominka, Gaines,

Attorney Schirmack
As counselor for the joint plaintiff Sims, White, Carlos Goins, Patrocinia Goins, Dames, Lorenz Grundmann-Green, Rodriguez

Attorney Neutee
As counselor for the joint plaintiff Gabriele Hornung, Peter Hornung, El-Fata,

Attorney Kötke
As counselor for the joint plaintiff Hafermalz, Bütow, Bluhm, Silvia Brigitte Lehmann, Uwe Lehmann, Güleç, Cynthia Klug, Mauren Klug

Attorney Bauer
As counselor for the joint plaintiff Oman, Mamat, Bingöl, Howell, Vieillard, Trowers,

Attorney Westphal
As counselor for the joint plaintiff Mahmood, Johnson, Chambers,,

Attorney Straubel
As counselor for the joint plaintiff Euring,.

Attorney Borck
As counselor for the joint plaintiff Redd and McCoy,

Attorney Graner
As counselor for the joint plaintiff Baczynski,,

Attorney Meyer
As counselor for the joint plaintiff Bell, Lawrenz,

Attorney Groh
As counselor for the joint plaintiff Lankisch, Jacobs, Jacobsohn,

Attorney Gräfin zu Castell-Castell
As counselor for the joint plaintiff Stephan, Wells, David Todd Jackson and Porteous,

Attorney Duvendack
As counselor for the joint plaintiff Mohammad,

Attorney Wolff
As counselor for the joint plaintiff Dickey, Dursun, Stilt-Elcin,

Attorney Möller
As counselor for the joint plaintiff Mansco,

354 Main Street, Suite 8, Newington, CT  06111 • 860-561-5438 • fax 425-988-7688
www.aptranslation.com • languagelink@cox.net

12

4

Rechtsanwalt Plöger
als Vertreter der Nebenkläger Brooks, Rühm,

Rechtsanwalt Karnetzki
als Vertreter der Nebenklägerinnen Stumpe-Kamara, Noos,

Rechtsanwalt Müller
als Vertreter der Nebenkläger Gerry Steve Smith, Gerald Ford, Jefferson, Sailor, Schade,
Sominka, Gaines,

Rechtsanwalt Schirmack
als Vertreter der Nebenkläger Sims, White, Carlos Goins, Patrocinia Goins, Dames, Lorenz
Grundmann-Green, Rodriguez,

Rechtsanwalt Neutze
als Vertreter der Nebenkläger Gabriele Hornung, Peter Hornung, El-Fata,

Rechtsanwalt Kötke
als Vertreter der Nebenkläger Hafermalz, Bütow, Bluhm, Silvia Brigitte Lehmann, Uwe Leh-
mann, Gülec, Cynthia Klug, Mauren Klug,

Rechtsanwalt Bauer
als Vertreter der Nebenkläger Orhan, Mamat, Bingöl, Howell, Vieillard, Trowers,

Rechtsanwältin Westphal
als Vertreterin der Nebenkläger Mahmood, Johnson, Chambers,

Rechtsanwältin Straubel
als Vertreterin des Nebenklägers Euring,

Rechtsanwältin Borck
als Vertreterin der Nebenklägerinnen Redd und Mc Coy,

Rechtsanwalt Graner
als Vertreter der Nebenklägerin Baczynski,

Rechtsanwalt Meyer
als Vertreter der Nebenkläger Bell, Lawrenz,

Rechtsanwalt Groh
als Vertreter der Nebenkläger Lankisch, Jacobs, Jacobsohn,

Rechtsanwältin Gräfin zu Castell-Castell
als Vertreterin der Nebenkläger Stephan, Wells, David Todd Jackson und Porteous,

Rechtsanwalt Duvendack
als Vertreter des Nebenklägers Mohammad,

Rechtsanwältin Wolff
als Vertreterin der Nebenkläger Dickey, Dursun, Stilt-Eloin,

Rechtsanwalt Möller
als Vertreter der Nebenklägerin Mansco,

# The Language Link of Connecticut

Translation, DTP and Foreign Language Typesetting

**5**

Attorney Theobaldt
As counselor for the joint plaintiff Rotter,

Clerk of the Court Görlach,
Senior Clerk of the Court Fischer,
As Clerk of the Court for the Branch Office.

in the session on November 13, 2001
the 39th large chamber – juvenile chamber – of the Regional Court Berlin has reached the following
verdict:

The defendant Verena Chanaa is convicted of the concurrently committed triple murders with concurrently
committed 104 count attempted murder and further concurrent premeditatedly detonating explosives, to a
prison term of:

Fourteen (14) years

**Convicted.**

The defendant Chraidi is convicted of the abetment on the concurrently committed triple murders with
abetment on concurrently committed 104 count attempted murder and further abetment on concurrent
premeditatedly detonating explosives, to a prison term of:

Fourteen (14) years

**Convicted.**

The defendants Ali Chanaa and Eter are convicted of the abetment on the concurrently committed triple
murders with abetment on concurrently committed 104 count attempted murder and further abetment on
concurrent premeditatedly detonating explosives, to a prison term of:

Twelve (12) years

**Convicted.**

The detention for the purpose of extradition suffered up to April 30, 1994 may be applied to the prison
term imposed on the defendant Chraidi at a ratio of 1:3 and the detention for the purpose of extradition
suffered since May 1, 1994 at a ratio of 1:2.

The detention suffered for the purpose of extradition is applied to the prison term of the defendant Eter at a
ratio of 1:1.

354 Main Street, Suite 8, Newington, CT 06111 • 860-561-5438 • fax 425-988-7688
www.aptranslation.com • languagelink@cox.net

14

5

Rechtsanwalt Theobaldt
als Vertreter der Nebenklägerin Rotter,

Justizsekretärin Görlach,
Justizobersekretärin Fischer
als Urkundsbeamte der Geschäftsstelle,

in der Sitzung am 13. November 2001

für R e c h t  erkannt:

Die Angeklagte Verena Chanaa wird wegen tateinheitlich begangenen dreifachen
Mordes in Tateinheit mit tateinheitlich begangenem 104-fachen versuchten Mord
und weiterer Tateinheit mit vorsätzlichem Herbeiführen einer Sprengstoff-
explosion zu einer Freiheitsstrafe von

14 (vierzehn) Jahren

verurteilt.

Der Angeklagte Chraidi wird wegen Beihilfe zum tateinheitlich begangenen drei-
fachen Mord in Tateinheit mit Beihilfe zum tateinheitlich begangenen 104-fachen
versuchten Mord und weiterer Tateinheit mit Beihilfe zum vorsätzlichen Herbeiführ-
ren einer Sprengstoffexplosion zu einer Freiheitsstrafe von

14 (vierzehn) Jahren

verurteilt.

Die Angeklagten Ali Chanaa und Eter werden wegen Beihilfe zum tateinheitlich
begangenen dreifachen Mord in Tateinheit mit Beihilfe zum tateinheitlich began-
genen 104-fachen versuchten Mord und weiterer Tateinheit mit Beihilfe zum vor-
sätzlichen Herbeiführen einer Sprengstoffexplosion jeweils zu einer Freiheitsstra-
fe von

12 (zwölf) Jahren

verurteilt.

Auf die gegen den Angeklagten Chraidi verhängte Freiheitsstrafe wird gegebe-
nenfalls bis zum 30. April 1994 erlittene Auslieferungshaft im Verhältnis 1:3 und
gegebenenfalls seit dem 1. Mai 1994 erlittene Auslieferungshaft im Verhältnis 1:2
angerechnet.

Auf die gegen den Angeklagten Eter verhängte Freiheitsstrafe wird erlittene Aus-
lieferungshaft im Verhältnis 1:1 angerechnet.

15

# The Language Link of Connecticut

Translation, DTP and Foreign Language Typesetting

6

The defendant Häusler is acquitted.

The treasury is obligated to compensate the defendant Häusler for the execution of detention for the purpose of extradition and pre-trial detention from October 10, 1996 to January 6, 2000 as well as for the execution of a resolution of clemency for imprisonment by the courts distributed directives on January 6, 2000 as a reporting obligation and regarding residency constraints.

To the extent that they are convicted, the defendants carry the costs of the proceedings and the necessitated outlays of the joint plaintiffs.

To the extent that acquittal is involved, the originating costs of the proceedings and those of the defendant Häusler accrue as necessary outlays by the treasury.

Applicable Penal Provisions:

- Re: Verena Channa:
§§ 211, 22, 23 Abs. 1, 25 Abs. 2, 311 Abs. 1 und 3 StGB a. F., 52 StGB n. F.;
- Re: Chraidi:
§§ 211, 22,23 Abs. 1,27,311 Abs. 1 und 3 StGB a.R, 52 StGB n. F.;
- Re: Ali Chanaa:
§§ 211, 22, 23 Abs. 1, 27, 311 Abs. 1 und 3 StGB a.F., 52 StGB n. F.;
- Re: Eter:
§§ 211, 22, 23 Abs. 1, 27, 311 Abs. 1 und 3 StGB a. F., 52 StGB n.

354 Main Street, Suite 8, Newington, CT 06111 • 860-561-5438 • fax 425-988-7688
www.aptranslation.com • languagelink@cox.net

6

Die Angeklagte Häusler wird f r e i g e s p r o c h e n.
Die Staatskasse ist verpflichtet, die Angeklagte Häusler für den Vollzug der Aus-
lieferungs- und Untersuchungshaft vom 10. Oktober 1998 bis zum 6. Januar 2000
sowie für den Vollzug der mit Haftverschonungsbeschluss der Kammer vom 6.
Januar 2000 erteilten Anweisungen zur Meldepflicht und Aufenthaltsbeschrän-
kung zu entschädigen.

Die Angeklagten, soweit sie verurteilt sind, tragen die Kosten des Verfahrens und
die notwendigen Auslagen der Nebenkläger.
Soweit Freispruch ergangen ist, fallen die Kosten des Verfahrens und die der
Angeklagten Häusler entstandenen notwendigen Auslagen der Staatskasse zur
Last.

Angewendete Strafvorschriften:

- bezüglich Verena Chanaa:
  §§ 211, 22, 23 Abs. 1, 25 Abs. 2, 311 Abs. 1 und 3 StGB a. F., 52 StGB n. F.;
- bezüglich Chraidi:
  §§ 211, 22, 23 Abs. 1, 27, 311 Abs. 1 und 3 StGB a.F., 52 StGB n. F.;
- bezüglich Ali Chanaa:
  §§ 211, 22, 23 Abs. 1, 27, 311 Abs. 1 und 3 StGB a.F., 52 StGB n. F.;
- bezüglich Eter:
  §§ 211, 22, 23 Abs. 1, 27, 311 Abs. 1 und 3 StGB a. F., 52 StGB n. F.;

# *The Language Link of Connecticut*

Translation, DTP and Foreign Language Typesetting

238

### 6 Provisional Result

After everything, the court came to the conclusion, with one exception, that the bomb was put together on the evening of April 4, 1986 in the Lindenstrasse apartment, and considering Al Channas statement later statement, and after further examination, was not of the inclination to give advantage to either one of the statements from Ali Channa or Eter preference,

The court has therefore finally supported their determinations to the "smallest common denominator" of this statement, as long as additional evidence does not change the considered opinion of the court.

The statements of defendants could not be the basis of a more certain determination, but also to convincement of the court, but are also not refuted to the convincement of the court, so that insofar as the precept "in dubio pro reo" (Give the defendant the benefit of the doubt) was one of the more beneficial variants to emerge for the particular defendants.

The disclosure application of the joint plaintiff counselor, attorney Plöger, attorney Lodowicks and attorney Hodok on 10/11/2001 upon recovery of a "plausibility opinion" for the event that the court does not hold as credible one or both statements of the defendants Eter and Ali Chanaa in the core area, the court refuses in accordance with § 244 Paragraph 4 Sentence 1 StPO, since the court possesses the required knowledge itself.

### 2. Individual Legal Consideration

### a) Historical Background / Role of the Libyan State

The determinations for the historical background of the act – the conflicts between the USA and Libya in early 1986 – touch every person with accessible information sources, and they are thereby generally well known. Additionally, they have also been confirmed by the defendants Eter and Ali Chanaa, as well as diverse witnesses to various degrees. Among others are the witnesses, Ernst, Klopsen and AK Shadban.

238

### d) Zwischenergebnis

Nach alledem sah sich die Kammer - mit einer Ausnahme bezogen auf die Feststellung, dass die Bombe am Abend des 4. April 1986 in der Wohnung Lindenstraße zusammengesetzt wurde, hinsichtlich der sie Ali Chanaas Einlassung gefolgt ist, worauf noch näher einzugehen sein wird - nicht in der Lage, einer der Einlassungen von Ali Chanaa bzw. Eter den Vorzug zu geben.

Die Kammer hat daher letztlich ihre Feststellungen auf den „kleinsten gemeinsamen Nenner" dieser Einlassungen gestützt, soweit nicht durch weitere Beweismittel eine Einlassung eines Angeklagten zur Überzeugung des Gerichts bestätigt wurde.

Hierbei konnten an vielen Stellen die Einlassungen der Angeklagten zwar nicht Grundlage sicherer Feststellungen, aber auch zur Überzeugung der Kammer nicht widerlegt werden, so dass insoweit nach dem Grundsatz "in dubio pro reo" von der jeweils günstigeren Variante für den jeweiligen Angeklagten auszugehen war.

Den Hilfsbeweisantrag der Nebenklägervertreter Rechtsanwalt Plöger, Rechtsanwalt Lodowicks und Rechtsanwalt Hodek vom 11. Oktober 2001 auf Einholung eines „Glaubhaftigkeitsgutachtens" für den Fall, dass das Gericht eine oder beide Aussagen der Angeklagten Eter und Ali Chanaa im Kernbereich nicht für glaubhaft hält, lehnt die Kammer gemäß § 244 Abs. 4 Satz 1 StPO ab, da das Gericht insoweit die erforderliche Sachkunde selbst besitzt.

### 2. Einzelwürdigung

### a) Historischer Hintergrund / Rolle des libyschen Staates

Die Feststellungen zum historischen Hintergrund der Tat - den Auseinandersetzungen zwischen den USA und Libyen im Frühjahr 1986 - beruhen auf jedermann zugänglichen Informationsquellen und sind damit allgemeinkundig. Sie sind im Übrigen auch von den Angeklagten Eter und Ali Chanaa sowie diversen Zeugen in Teilaspekten, so unter anderem von den Zeugen Ernst, Klopsch und Al-Ghadban bestätigt worden.

# The Language Link of Connecticut

Translation, DTP and Foreign Language Typesetting

239

aa) Active persons at that time at LVB (Libyan Volksburo – Libyan Embassy)

The assessments regarding the active persons at LVB at that time touch particularly upon the statements of the defendant Eter, as well as the defendant Ali Chainaa that widely support the statements of Eters.

Additionally, the witnesses heard by a Libyan judge confirmed that Keshlaf and Elamin at least claimed to have been active as diplomats during the time frame in question at LVB. Senior prosecutor Mehlis, who was present at these examinations, expressed credibly on the content of the witnesses in Libya of the following credible statements.

The witness Elamin clarified that he had been active in the Propaganda Department, while Keshlaf affirmed to have led the consular department. However, both witnesses had denied their membership in the Libyan Secret Service. The court is convinced that it dealt with the final statements regarding improper attempts to justify their behavior.

After the statement from senior prosecutor Mehlis, Elamin testified of a secret resident at LVB who was not known to him, he didn't even know of the secret service - Keshlaf stated that no such resident was at LVB. The witness Said Rashed even clarified in a grotesque manner that it would have been a scandal had there been a secret service resident at LVB. To the conviction of the court, all this refutes the credible statements of the defendants Eter and Ali Chanaa that also had been confirmed by the statements of the MfS witnesses.

The witnesses Ernst, Maschkeund, and Dr. Stuchly consistently confirm, according to their recollection at the time, that they not only touch upon the statements of Ali Chanaas, but that a secret service resident had been firmly established, whose leader in early 1986 had been Keshlaf. In this connection, the witness Haschke, had also obtained information from the head office reconnaissance (HVA), that the persons who work in the consular field of LVB, have been assigned to the secret service.

354 Main Street, Suite 8, Newington, CT  06111 • 860-561-5438 • fax 425-988-7688
www.aptranslation.com • languagelink@cox.net

20

239

### aa) Am LVB seinerzeit tätige Personen

Die Feststellungen zu den am LVB damals tätigen Personen beruhen insbesondere auf den Angaben des Angeklagten Eter sowie den Angaben des Angeklagten Ali Chanaa, die die Angaben Eters weitgehend stützen.

Im Übrigen haben die in Libyen durch einen libyschen Richter gehörten Zeugen Keshlaf und Elamin zumindest bestätigt, im fraglichen Zeitraum am LVB als Diplomaten beschäftigt gewesen zu sein, was Oberstaatsanwalt Mehlis, der bei diesen Vernehmungen anwesend war, glaubhaft bekundet hat. Oberstaatsanwalt Mehlis hat zum Inhalt der Zeugenaussagen in Libyen des Weiteren folgendes glaubhaft bekundet:

Der Zeuge Elamin habe erklärt, er sei in der „Propaganda-Abteilung" tätig gewesen, während Keshlaf bestätigt habe, die konsularische Abteilung geleitet zu haben.

Beide Zeugen hätten aber ihre Mitgliedschaft im libyschen Geheimdienst verneint. Das Gericht ist überzeugt, dass es sich bei letzteren Aussagen um unzutreffende Schutzbehauptungen gehandelt hat.

Nach der Aussage von Oberstaatsanwalt Mehlis hat Elamin in dem Zusammenhang erklärt, von einer Geheimresidentur am LVB sei ihm nichts bekannt, er kenne nicht einmal den Geheimdienst. Keshlaf habe erklärt, am LVB habe es eine solche Residentur nicht gegeben. Der Zeuge Said Rashed habe sogar in grotesker Art und Weise erklärt, es wäre ein Skandal gewesen, wenn es eine Geheimdienstresidentur am LVB gegeben hätte.

All dies ist zur Überzeugung der Kammer nach den glaubhaften Angaben der Angeklagten Eter und Ali Chanaa, die auch durch die Angaben der MfS-Zeugen bestätigt worden sind, widerlegt.

So haben die Zeugen Ernst, Haschke und Dr. Stuchly übereinstimmend bestätigt, nach ihren damaligen Erkenntnissen, die insoweit nicht nur auf den Angaben Ali Chanaas beruhten, sei am LVB eine Geheimdienstresidentur verankert gewesen, deren Leiter im Frühjahr 1986 Keshlaf gewesen sei. In dem Zusammenhang hat der Zeuge Haschke ausgeführt, sie hätten diese Informationen auch von der Hauptverwaltung Aufklärung (HVA) erhalten, wie im Übrigen auch die Information, dass die Personen, die im konsularischen Bereich des LVB arbeiteten, dem Geheimdienst zuzuordnen gewesen seien.

# *The Language Link of Connecticut*

Translation, DTP and Foreign Language Typesetting

240

In the objective "ring", defendant Chraldi has shown that the witness Ernst credibly expressed sympathy for the performance of the secret service resident at UVB, and herewith also named Keshaf as a secret service member. The witness Al-Qhadban explained of the latter, that according to his perceptions Keshlaf had been headmost in the secret service in LVB.

The court is convinced of the validity of these statements, since, according to named sources, all statements involving the secret service resident, the membership of Keshlaf and Elamin in the secret service are covered.

Al Abani, who has been described by Eter as a diplomatic courier, has confirmed this function in his examination in Libya according to credible statements of Senior Prosecutor Mehlis.

bb) Responsibility of the Libyan Position for the Attack

The determinations of the person Said Rashed and his connection to the occurrence of the act, as well as determinations on the role of Keshlaf and Elamin with the concrete attack plans and preparations in LVB, touch upon the statements of Eter and Ali Chanaas as well as on the testimony of main office MfS employees.

The defendant Eter has credibly depicted the time frame of an impending confrontation of a crisis between the USA and Libya, in the area of the Gulf of Sidra. In March 1986, the Libyan Central Secret Service in Tripoli' contacted foreign agents and thereby contact to the LVB in Berlin (East) had begun, in order to contemplate the possibilities of backing an attack against an American installation in Berlin. In this connection, Said Rashed, named the Engineer by Kashlaf, would be the competent leading employee of the Libyan Secret Service for foreign actions, and would have been informed on conceivable attack targets in Berlin. A short time thereafter a telex arrived from Said Rashed at Händen Elamins in LVB that the emphatic approval was obtained for conducting an attack of this kind against American installations.

354 Main Street, Suite 8, Newington, CT 06111 • 860-561-5438 • fax 425-988-7688
www.aptranslation.com • languagelink@cox.net

22

240

Auch der Angeklagte Chraidi hat im Objekt „Ring", wie der Zeuge Ernst glaubhaft bekundet hat, hiermit in Einklang stehende Ausführungen zur Geheimdienstresidentur am LVB gemacht und hierbei auch Keshlaf als Geheimdienstmitglied benannt. Des Weiteren hat auch der Zeuge Al-Ghadban erklärt, nach seinen Erkenntnissen sei Keshlaf „Oberst im Sicherheitsdienst" im LVB gewesen.

Da nach den genannten Quellen alle Angaben bezüglich der Geheimdienstresidentur bzw. der Mitgliedschaft von Keshlaf und Elamin im Geheimdienst sich decken, ist die Kammer von der Richtigkeit dieser Angaben überzeugt.

Al Abani, der von Eter als diplomatischer Kurier bezeichnet worden ist, hat diese Funktion in seiner Vernehmung in Libyen nach glaubhafter Aussage von Oberstaatsanwalt Mehlis bestätigt.

bb) Verantwortlichkeit libyscher Stellen für den Anschlag

Die Feststellungen zur Person Said Rasheds und dessen Verbindung zum Tatgeschehen sowie die Feststellungen zu der federführenden Rolle von Keshlaf und Elamin bei den konkreten Anschlagsplanungen und -vorbereitungen im LVB beruhen auf den Angaben Eters und Ali Chanaas sowie auf Bekundungen ehemaliger hauptamtlicher MfS-Mitarbeiter.

Der Angeklagte Eter hat glaubhaft geschildert, dass im Zeitraum der sich zuspitzenden Konfrontation zwischen den USA und Libyen im Bereich der Großen Syrte im März 1986 die libysche Geheimdienstzentrale in Tripolis Kontakte zu Auslandsvertretungen und dabei auch zum LVB in Berlin (Ost) aufgenommen habe, um über das LVB Möglichkeiten zur Begehung eines Anschlags gegen eine amerikanische Einrichtung in Berlin auszuloten. In dem Zusammenhang sei Said Rashed als der für Auslandsaktionen zuständige leitende Mitarbeiter des libyschen Geheimdienstes, genannt „der Ingenieur", von Keshlaf über denkbare Anschlagsziele in Berlin informiert worden. Kurze Zeit darauf sei aus Libyen ein Telexschreiben von Said Rashed zu Händen Elamins im LVB eingetroffen, das die ausdrückliche Genehmigung enthalten habe, derartige Anschläge gegen amerikanische Einrichtungen durchzufüh-

# *The Language Link of Connecticut*
Translation, DTP and Foreign Language Typesetting

241

Responsibility for the following detailed planning was to have been carried out by Al Keshlef and Abdallah Elamin, who also had responsibility for the planning and carrying out of the La Belle attack.

The court had no doubts about these statements by Eter, although it must be taken into account that, as laid out before Eters statement, in Sept 2000 Eter could also have had interests, for easing his own case to incriminate Keshlaf and Bamin.

For the integrity of Eters statements, there is first that he, and possibly his family too had been massively burdened by the danger of reprisals resulting from his strongly incriminating statements against Libya, from which no country can effectively protect him.

Of the other hand, Eters statements were confirmed by the statements of Ali Channas in the main trial.

Ali Chanaa has demonstrated as well that he had learned from Chraidi in the beginning of March 1986 that Libya had exercised pressure on its foreign representatives to undertake something against the Americans. He learned from Chraidi or Eter that Keshlaf and Bamin were under the authority of a person of the Libyan Secret Service who identified himself as "the engineer."

With this statement, Ali Chanaa confirmed his own earlier statements pursuant to the MfS in the year 1986, as well as later in the preliminary proceedings regarding KHK Chmielorz, in which he had mentioned a person with the designation "engineer" and a corresponding function in Libya.

Additionally, Ali Chanaa had expressed in his assessment in the main trial, that starting March 1986 all staffers in LVB discussed plans to attack an American installation, to be coordinated with the engineer, and also the "La Belle" attack was planned on this basis in the LVB. In this connection, Ali Chanaa confirmed the leading roles of Kashlaf and Elamin in the LVB.

241

Diarmaan für Ehemalaga anion Ali Keshlaf und Ab-

ren. Verantwortlich für die dann erfolgende Planung im Einzelnen seien Ali Keshlaf und Abdallah Elamin gewesen, die auch die Verantwortung für die Planung und Durchführung des „La Belle"-Anschlags getragen hätten.

Das Gericht hatte an diesen Angaben Eters keine Zweifel, obwohl zu berücksichtigen war, dass es - wie dargelegt - vor Eters Aussagen im September 2000 Versuche von Nebenklagevertretern gegeben haben könnte, auf seine Angaben inhaltlich zu Lasten des libyschen Staates Einfluss zu nehmen und zudem Eter auch Interesse daran gehabt haben könnte, zur eigenen Entlastung Keshlaf und Elamin zu belasten.

Für die Richtigkeit von Eters Angaben spricht zunächst, dass er sich, und möglicherweise auch seine Familie, durch seine Libyen massiv belastende Einlassung der erheblichen Gefahr von Repressalien ausgesetzt hat, vor denen ihn kein Staat mit letzter Sicherheit dauerhaft wirksam schützen kann.

Des Weiteren wurden Eters Angaben durch die Aussagen Ali Chanaas in der Hauptverhandlung bestätigt.

Ali Chanaa hat ebenfalls geschildert, er habe Anfang März 1986 von Chraidi erfahren, dass die Libyer auf ihre Auslandsvertretungen Druck ausgeübt hätten, etwas gegen die Amerikaner zu unternehmen. Er habe von Chraidi oder Eter erfahren, dass Keshlaf und Elamin einer Person des libyschen Geheimdienstes unterstanden, die als „Ingenieur" bezeichnet worden sei.

Mit dieser Aussage bestätigte Ali Chanaa eigene frühere Angaben gegenüber dem MfS im Jahre 1986 sowie später im Ermittlungsverfahren gegenüber KHK Chmielorz, in denen er ebenfalls eine Person mit der Bezeichnung „Ingenieur" und einer entsprechenden Funktion in Libyen erwähnt hatte.

Ali Chanaa hat im Übrigen in der Hauptverhandlung seine Einschätzung geäußert, dass alle ab März 1986 im LVB angestellten Überlegungen zur Begehung eines Anschlages gegen eine amerikanische Einrichtung mit dem „Ingenieur" abgestimmt gewesen seien und auch der „La Belle"-Anschlag auf dieser Basis im LVB geplant worden sei. In diesem Zusammenhang bestätigte Ali Chanaa auch die führenden Rollen von Keshlaf und Elamin im LVB.

# *The Language Link of Connecticut*

Translation, DTP and Foreign Language Typesetting

242

Hereafter, it is to be determined that the statements of Eter and Ali Chanaa form an agreement in their view of the role of the Libyan Secret Service, or of the LVB in connection with the "La Belle" attack, or make it understandable and resolve contradictions.  The statements were additionally supported by the results of the operative "Processes Box" and "Lux" of the HA U/15 of MfS that have been introduced by examination of countless previous main office employees of this department, particularly of the witnesses Ernst, Haschke and Dr. Stuchly in the main trial.  Hereafter, there existed an urgent suspicion that the "La Belle" attack had been planned and carried out by the Secret Service resident established in the LVB under gross abuse of the status and functions of the embassy. This estimation is based on the statements of the witnesses, not only on the statements of Ali Channaa as IM but also on corresponding statements of additional IM's outside the realm of the LVB.

Finally,  the role described by Eter and Ali Chanaa of the Libyan Secret Service with respect to the time frame of the motive to commit to an attack against a US installation remains to be determined, whether it can conclusively be linked with the conflict at the time between Libya and the USA.  It is also plausible from the court's perspective that in Germany especially the two diplomats Keshlaf and Elamin with their prominent positions and their special contacts established to bureaus in Libya made the relevant decisions on location, and in this context it could remain open to what extent Elamin and Keshlaf on their part had to operate dependent on instructions from  their ministerial departments in Libya, e.g. by Said Rashed or others.

The witnesses' statements undertaken in Libya were completely unproductive, since they all declared they had no knowledge about the attack on the disco  "La Belle,"  Also, on the telex from the Federal Information Service on October 9, 1996 to the public prosecutor's office, the court can support nothing in its connection. These telexes are said to be between

242

Hiernach ist zunächst festzustellen, dass die Angaben Eters und Ali Chanaas hinsichtlich der Rolle des libyschen Geheimdienstes bzw. des LVB im Zusammenhang mit dem „La Belle"-Anschlag übereinstimmen bzw. sich nachvollziehbar und widerspruchsfrei ergänzen.

Die Angaben werden zusätzlich gestützt durch die Ergebnisse der Operativ-Vorgänge „Box" und „Lux" der HA II/15 des MfS, die durch die Vernehmungen zahlreicher ehemaliger hauptamtlicher Mitarbeiter dieser Abteilung, insbesondere der Zeugen Ernst, Haschke und Dr. Stuchly in die Hauptverhandlung eingeführt worden sind. Hiernach bestand aus Sicht des MfS ein dringender Verdacht, dass der „La Belle"-Anschlag durch die im LVB etablierte Geheimdienstresidentur unter grobem Missbrauch des Status' und der Aufgabe der Botschaft geplant und durchgeführt worden ist. Diese Einschätzung basierte nach den Angaben der Zeugen nicht nur auf den Angaben Ali Chanaas als IM, sondern auch auf entsprechenden Angaben weiterer IM's aus dem Umfeld des LVB.

Es bleibt schließlich festzustellen, dass die von Eter und Ali Chanaa übereinstimmend beschriebene Rolle des libyschen Geheimdienstes bei der Planung und Durchführung des „La Belle"-Anschlags, auch hinsichtlich des Zeitpunktes und des Motivs, einen Anschlag gegen eine US-Einrichtung zu begehen, schlüssig mit der damaligen Konfliktlage zwischen Libyen und den USA in Einklang gebracht werden kann. Dabei ist es für die Kammer auch plausibel, dass in Deutschland gerade die beiden Diplomaten Keshlaf und Elamin mit ihrer herausgehobenen Position und ihren besonderen Kontakten zu Dienststellen in Libyen die maßgeblichen Entscheidungen vor Ort getroffen haben, wobei hierbei offen bleiben musste und auch konnte, inwieweit Elamin und Keshlaf ihrerseits in ihrem Handeln abhängig von Weisungen behördlicher Stellen in Libyen, zum Beispiel von Said Rashed oder anderen, waren.

Die Aussagen der in Libyen vernommenen Zeugen waren insoweit völlig unergiebig, da diese alle erklärt haben, über den Anschlag auf die Diskothek „La Belle" nichts zu wissen. Auch auf die vom Bundesnachrichtendienst erst am 9. Oktober 1996 an die Staatsanwaltschaft bei dem Kammergericht übersandten Telexschreiben hat die Kammer in dem Zusammenhang letztlich nichts stützen können. Diese Telexe sollen zwischen der libyschen

# *The Language Link of Connecticut*

Translation, DTP and Foreign Language Typesetting

p. 380

III. Offset ratio for extradition custody

1. Yasser Chraidi

In view of the extremely hard custody conditions that Chraidi was subjected to during his custody in Sidon and Sur until April 30, 1984, the court deemed it suitable to off-set this custody at a ratio of 1:3, pursuant to § 51 IV/2 StGB.
Due to the ensuing, still noticeably hard conditions of custody in the penitentiary in Rumie near Beirut, the court deemed it suitable to off-set this custody at a ratio of 1:2.

2. Musbah Omar Abulgasem Eter

For the extradition custody suffered by Eter in Rome, the court in Rome has applied a rule of 1:1.
As described in the findings, the conditions of custody that Eter experienced in the penitentiary in Rome, (no toiletries, no change of clothes) were only slightly worse than those in German institutions, so that it seemed inappropriate to increase the offset ratio in this case.

Marhofer                          Groß                                    Heinen

Issued

[signature]

Court clark

29

360

## III. Anrechnungsmaßstab für die Auslieferungshaft

### 1. Yasser Chraidi

Im Hinblick auf die besonders erschwerten Haftbedingungen für Chraidi während der Haft in den Haftanstalten in Sidon und Sur bis zum 30. April 1984 erschien dem Gericht für diese Haft eine Anrechnung im Verhältnis 1:3 angemessen, § 51 Abs. 4 Satz 2 StGB.

Wegen der nachfolgenden immer noch deutlich erschwerten Haftbedingungen in der Haftanstalt in Rumie bei Beirut erschien dem Gericht eine Anrechnung für diese Haft im Verhältnis 1:2 angemessen.

### 2. Musbah Omar Abulgasem Eter

Für die von Eter erlittene Auslieferungshaft in Rom hat das Gericht in Rom einen Maßstab 1:1 angesetzt.

Die in den Feststellungen beschriebenen Haftbedingungen, die Eter in Italien in der Haftanstalt in Rom erfuhr, (keine Toilettenartikel, keine Kleider zum Wechseln) waren im Vergleich zu den Bedingungen in deutschen Haftanstalten nur geringfügig schlechter, so dass hier eine Erhöhung des Anrechnungsmaßstabs nicht angebracht erschien.

Marhofer                    Groß                        Heinen

Ausgefertigt/Beglaubigt



Justizangestellte



# EXHIBIT 1(b)

# *The Language Link of Connecticut*

Translation, DTP and Foreign Language Typesetting

[Seal]
German Embassy

Protocol

Present:

Ambassador KUNZ, representing the Embassy
has permission for questioning in accordance with § 19 Consular Act

OStA Detlef MEHLIS, representing the Office of the District Attorney of the Superior Court of Justice
Berlin

KOR Uwe Wilhelms, representing the state Office of Criminal Investigation Berlin (LKA 513)
- acting as recording clerk-

also present

Musbah ABULGASEM ETER
Known personally, identified through Libyan passport 518325, issued December 13, 1994 in Tripoli/Libya
- .

Taking part in the trial 1 Js 2/92 of the KG Berlin (Superior Court of Justice)

Mr ABULGASEM ETER states:
I was told what offense I am being charged with and which penal regulations apply in German law. I was
cautioned that I am free to testify on this case and that I have the right to a defense solicitor.
Furthermore it was explained to me that I can, at any time, file individual motions to hear evidence.
I have understood the caution and would like to testify.

Personal:

I speak the German language fluidly and am able to follow the trial without the need for an interpreter.

About the case:

Question:
What knowledge has become available to you regarding the attack on the discotheque "La Belle"?

Answer:
Everything was organised by the Libyan Peoples' Bureau in Berlin. The reason was the conflict between
Libya and the USA. At the time, the people in charge in the LVB were of the opinion that an attack had to
be carried out.

[signature,]

VS-Gelöscht/Bl.:
amtlich geheimgehalten

Botschaft der Bundesrepublik Deutschland          Malta, den 10.09.1996

/131

1 0.04. 1996

P R O T O K O L L

Gegenwärtig:

Botschafter KUNZ als Vertreter der Botschaft,

berechtigt zu Vernehmungen gem. § 19 Konsulargesetz

OStA Detlef MEHLIS als Vertreter der Staatsanwaltschaft beim Kammergericht Berlin,

KOR Uwe Wilhelms als Vertreter des Landeskriminalamtes Berlin (LKA 513)
- als Protokollführer -
sowie

Musbah ABULGASEM ETER
- von Person bekannt, ausgewiesen durch libyschen Reisepaß 518325, ausgestellt
  am 13.12.1994 in Tripoli/Libyen -

im dem Strafverfahren 1 Js 2/92 des KG Berlin.

Herr ABULGASEM ETER erklärt:

Mir wurde eröffnet, welche Tat mir zur Last gelegt wird und welche Strafvorschriften
nach deutschem Recht in Betracht kommen. Ich wurde darüber belehrt, daß es mir
freisteht, zur Sache auszusagen und ggf. einen Verteidiger zuzuziehen.
Ferner wurde mir erklärt, daß ich jederzeit einzelne Beweisanträge beantragen
kann.
Ich habe die Belehrung verstanden und möchte aussagen.

Zur Person:

Ich spreche die deutsche Sprache fliessend und bin in der Lage, der Vernehmung
zu folgen ohne Dolmetscher.

Zur Sache:

Frage: Was ist Ihnen über den Anschlag auf die Diskothek "La Belle" bekannt geworden?
Antwort: Alles wurde vom Libyschen Volksbüro in Berlin organisiert. Grund waren
die Auseinandersetzungen zwischen Libyen und den USA. Zu dieser Zeit waren
die Verantwortlichen im LVB der Meinung, es müsse ein Anschlag durchgeführt
werden.

33

# *The Language Link of Connecticut*

Translation, DTP and Foreign Language Typesetting

The people in charge at the time were Ali KESHLAF and EL-AMIN.

The attack was organised by Youssef CHRAIDI with his Palestinians and Libyans, the equipment came from Libya.

Therefore the LVB received, some time before the attack, a total of 12kg of explosives, which Musbah EL-ABANI brought to East Berlin in his diplomat's luggage.

By the way, the weapons that will be mentioned here, too, were delivered from Libya in the same way. Initially the intention was to target a US coach that passed the inner city limits every day. Later on, KESHLAF and EL-AMIN decided something else would have to be done - instead of the bus, the attack on the discotheque.

During the time before the attack, I had a piece of paper from Ali Chanaa and his wife Verena, written by Verena Chanaa, with the addresses of the three discos. With this piece of paper I unintentionally got controlled by the entry control of the GDR authorities, about 5 days before the attack.

As ordered, I handed the paper to Ali KESHLAF and EL-AMIN.

Then a new guy arrived from Libya, called ABULGA KHER, a specialist for explosives technology (bomb building). The man was Libyan, but of black skin color.

He prepared the materials for the attack.

After the preparation, KESHLAF handed over the explosives to Souad MANSOUR, who first brought them to West Berlin, where they were stored in CHANAA's flat in Lindenstrasse 115. After that, Souad MANSOUR brought the detonator and the remaining parts to West Berlin, too, in separate journeys. They were also stored in the flat in Lindenstrasse.

In the LVB, ABULGA KHER noted down how the bomb was to be assembled. I brought these instructions to CHANAA's flat the day before the attack, in the evening. Afterwards I went straight back to East Berlin and arrived there around 23.00, that means shortly before the attack.

It was planned that the suitcase with the bomb should be brought into the disco by Verena CHANAA, accompanied by her sister. But I know that she initially left the flat in Lindenstrasse alone, and that it was only later that she planted the bomb in the disco as planned, with her sister.

For this, Verena CHANAA received DM 6,000 and her husband, Ali CHANAA, received a monthly payment over DM 1,500 from the LVB for 6 months.

These payments stopped when EL-AMIN was removed from his office in the LVB (notation see protocol Annex I, written by Mr. Eter himself). The payments to Ali CHANAA were always handed over by me, in two or three cases with receipt. The money for this purpose was always given to me by EL-AMIN in the LVB.

Answering the question, I state that CHRAiDI was not paid separately for the attack on the discotheque, but he was recompensed through his post in the LVB and the opportunity to lead his group in West Berlin. In addition this meant a secure residence permit for the GDR.

Question:
Did Verena's sister know about the bomb?

Answer:
I couldn't say. I only know that Verena and her sister were supposed to go to "La Belle" on orders of Ali and Youssef and Verena should deposit the bomb there. The bomb wasn't exactly placed in a suitcase, but in a handbag, that I have roughly drawn here. (see protocol Annex II).

[signature, new page]

amtlich [Gelöscht Bl.:]

1 0. OKT. 1996

Die Verantwortlichen waren seinerzeit Ali KESHLAF und EL-AMIN.
Organisiert hat den Anschlag der Youssef CHRAIDI mit seinen Palästinensern und
Libanesen, wobei die Ausrüstung aus Libyen kam.
Das LVB erhielt deshalb einige Zeit vor dem Anschlag insgesamt 12 kg Sprengstoff,
die von Musbah EL-ABANI im Diplomatengepäck nach Ostberlin gebracht wurden.
Die Waffen, von denen hier auch noch die Rede sein wird, sind übrigens auf dem
gleichen Wege geliefert worden.
Es gab ursprünglich die Absicht, einen Anschlag auf einen US-Bus zu verüben, der
täglich die innerstädtische Grenze passierte. Später fiel dann von KESHLAF und
EL-AMIN die Entscheidung, es müsse etwas anderes gemacht werden, nämlich statt
des Busses der Anschlag auf die Diskothek.
In der Zeit vor dem Anschlag hatte ich Ali Chanaa und seiner Frau Verena,
geschrieben von Verena Chanaa, einen Zettel mit den Anschriften der drei Disko-
theken. Mit diesem Zettel geriet ich ungewollt in die Einreisekontrolle der
DDR-Behörden, etwa 5 Tage vor dem Anschlag.
Ich habe den Zettel auftragsgemäß an Ali KESHLAF und EL-AMIN übergeben.
Dann kam ein neuer Mann aus Libyen mit Namen ABULGA KHER, der ein Spezialist für
Sprengstofftechnik (Bombenbauen) war. Dieser Mann war ein Libyer, aber von
schwarzer Hautfarbe.
Er bereitete die Materialien für den Anschlag vor.
Nach der Vorbereitung wurde zunächst der Sprengstoff von Keshlaf, übergeben an
Souad MANSOUR nach Westberlin gebracht und in der Wohnung Chanaa in der
Lindenstr. 115 gelagert. Anschließend brachte Souad MANSOUR den Zünder und die
übrigen Bestandteile gesondert nach Westberlin, ebenfalls zu der Wohnung in der
Lindenstraße.
ABULGA KHER schrieb im LVB auf, wie die Bombe zusammenzusetzen sei. Diese
"Bedienungsanleitung" habe ich dann am Tag vor dem Anschlag in den Abendstunden
in die Wohnung CHANAA's gebracht. Anschließend bin ich direkt wieder nach
Ostberlin gefahren und kam etwa gegen 23.00 Uhr an, also kurz vor dem Anschlag.
Geplant war, daß der Koffer mit der Bombe von Verena CHANAA in die Diskothek
in Begleitung ihrer Schwester gebracht wird. Ich weiß aber, daß sie zunächst die
Wohnung in der Lindenstraße 'ein verließ und erst später die Bombe, wie
geplant, in der Diskothek gemeinsam mit ihrer Schwester abgelegt hat.
Dafür hat Verena CHANAA DM 6.000,- erhalten, und ihr Ehemann, Ali CHANAA, bekam
vom Volksbüro für etwa 6 Monate 1.500,- DM monatlich.
Diese Zahlungen endeten, als EL-AMIN vom LVB abgezogen wurde (Schreibweise vgl.
Anlage I zum Protokoll, von Herrn ETER selbst geschrieben). Die Zahlungen
an Ali CHANAA erfolgten immer durch mich, in zwei oder drei Fällen gegen
Quittung. Das Geld wurde mir jeweils von EL-AMIN im Volksbüro für diesen Zweck
ausgehändigt.
Auf Frage erkläre ich, daß CHRAIDI für den Anschlag auf die Diskothek nicht
gesondert bezahlt worden ist, sondern durch die Arbeitsmöglichkeit im Volksbüro
und die Möglichkeit, seine Gruppe in Westberlin zu führen, belohnt wurde.
Ausserdem hatte er auf diesem Wege eine gesicherte Aufenthaltserlaubnis in der DDR.

Frage:
Wußte die Schwester von Verena von der Bombe?

Antwort:
Das kann ich nicht sagen. Ich weiß nur, daß auf Weisung von Ali und Youssef
Verena und ihre Schwester in das La Belle gehen sollten und Verena dort die
Bombe ablegen sollte. Die Bombe war nicht direkt in einem Koffer, sondern in
einer Handtasche, die ich hier in etwa aufgezeichnet habe (vgl. Anlage II zum
Protokoll) untergebracht.

# The Language Link of Connecticut

Translation, DTP and Foreign Language Typesetting

Question:
How exactly happened the transport of the bomb's parts?

Answer:
The explosive and the other parts were handed from KESHLAF to Youssef in the LVB and brought to his flat in East Berlin. From there his wife, Souad MANSOUR, transported the parts to CHANAA's flat.
In connection with the two sisters, i.e. Verena and her sister, I was shown a folder with photos for "La Belle", part women, images 1-49. I recognize Verena CHANAA on picture 46 - unmistakably. I can't recognize her sister because I never saw her in person.

Question:
Please explain once more who was present in Ali and Verena CHANAA's flat when the bomb was handed over?

Answer:
I was there, Ali, Youssef and Verena. I went back to East Berlin and went to the "Lindencorso". Ali, together with Youssef, also went to East Berlin. Everyone took the underground back to East Berlin. From the "Lindencorso", I, Youssef and Ali CHANAA drove by car to the hotel "Berolina". As far as I remember today, there was also a [female] friend of Youssef in the car. At the "Berolina" we met EL-AMIN. I believe, without remembering exactly today, that Youssef or Ali said there that the attack had been successful. Then Ali, Youssef and I drove to the "Palasthotel". There is a night bar there, with a telephone in the corner. Youssef called the "BZ" [Berlin newspaper] from there and admitted his responsibility for the attack - that means he said something like the attack was a response to the American aggression against Libya.

Question:
Describe the bomb!

Answer:
I did a rough sketch here (see protocol Annex II R).
The explosive was cream colored and flexible. It was in one piece. There were also pieces of metal within the explosive. The detonator consisted of an aluminum capsule. The detonation device had an on/off switch and a time display that could be adjusted (electronically). In response to question, with more detail: It was an oblong electronic element with a thumb wheel to adjust the minute delay. The respective delay was shown on a display at the top; this window was positioned right next to the switch that was installed there with the positions "on" and "off".
It should be added, that the above mentioned total amount of explosive was made into four equal looking bombs. I have no information about the whereabouts of the remaining three bombs. All the explosive devices were stored in the LVB.

Question:
Please tell us in how far the attack was discussed in the LVB during the following days.

Answer:
As far as I remember I was at the LVB every day in the days that followed and I met the employees that normally work there; Youssef and Ali CHANAA were also present. There was no more talk about the attack and I can also say with certainty that no wire was received from Libya on this matter.  At the time, in order to check this, I asked Ali KESHLAF, who was the sole person in the LVB responsible for telecommunications and encryption. He confirmed expressly that there was no 'congratulation'-wire from Libya as was wrongly alleged by the press.

[signed, new page]



VS (Geheim)
amtl. ... Geheim ...
... sicht Bl.:
1 OKT. 1998

/137

**Frage:**
Wie genau lief der Transport der Bestandteile der Bombe ab?

**Antwort:**
Im LVB wurde der Sprengstoff und die anderen Bestandteile von KESHLAF an Youssef übergeben und in seiner Wohnung in Ostberlin verbracht. Von dort aus transportierte seine Frau, Souad MANSOUR, die Bestandteile in die Wohnung CHANAA.
Im Zusammenhang mit den beiden Schwestern, d.h. Verena und ihrer Schwester, wurde mir die Lichtbildmappe zu "La Belle", Teil Frauen, Bild 1 - 49, vorgelegt. Auf Bild 46 erkenne ich eindeutig Verena CHANAA wieder. Ihre Schwester kann ich nicht wiedererkennen, da ich sie persönlich nie gesehen habe.

**Frage:**
Stellen Sie bitte noch einmal klar, wer sich in der Wohnung von Ali und Verena CHANAA bei Übergabe der Bombe aufhielt?

**Antwort:**
Ich selbst, Ali, Youssef und Verena. Ich fuhr von dort zurück nach Ostberlin und ging in den "Lindencorso". Ali ging zusammen mit Youssef ebenfalls nach Ostberlin. Es sind alle mit der U-Bahn zurück nach Ostberlin gefahren. Vom "Lindencorso" sind dann ich selbst, Youssef und Ali CHANAA im Auto zum Hotel "Berolina" gefahren. Soweit ich mich heute zu erinnere, war auch noch eine Freundin von Youssef mit im Auto. Im "Berolina" trafen wir auf EL-AMIN. Ich glaube, ohne es heute noch genau zu wissen, daß Youssef oder Ali dort sagten, der Anschlag hätte geklappt. Ali, Youssef und ich sind daraufhin zum "Palasthotel" gefahren. Dort ist eine Nachtbar mit einem Telefon an der Ecke. Von diesem Apparat rief dann Youssef bei der "BZ" an und bekannte sich zu der Tat, d.h. er sagte so etwas wie, daß der Anschlag eine Antwort auf die amerikanische Aggression gegen Libyen wäre.

**Frage:**
Beschreiben Sie die Bombe!

**Antwort:**
Ich habe sie hier in etwa aufgezeichnet (vgl. Anlage II R zum Protokoll). Der Sprengstoff sah cremefarben aus und war flexibel. Er war ein Stück. Im Sprengstoff waren auch Eisenstücke drin. Der Zünder bestand aus einer Aluminiumkapsel. Die Zündeinrichtung hatte einen An- und Ausschalter und eine Zeitanzeige, die man einstellen konnte (elektronisch). Auf Befragung noch einmal genau: Es handelte sich um einen rechteckigen elektronischen Baustein, der ein Rändelrad zum Einstellen der Minutenverzögerung besaß. Die entsprechende Verzögerung wurde in einem Fenster an der Oberseite angezeigt; dieses Fenster befand sich unmittelbar neben dem aufgebrachten Schalter mit den Postionen "on" und "off".
Ergänzend sei noch erwähnt, daß die o.g. Gesamtmenge an Sprengstoff zu vier gleichaussehenden Bomben verarbeitet wurde. Über den Verbleib der übrigen drei Bomben ist mir nichts bekannt. Alle Sprengkörper lagerten im Volksbüro.

**Frage:**
Berichten Sie bitte, inwieweit über den Anschlag an den Folgetagen im LVB gesprochen wurde.

**Antwort:**
Ich war in den nachfolgenden Tagen nach meiner Erinnerung täglich im Volksbüro und traf auf die üblicherweise dort vorhandenen Mitarbeiter; auch Youssef und Ali CHANAA waren anwesend. Es wurde aber nicht mehr über den Anschlag gesprochen und ich kann auch sicher sagen, daß es nicht zum Empfang eines Telegramms aus Libyen in dieser Angelegenheit kam. Um dies zu überprüfen, habe ich damals Ali KESHLAF befragt, der im Volksbüro allein für das Fernmelde- und Chiffrierwesen zuständig war. Er hat mir ausdrücklich bestätigt, daß es kein "Glückwunschtelegramm" aus Libyen gegeben hat, wie fälschlich in der Presse behauptet wurde. N.K.

37

# *The Language Link of Connecticut*

Translation, DTP and Foreign Language Typesetting

The line between Tripoli and the LVB was encoded over Telex. The responsible person in Tripoli was the 'engineer' Said RASHED. In Berlin this was EL-AMIN. EL-AMIN was KESHLAF's superior. The instructions to plan and carry out attacks against the Americans also came through this way.

Question:
Does the name 'Leila' mean anything to you?

Answer:
No, not at the moment.

Question:
You're being presented with the photocopied receipt over DM 1,500, made out to 'Leila'. Do you know this person?

Answer:
That is the receipt for one of the payments to Ali. Ali signed here with Leila.

Question:
What do you know about the storing of weapons in Berlin (West) before the attack?

Answer:
After the order came from Tripoli to carry out attacks against the Americans, AL- ABANI brought a suitcase full of weapons over the border towards the end of March, in his diplomat's luggage, and there passed it on to Imad MAHOUD. I don't know the exact circumstances as I wasn't present at the hand-over. At a visit to MAHMOUD's flat I saw the weapons in the suitcase. As far as I remember today, there were at least two hand grenades, two pistols with mufflers and two or more machine guns, I think of the type "Beretta". The weapons were intended for the attack on the American military coach. After that attack had been called off, ALBANI returned the weapons to East Berlin by car. Imad MAHMOUD was also scared that the Berlin police would discover the weapons in his flat. Again, I have to say that I wasn't present when the weapons were returned. I heard it from Youssef. When I am being asked here, whether I know the "Abu Jabber brothers", I can affirm that I do. Youssef had the intention to use them to carry out an attack. Today I believe that I was together with HAMADI ABU JABBER in Imad MAHMOUD's flat in Kreuzberg and there saw the weapons that I have described.

Question:
Who belongs to Yasser CHRAIDI's group?

Answer:
Ali CHANAA, Ali MANSOUR, Imad MAHMOUD, Daher FAOUR, "HAMADI" and ABU ALI. Yasser CHRAIDI worked for AHMED JIBRIL. Later he also worked a little bit for ABU NIDAL. He came to the LVB because he had, together with others, shot an exiled Libyan on Libya's orders.

[signature, new page]

354 Main Street, Suite 8, Newington, CT  06111 • 860-561-5438 • fax 425-988-7688
www.aptranslation.com • languagelink@cox.net

38



VS- ~~Vertrau~~ ~~ment BI.:~~
amtlich ~~geheim~~ ~~gehalten~~
- 4 -
10 XI. 1986

/134

Die Verbindung zwischen Tripolis und dem Volksbüro lief verschlüsselt über
Telex. In Tripolis war der zuständige Mann der "Ingenieur" Said RASHED. In
Berlin war es EL-AMIN. EL-AMIN war KESHLAF übergeordnet. Auch die Anweisung,
Anschläge gegen die Amerikaner zu planen und zu begehen, kam auf diesem Weg.

Frage:
Sagt Ihnen der Name "Leila" etwas?

Antwort:
Nein, im Moment nicht.

Frage:
Ihnen wird ja eine abgelichtete Quittung über 1.500,- DM an eine Leila vor-
gelegt. Kennen Sie diese?

Antwort:
Das ist ein Beleg für eine der Zahlungen an Ali. Ali hat in diesem Fall mit
Leila quittiert.

Frage:
Was ist Ihnen über die Lagerung von Waffen in Berlin (West) vor dem Anschlag
bekannt geworden?

Antwort:
Nachdem die Anweisung aus Tripolis kam, Anschläge gegen die Amerikaner zu
begehen, brachte AL ABANI Ende März einen Koffer mit Waffen als Diplomaten-
Gepäck über die Grenze und gab ihm- dort an Imad MAHMOUD weiter. Wie es genau
war, weiß ich nicht, da ich bei der Übergabe nicht dabei war. Anläßlich eines
Besuches in der Wohnung von MAHMOUD habe ich die Waffen im Koffer gesehen.
Nach meiner heutigen Erinnerung waren es mindestens zwei Handgranaten, zwei
Pistolen mit Schalldämpfern und zwei oder mehr Maschinenpistolen, ich glaube,
Typ "Beretta". Die Waffen waren für den Anschlag auf den amerikanischen
Militärbus bestimmt. Nachdem der Anschlag abgesagt wurde, brachte ~~Xausxafsxfxxx~~
ALABANI die Waffen im PKW wieder nach Ostberlin zurück. Es war auch so, daß
Imad MAHMOUD Angst hatte, die Berliner Polizei würde die Waffen in seiner
Wohnung entdecken. Auch hier muß ich sagen, daß ich nicht selbst beim Rück-
transport dabei war. Ich habe es von Youssef gehört. Wenn ich hier gefragt
werde, ob mir die "Abu Jabber-Brüder" bekannt sind, so kann ich das bejahen.
Youssef hatte die Absicht, sie zur Begehung eines Anschlags zu benutzen.
Ich meine heute, daß ich mit HAMADI ABU JABBER zusammen in der Wohnung von
Imad MAHMOUD in Kreuzberg war und dort die beschriebenen Waffen gesehen habe.


Frage:
Wer gehörte zur Gruppe des Yasser CHRAIDI?

Antwort:
Ali CHANAA, Ali MANSOUR, Imad MAHMOUD, Daher FAOUR, "HAMADI" und ABU ALI.
Yasser CHRAIDI arbeitete für AHMED JIBRIL. Später auch etwas für ABU NIDAL.
Er kam zum Volksbüro, weil er zusammen mit anderen im Auftrag Libyens einen
Exil-Libyer erschossen hatte.

# *The Language Link of Connecticut*

Translation, DTP and Foreign Language Typesetting

Question: what were your responsibilities at the LVB?

Answer:
I was first working at the Peoples' Bureau in Bonn. But I was interested in going to the People's Bureau in Berlin (East). I told Said RASHED of this wish, who was a good acquaintance of mine. I was then transferred to East Berlin and there worked in the press department.

Question:
Did you or do you still have connections to the Libyan intelligence service?

Answer:
I am not a member of the Libyan intelligence service nor do I receive money from them. But I know many people, including Said RASHED, who are working for the intelligence service. Whilst I was working in Bonn, part of my responsibilities included the collection of information about Libyans staying in Germany. Answering your question, I can also confirm that DENALI was known to me. But I emphasize that I have nothing to do with his murder that, as far as I know, was ordered from Libya. Something like that was not part of my duties. Said RASHID decided on all assignments, in Germany this happened together with EL AMIN.
In this way I was first positioned in Tschad, after working as a journalist, and in the Libyan embassy there I had journalistic duties. As I was starting to have heart problems in Tschad, I talked to Said RASHED and asked for another assignment, which led to me being sent to the People's Bureau in Bonn, where EL AMIN was already working.
After the DENALI affair I had been to East Berlin for a short time and I liked it so much that I suggested to Bonn that I could work in Berlin. EL AMIN and RASHED agreed and I could start work in East Berlin in 1985. After being asked, I'd like to repeat that the activities of the Libyan intelligence service, which in East Berlin I assign to KESHLAF, EL-AMIN and Youssef, were, as far as I know, carried out by members of the intelligence service in the LVBs. Usually the matter was discussed over and above this circle of people. Therefore I learnt of information from the area of the intelligence service - and the longer you worked in the respective Peoples' Bureau, the higher your level of knowledge would become.


Question:
What do you know about the murder of ASHUR in Berlin?

Answer:
ASHUR was a friend of mine. After his murder, Ali KESHLAF told me that he had been a spy for the American intelligence service. That's why he was shot on official orders by YUSEF ESLEH. I have nothing to do with this offense.

My statements are true and according to what I remember today. Of course it is already a long time ago. Naturally I am prepared to repeat these statements in front of a German court and to answer further questions. But I would like to be protected.

Checked and signed:
[signature]
Signature of the questioner:                          [seal]
[signatures]



**Frage:**
Welche Funktionen erfüllten Sie am Volksbüro?

**Antwort:**
Es war so, daß ich zunächst am Volksbüro in Bonn tätig war. Ich hatte jedoch
Interesse, an das Volksbüro nach Berlin (Ost) zu gehen. Da Said RASHED ein
guter Bekannter von mir war, trug ich ihm diese Bitte vor. Ich wurde dann nach
Ostberlin versetzt und war dort in der Presseabteilung tätig.

**Frage:**
Hatten oder haben Sie Verbindungen zum Libyschen Nachrichtendienst?

**Antwort:**
Ich bin nicht beim Libyschen Nachrichtendienst und erhalte auch von dort kein
Geld. Ich kenne allerdings viele Leute, unter anderem Said RASHED, der beim
Nachrichtendienst ist. Während meines Einsatzes in Bonn gehörte es auch zu
meinen Aufgaben, Informationen über in Deutschland aufhältliche Libyer zu
sammeln. Auf Frage kann ich insoweit auch bestätigen, daß mir DENALI bekannt
war. Ich betone jedoch, daß ich mit seiner Ermordung, die meines Wissens im
Auftrag Libyens erfolgte, nichts zu tun habe. Etwas derartiges gehörte nicht
zu meinen Aufgaben. Über alle Verwendungen entschied Said RASHED, wobei in
Deutschland dies in Verbindung mit EL AMIN erfolgte.
Auf diese Weise war ich zunächst im Tschad nach meiner Tätigkeit als Journalist
eingesetzt, und ich hatte in der dortigen Libyschen Vertretung journalistische
Aufgaben. Da ich jedoch im Tschad Herzbeschwerden bekam, sprach ich mit Said
RASHED und bat um eine andere Verwendung, woraufhin ich nach Bonn zum dortigen
Volksbüro entsandt wurde, wo EL AMIN bereits arbeitete.
Nach der DENALI-Sache war ich dann für kurze Zeit nach Ostberlin gekommen und es
gefiel mir dort sehr, so daß ich in Bonn vorschlug, in Berlin zu arbeiten. EL
AMIN und auch RASHED waren damit einverstanden, und ich konnte in Ostberlin im
Laufe des Jahres 1985 zu arbeiten anfangen. Auf Frage möchte ich nochmals
ergänzen, daß die Tätigkeiten des Libyschen Geheimdienstes, denen ich in Ost-
berlin KESHLAF, EL AMIN und Youssef zuordne, in den Volksbüros nach meinem Dafür-
halten von Mitarbeitern des Geheimdienstes ausgeführt wurden, ~~jedoch üblicherweise~~
~~wurde.~~ über diesen Personenkreis hinaus über die Angelegenheit diskutiert ~~wurde.~~
Dadurch gelangten auch mir Informationen aus dem Geheimdienstbereich zur Kenntnis
und je länger man im entsprechenden Volksbüro arbeitete, umso größer wurde der
Erkenntnisstand.

**Frage:**
Was ist Ihnen über die Ermordung des ASHUR in Berlin bekannt?

**Antwort:**
ASHUR war ein Freund von mir. Nach seiner Ermordung hat mir Ali KESHLAF erzählt,
daß er für den amerikanischen Geheimdienst spioniert hat. Er sei deshalb im
offiziellen Auftrag von einem YUSEF ESALEH erschossen worden. Ich selbst habe mit
der Tat nichts zu tun.

Meine Angaben entsprechen der Wahrheit und meiner heutigen Erinnerung. Es ist
natürlich schon lange her. Selbstverständlich bin ich bereit, diese Angaben
auch vor einem deutschen Gericht zu wiederholen und auch weitere Fragen zu
beantworten, ICH MÖCHTE ABER GESCHÜTZT WERDEN.

Genehmigt ~~bzw.~~ unterschrieben:

Unterschrift des Vernehmenden:
Gerhard Kunz, Botschafter



41

# EXHIBIT 1(c)

# *The Language Link of Connecticut*
### Translation, DTP and Foreign Language Typesetting

Prosecution in the
Superior Court of Justice

Berlin, October 16th, 1996

Reference Number: 1 Js 2/92

Criminal Case

Present:

against
Chraidi et al.

Mehlis
As senior prosecutor

Hahne
Prosecutor

accused of
murder pp.

KR Wilhelms
KHK Chmielorz

Groke
Recording clerk

The accused Musbah Abulgasem Eter appeared.

The charges against him were explained as well as the potential penalty provisions.

He was made aware that he has the right to respond or remain silent to the charges against him and he can speak anytime, including prior to the hearing to an attorney choosen by him. He was further instructed of his right to apply for individual hearing of evidence for his exculpation.

I hereby confirm again that the statements I made to the German Ambassador in Malta are the truth.

**Staatsanwaltschaft
bei dem Kammergericht**

Berlin, den 16.10.1996

*161*

Geschäftszeichen: 1 Js 2/92

***Strafsache***

Gegenwärtig:

Mehlis
als Oberstaatsanwalt

Hahne
Staatsanwalt

KR Wilhelms
KHK Chmielorz

Groke
als Protokollführerin

gegen
**Chraidi u.a.**

wegen
Mordes pp.

Es erschien der Beschuldigte
Musbah Abulgasem Eter

Es wurde ihm eröffnet, welche Tat ihm zur
Last gelegt wird und welche Strafvorschriften
in Betracht kommen.

Er wurde darauf hingewiesen, daß es ihm
freistehe, sich zu der Beschuldigung zu äußern
oder nicht zur Sache auszusagen und jederzeit,
auch schon vor seiner Vernehmung, einen von
ihm zu wählenden Verteidiger zu befragen. Er
wurde ferner darüber belehrt, daß er zu seiner
Entlastung einzelne Beweiserhebungen bean-
tragen kann.

Ich bestätige noch einmal, daß meine Angaben, die ich gegenüber dem deutschen Botschafter
in Malta gemacht habe, der Wahrheit entsprechen.

44

# *The Language Link of Connecticut*

Translation, DTP and Foreign Language Typesetting

2

Question:

Did you get to know the circumstances why the trafficking by your present wife failed at that time?

Answer:

At that time only Manon himself or Ali Chanaa came into question, who I told my plan to and asked for help. After Manon denied everything, I thought that Ali betrayed the plan. I asked him later specifically regarding this but he denied it.

Question:

Where were the explosives in the Libyan Embassy stored?

Answer:

It was like this, the explosives were brought at some time previously by Mesbah Al Abani. He stored it then in the safe of Ali Keshlaf. Only Keshlaf had access to the safe. Documents to decode messages from Tripoli were also kept there.

Question:

Did you get to know why Verena placed the bomb in the disco?

Answer:

Ali Chanaa and Youssef told me, that they should receive from the Volksbüro (Libyan People's Office), meaning to say from El Amin and Keshlaf, the money for a Porsche. What they actually received I already testified. If their sister should receive also something, I do not know. As far as I can remember was the idea of Ali Chanaa and Verena that his wife will not go alone into the disco, but with her sister. This is how he told it to me, and based on his story after the incident it happened like this.

Question:

Describe once again how the bomb was activated in the apartment of Chanaa.

354 Main Street, Suite 8, Newington, CT 06111 • 860-561-5438 • fax 425-988-7688
www.antranslation.com • languagelink@sns.net

2

*/ſ:·ɣ*

Frage:

Ist Ihnen bekannt geworden, aufgrund welcher Umstände die Ausschleusung Ihrer heutigen Ehefrau seinerzeit scheiterte?

Antwort:

Es kamen seinerzeit für mich nur die Manon selbst, oder der Ali Chanaa, dem ich von meinem Plan berichtet und um Hilfe gebeten hatte, infrage. Nachdem die Manon das abgestritten hatte, ging ich davon aus, daß Ali den Plan verraten hatte. Ich habe ihn später auch direkt danach gefragt, aber er hat das bestritten.

Frage:

Wo lagerte in der libyschen Botschaft der Sprengstoff?

Antwort:

Es war so, daß der Sprengstoff schon einige Zeit vorher vom̃Al Abani gebracht worden war. [MOSBAH]
Er lagerte dann im Tresor von Ali Keshlaf. Zu dem Tresor hatte allein Keshlaf Zugang. Dort befanden sich auch die Unterlagen zum Entschlusseln von Mitteilungen aus Tripolis.

Frage:

Ist Ihnen bekannt geworden, warum Verena die Bombe in der Disco ablegte?

Antwort:

Ali Chanaa und Youssef erzählten mir, daß sie vom Volksbüro, d.h. von El Amin und Keshlaf das Geld für einen Porsche bekommen sollte. Was sie tatsächlich bekommen hat, habe ich bereits ausgesagt. Ob ihre Schwester auch etwas bekommen sollte, weiß ich nicht. Nach meiner Erinnerung war es die Idee von Ali Chanaa, [und Jelina] daß seine Frau nicht alleine in die Disco gehen, sondern ihre Schwester mitgehen sollte. Das hat er mir so erzählt, und so ist es nach seiner Erzählung nach der Tat auch gewesen.

Frage:

Schildern Sie noch einmal, wie die Bombe in der Wohnung Chanaa scharf gemacht wurde.

# The Language Link of Connecticut

Translation, DTP and Foreign Language Typesetting

3

Answer:

As I already said, on the evening in question I brought a kind of "operations manual" to the apartment. It was in Arabic. I received it in the Volksbüro (Libyan People's Office) from El Amin and Abugela Kher was present and [I?] should bring it over the border. It contained a few steps on how to activate the bomb. I was reading it and Youssef and Ali worked according to this on the bomb. Afterwards the paper was ripped up. Verena was also present. The explosive was in a light-blue plastic and wrapped tight with adhesive tape. I left the apartment since I was not comfortable with the whole thing. I had no interest to carry out an attack against Americans, but of course I had to fulfill the orders especially since given by El Amin. After all, I wanted to stay with the embassy longer. So Ali, Youssef and Verena were left in the apartment.

As reference a folder with photographs was presented to me. I will specify who was part of the group with Youssef.

Picture No. 1 Ali Mansur

Picture No. 4 Saleh Hadba

Picture No. 6 Marouf, Abu Achmed

Picture No. 8 Fabur

Picture No. 18 Ali Chanaa

Picture No. 38 Al Sadek

Picture No. 62 Jabbr

Picture No. 63 no name given

354 Main Street, Suite 8, Newington, CT 06111 • 860-561-5438 • fax 425-988-7688
www.aptranslation.com • languagelink@cox.net

47

3

Antwort·

Wie schon gesagt, brachte ich an jenem Abend eine Art „Bedienungsanleitung" in die Wohnung. Sie war in arabischer Sprache. Ich hatte sie von El Amin im Beisein von Abugela Kher im Volksburo bekommen, und sollte sie über die Grenze bringen. Sie enthielt einige wenige Schritte, um die Bombe verwendungsbereit zu machen. Ich habe es vorgelesen und Youssef und Ali haben dementsprechend an der Bombe gearbeitet. Anschließend ist der Zettel zerrissen worden. Verena war auch anwesend. Der Sprengsatz war in hellblauem Plastik mit Klebeband eng umwickelt. Ich habe dann die Wohnung verlassen, weil ich mich bei der ganzen Sache auch nicht wohlfühlte. Ich hatte kein Interesse an der Durchführung eines Anschlages gegen die Amerikaner, aber mußte natürlich die mir insbesondere von El Amin gegebenen Anweisungen ausführen. Ich wollte ja schließlich weiter an der Botschaft bleiben. Es blieben also Ali, Youssef und Verena in der Wohnung zurück.

Mir ist hier eine Lichtbildmappe zur Einsichtnahme vorgelegt worden. Ich gebe dazu zunächst an, welche Leute zur Gruppe des Youssef gehörten:

Bild Nr. 3: Ali Mansur

Bild Nr. 4: Saleh Hadba

Bild Nr 6: Marouf, Abu Achmed

Bild Nr 8: Fabur

Bild Nr. 18: Ali Chanaa

Bild Nr. 38: Al Sadek

Bild Nr 62: Jabbr

Bild Nr. 63: kein Name genannt

# The Language Link of Connecticut
Translation, DTP and Foreign Language Typesetting

4

Picture No. 10 El Amin

Picture No. 11 Keshlaf

Picture No. 14 Hamuda, was consul for Ali Keshlaf

Picture No. 19 Hadi

Picture No. 20 Drera, Press Department

Picture No. 21 would have not recognized him as Dargam

Picture No. 22 Nabil Amashe

Picture No. 23 Abul Salam

Picture No. 24 responsible for Telex

Picture No. 25 Abulan, now secretary in the Libyan Foreign Ministry

Picture No. 27 Shalbak, Ambassador in Bonn

Picture No. 28 Muntaser

Picture No. 29 name unknown

Picture No. 51 I was asking him if he has a box (planned trafficking of Manon)

The picture on page 7 shows Abu Ali.

At the picture on page 8 shows Youssef and Achmed. I do not know the woman.

regarding the women I recognized.

No. 3 – 6 Suad, Wife of Youssef

No. 13/14 was working at the airport Schönefeld (Irna)

No. 15-17 Manon, my wife

No. 23 Girlfriend of Youssef

Nr. 27 Petra, has a child with a Libyan from the Volksbüro (Libyan People's Office)

Nr. 31 Girl friend of Saleh Hadba

Nr. 33-35 resorted in the Palasthotel

Nr. 40 Verena Chanaa

Nr. 46 Verena Chanaa

I was pointed to picture No. 49. After I was told that this woman was often together with her mother, I remembered her name was Annegret or similar. She was living outside of Berlin. She was often together with the whole group. She "hung out" with a lot of Arabs. I did not know her.

4

Zum libyschen Volksburo gehörten:

Bild Nr. 10: El Amin

Bild Nr. 11: Keshlaf

Bild Nr. 14. Hamuda, war Konsul vor Ali Keshlaf

Bild Nr. 19 Hadi

Bild Nr. 20. Drera, Presseabteilung

Bild Nr. 21 hätte ich als Dargam nicht wiedererkannt

Bild Nr. 22: Nabil Amashe

Bild Nr. 23. Abul Salam

Bild Nr. 24: für Telex zuständig

Bild Nr. 25: Abulati, jetzt im libyschen Außenministerium Sekretar

Bild Nr. 27: Shalbak, Botschafter in Bonn

Bild Nr. 28: Muntaser

Bild Nr. 29. Name unbekannt

Bild Nr. 51: habe ich gefragt, ob er eine Kiste hat (beabsichtigte Schleusung der Manon)

Das Bild auf Seite 7 zeigt Abu Ali.

Auf dem Bild Seite 8 werden Youssef und Achmed gezeigt  Die Frau kenne ich nicht

Von den Frauen habe ich wiedererkannt

Nr. 3 – 6: Suad, die Frau von Youssef

Nr. 13/14: hat am Flughafen Schonefeld gearbeitet

Nr. 15 – 17: Manon, meine Ehefrau

Nr. 23:      die Freundin von Youssef

Nr. 27:      Petra, hat ein Kind mit einem Libyer vom Volksbüro

Nr. 31:      Freundin von Saleh  Hadba

Nr. 33 – 35: verkehrte im Palasthotel

Nr. 40:      Verena Chanaa

Nr. 46:      Verena Chanaa

Ich bin auf das Lichtbild Nr. 49 hingewiesen worden  Nachdem mir gesagt wurde, daß diese Frau mit ihrer Mutter oft zusammen war, fällt mir ein, daß diese Frau Annegret oder ähnlich heißt. Sie wohnte außerhalb von Berlin. Sie war oft mit der ganzen Gruppe zusammen. Sie ging mit sehr viel Arabern. Ich war auch mit ihr zusammen.



50

# The Language Link of Connecticut
Translation, DTP and Foreign Language Typesetting

5

Question:

Do you know where Said Rashid is now?

Answer:

He is the director of a state owned Libyan electronics company in Tripoli.

Self-read, approved and signed

[signatures]

5

Frage·

Ist Ihnen bekannt, wo sich Said Rashid heute aufhalt?

Antwort·

Er ist Direktor der staatlichen libyschen Elektronikfirma in Tripolis

Selbst gelesen, genehmigt und unterschrieben.

# *The Language Link of Connecticut*

Translation, DTP and Foreign Language Typesetting

[page has stamp]

354 Main Street, Suite 8, Newington, CT  06111  •  860-561-5438  •  fax 425-988-7688
www.aptranslation.com  •  languagelink@cox.net

# The Language Link of Connecticut
Translation, DTP and Foreign Language Typesetting

[letterhead Holiday Inn Malta]





# EXHIBIT 1(d)

# *The Language Link of Connecticut*
Translation, DTP and Foreign Language Typesetting

Confidential – For official use only

From: Washington

Nr. 596 from 31.03.2001, 1734 oz
Citissime

---

Telex (Encoded) to 200

---

Written by: Ambassador
Gz.; Pol 321.10

Subject: Visit of Federal Chancellor Schröder in Washington on March 29th, 2001

----Follows in two parts ----

I. Summary
Federal Chancellor Schröder met with President Bush in Washington on March 29th for a first meeting and resultantly also met the head of the senate and of the House of Representatives.

1

354 Main Street, Suite 8, Newington, CT 06111 • 860-561-5438 • fax 425-988-7688
www.aptranslation.com • languagelink@cox.net

V S - N u r   f u e r   d e n   D i e n s t g e b r a u c h

aus: WASHINGTON
nr 596 vom 31.03.2001, 1734 oz
C i t i s s i m e
--------------------------------------------------
Fernschreiben (verschluesselt) an 200
--------------------------------------------------
Verfasser: Botschafter
Gz.: Pol 321.10
Betr.: Besuch Bundeskanzler Schröder in Washington am 29. März 2001

--folgt DB in zwei Teilen--
I. Zusammenfassung
Bundeskanzler Schröder hielt sich am 29. März zu einem ersten
Arbeitstreffen mit Präsident Bush in Washington auf und traf aus
diesem Anlaß auch mit der Führung des Senats und des
Repräsentantenhauses zusammen.

1

# *The Language Link of Connecticut*
Translation, DTP and Foreign Language Typesetting

In a small group (on the US side additional with Foreign Minister Powell and security advisor Rice, on the German side MD Steiner, Ambassador Chrobog) the current important foreign policy topics were discussed. Of particular significance was environmental topic, where the existing differences of opinion became apparent. There was a high degree of affinity in the topics RUS, Missile Defense, Turkey and Middle East. After the talks a joint statement ("Transatlantic Vision for the 21st Century") was published.

60

In einem Gespräch im kleinen Kreis (auf US-Seite zusätzlich AM
Powell und Sicherheitsberaterin Rice, auf deutscher Seite MD
Steiner, Botschafter Chrobog) wurden die derzeitig wichtigen
außenpolitischen Themen behandelt. Besondere Bedeutung kam dem
Thema Umwelt zu, in dem die bestehenden Meinungsunterschiede
deutlich wurden. Ein großes Maß an Übereinstimmung gab es zu den
Themen RUS, Missile Defense, Türkei und Naher Osten. Im Anschluß an
die Gespräche wurde eine gemeinsame Erklärung ("Transatlantic
Vision for the 21st Century") veröffentlicht.

II. Im einzelnen
1. Rußland:
Präs. Bush betonte, es gebe keine feindliche Einstellung der USA
ggü. RUS. Bevor man aber zu weiterer wirtschaftlicher Unterstützung
bereit sei, müsse man Putins Politik besser kennenlernen und seine
Ziele analysieren. Auf seine Frage nach der Einschätzung des BK zu
Putin und dessen Politik unterrichtete dieser über sein
Zusammentreffen anl. des orthodoxen Weihnachtsfestes zu Beginn
dieses Jahres. Putin käme aus dem alten Apparat, habe sich aber
weiter entwickelt. Er glaube, daß es feste Beziehungen zwischen RUS
und dem "christlichen Abendland" geben müsse, so wie er sich
ausgedrückt habe. Dieses schließe insbesondere Europa aber auch die
USA ein und sei notwendig, um sich gegen den islamischen
Fundamentalismus zu behaupten. Mit dieser Auffassung begründe er
auch seine Tschetschenien-Politik. BK habe festgestellt, daß Putin
dem orthodoxen Glauben sehr verbunden sei. Zu Putin gebe es
gegenwärtig keine vernünftige Alternative. Er bemühe sich,
langfristig ein marktwirtschaftliches und tendenziell
demokratisches System durchzusetzen, was unsere Unterstützung
verdiene. Offen sei aber die Frage, ob er sich gegen die alten,
durch die SU geprägten Eliten wirklich durchsetzen könne. Der
Westen täte gut daran, Putin zu stabilisieren. BK stimmte mit Bush
darin überein, daß es nicht um neue Finanzhilfen gehen könne,
solange ungeheure Summen ins Ausland geschafft würden. Zwischen D
und RUS gebe es eine ständige Diskussion über die Altschulden, die
von RUS zurückgezahlt werden müßten, wozu es aufgrund der
Öleinnahmen auch durchaus in der Lage sei und was gegenwärtig auch
geschähe. BK betonte, daß D in Europa eine besondere Verantwortung
übernommen habe, um den Reformprozeß in RUS und in Osteuropa zu
stabilisieren.

Präs. Bush betonte das Interesse der USA an einem
marktwirtschaftlich orientierten RUS. Die amerikanische Politik
stelle ggü. Putin keine Bedrohung dar. Er teilte die Auffassung,
daß der islamische Fundamentalismus auch für RUS eine echte
Bedrohung sei. Daher sei für ihn die Schaffung eines
Raketenabwehrsystems auch im russischen Interesse. Er habe zwei
Sorgen bezüglich Putin: Erstens dessen Umgang mit der freien
Presse, zweitens die fortlaufende Bewaffnung Irans, was jeder Logik
entbehre, da RUS damit den islamischen Fundamentalismus
unterstütze. Putin wäre besser beraten, sich an dem
Raketenabwehrprogramm der Amerikaner zu beteiligen.

BK verwies auf die Teilnahme Putins beim Europäischen Rat in
Stockholm, wo dieser interessanterweise seine Rede mit der
Bemerkung eingeleitet habe, er betrachte die NATO nicht als Feind
oder Gegner. Was die Bemerkung des Präsidenten zum russ. Verhältnis
zum Iran anginge, teile er diese.

2

# The Language Link of Connecticut

Translation, DTP and Foreign Language Typesetting

6. Middle East

President Bush referred to a recent telephone conversation with Sharon, who will respond to terrorism with the military. Arafat does not want to give in. Also Foreign Minister Powell informed about a telephone conversation with Arafat who lost his grip on reality ("The guy is lost."). He is blaming everybody else, except himself. Israel, Iran, USA, all are responsible for the situation at the moment. He was asking again and again for the American agenda, how to return to peace talks and referred to the Arab Summit, which supposedly supported a continuation of the peace process. This Powell rates as totally absurd. The language during this Summit was totally inadequate ("outrageous"). He made clear to Arafat that there will be no American efforts. First of all an end of the violence is necessary. But it seems to be impossible to explain this to Arafat.

The Federal Chancellor supported the American position that all the parties are challenged by themselves. No external micromanagement was possible, such as the former administration had tried to do. One cannot force the parties to an agreement. He understands the new American strategy, but did not rule out dangerous developments resulting from it.

President Bush explained the future US strategy: At the moment we are developing a position with other Arabic countries and building a new alliance with countries like Egypt, Jordan and Saudi Arabia. There are also intensified talks with Syria. Powell had favourable impressions there.

The Federal Chancellor expressed his opinion on the indivuduals concerned. The Jordanian King is one of the most intelligent leader in the region, but also the most powerless. In the case of Bashar it is different; he wants to change his country. But it is not clear how much he depends on the nomenclature (sic) of his country. The Federal Chancellor described his talks with the Syria Cabinet due to the presented militant statements as "terrible".

The President stressed the American responsibilities vis a vie Israel, which they will also stand by in the future. The Federal Chancellor supported this position. Also for us, the right of Israel to exist is untouchable. Germany is doing a lot for the military stabilization of this country without making it public.

MD Steiner reported on his talks in Libya with Gadafi who admitted that Libya was active in terroristic

354 Main Street, Suite 8, Newington, CT  06111 • 860-561-5438 • fax 425-988-7688
www.aptranslation.com • languagelink@cox.net

62

Risiko eingestiegen sei, habe auch die Folgen selbst zu tragen.

Präs. Bush unterstrich das amerikanische Interesse an einer starken Türkei und empfahl eine enge Abstimmung zwischen dem deutschen und amerikanischen Finanzminister. Die Türkei müsse dringend einen Reformprozeß in Gang setzen, insbesondere eine Restrukturierung des Bankensystems sei notwendig. Der türkische Finanzminister habe sich ggü. US-FM O'Neill optimistisch über die Reformbereitschaft seines Landes geäußert, was als Durchbruch zu sehen sei.

6. Naher Osten
Präs. Bush verwies auf ein kürzlich geführtes Telefongespräch mit Scharon, der auf den Terrorismus militärisch antworten wolle. Arafat sei nicht zum Einlenken zu bewegen. AM Powell unterrichtete seinerseits über ein heutiges Telefongespräch mit Arafat. Dieser habe völlig den Bezug zur Realität verloren ("The guy is lost."). Er schiebe die Schuld auf alle anderen, nur nicht auf sich selbst. Israel, Iran, USA, alle seien für die derzeitige Lage verantwortlich. Er frage immer wieder nach den amerikanischen Vorstellungen, wie die Friedensverhandlungen wieder aufgenommen werden könnten und verwies auf den arabischen Gipfel, der sich angeblich für die Fortsetzung des Friedensprozesses ausgesprochen habe. Diesen Hinweis bezeichnete Powell als völlig abwegig. Die Sprache dieses Gipfels sei völlig unangemessen gewesen ("outrageous"). Er habe Arafat deutlich zu verstehen gegeben, daß es keinerlei amerikanische Anstrengungen geben werde. Zunächst sei ein Ende der Gewalt notwendig. Es sei aber offensichtlich unmöglich, Arafat dieses verständlich zu machen.

BK unterstützte die amerikanische Haltung, daß zunächst einmal die Parteien selbst gefordert seien. Von außen könne kein Micromanagement gemacht werden, so wie es die frühere Administration versucht habe. Man könne die Parteien nicht zu einer Einigung zwingen. Ihm leuchte die neue amerikanische Strategie ein, dennoch seien gefährliche Weiterentwicklungen nicht auszuschließen.

Präs. Bush erläuterte die zukünftige US-Strategie: Man sei jetzt dabei, eine Position mit anderen arabischen Staaten zu entwickeln und eine neue Allianz aufzubauen mit Staaten wie Ägypten, Jordanien und Saudi Arabien. Auch mit Syrien sei man verstärkt im Gespräch, Powell habe dort ein gutes Klima vorgefunden.

BK gab seine Einschätzung zu den handelnden Personen wieder. Der jordanische König sei einer der intelligentesten Führer in der Region, aber auch der machtloseste. Bei Bashar lägen die Dinge anders, er wolle sein Land verändern. Es sei aber nicht klar, wie weit er von der Nomenklatur seines Landes abhängig sei. BK bezeichnete sein Gespräch mit dem syrischen Kabinett, aufgrund der dort vorgetragenen militanten Äußerungen, als "schrecklich".

Präs. Bush betonte die amerikanische Verpflichtung gegenüber Israel, zu der man auch in Zukunft stehen werde. BK unterstützte diese Position. Auch für uns sei das Lebensrecht Israels unantastbar. Deutschland täte viel zur militärischen Stabilisierung dieses Landes, ohne dieses in die Öffentlichkeit zu tragen.

MD Steiner berichtet über seine Gespräche mit Gadafi in Libyen. Dieser habe eingestanden, daß sich Libyen an terroristischen

# The Language Link of Connecticut
Translation, DTP and Foreign Language Typesetting

Activities (La Belle, Lockerbie). He declares that he is swearing off terrorism and is asking for help to prove this new position of Libya. Even Gadafi is afraid of fundamentalist movements.

Aktionen (La Belle, Lockerbie) beteiligt habe. Er habe erklärt, dem
Terrorismus abgeschworen zu haben und bat um die Chance, diese neue
Haltung Libyens beweisen zu können. Auch Gadafi habe Angst vor
fundamentalistischen Strömungen.

III. In einem erweiterten Delegationsgespräch, an dem auch VP
Cheney und weitere Mitarbeiter des NSC teilnahmen, wurden die
Themen ESVP, Europa und NATO-Erweiterung besprochen.

1. ESVP:
Präs. Bush unterstrich, die amerikanische Unterstützung für diese
Politik, soweit sie nicht die NATO unterminiere. BK erläuterte die
deutsche Haltung und betonte, daß ESVP nicht in Konkurrenz zur NATO
stehe. Er warb dafür, den Verteidigungsbeitrag nicht nur in den
Prozentzahlen des Verteidigungshaushaltes im Verhältnis zum
Bruttosozialprodukt zu messen, sondern die Gesamtleistungen in
Rechnung zu stellen. Milliarden DM seien in den vergangenen zehn
Jahren von West- nach Ostdeutschland geflossen. Wir trügen die
Hauptlast bei dem Versuch, RUS und Südosteuropa

# EXHIBIT 1(e)

# *The Language Link of Connecticut*

Translation, DTP and Foreign Language Typesetting

---

Federal Intelligence Service (BND)

82049 Pullach, 9 October 1996

The President

---

Prosecution of the
Superior Court of Justice Berlin
C/o Mrs. Senior Prosecutor Mehlis
Elszholz Strasse 30-33

10781 Berlin

RE: Attack in the disco "La Belle" at 04.04.86
       Here: Wording of the Telex communication between the Volksbüro (Libyan People's Office) in East Berlin and the Libyan Intelligence Service center in Tripoli / Libya

Dear Mr. Senior Prosecutor,

The Federal Intelligence Service (BND) came to the knowledge of the following Telex communication (original language Arabic) during the investigation of the complex "La Belle":

1.  25.03.86 - 11.30 from Tripoli (almarafiq) to East Berlin (Volksbüro (Libyan People's Office)
    "to the Volksbüro (Libyan People's Office) in Berlin, to Alamin Abdallah. It is only possible with the path [help] of the Palestinians to hit the Americans with the weapons, which they have.
    At the same time it is possible, to use all Arabs and friends likewise for the same issue.
    Almarafiq"

67



**BND**
**BUNDESNACHRICHTENDIENST**
Der Präsident

82049 Pullach, 09. Oktober 199.

> Staatsanwaltschaft
> bei dem Kammergericht
>
> Eing am **18. OKT. 1996**
>
> mit Anl. Statts. Bd Akten

Staatsanwaltschaft
bei dem Kammergericht Berlin
z. Hd. Herrn Oberstaatsanwalt Mehlis
Elszholz Straße 30 - 33

10781 Berlin

Betr.:  Anschlag auf die Diskothek "La Belle" am 04.04.86

hier:  Wortlaut der Telex-Verkehre zwischen dem Libyschen Volksbüro (LVB)
in Berlin-Ost und der libyschen Nachrichtendienstzentrale in
Tripolis/Libyen

Sehr geehrter Herr Oberstaatsanwalt,

dem BND sind im Rahmen seiner Aufklärungstätigkeit zum Komplex "La Belle" die
folgenden Telex-Verkehre (Originalsprache arabisch) zur Kenntnis gelangt:

1.    25.03.86, 11.30 Uhr, von Tripolis (almarafiq) an Berlin-Ost (LVB)
      "an das volksbuero in berlin
      zur aufmerksamkeit von alamin abdaliah.
      es ist nur moeglich, auf dem wege über die palaestinenser die amerikaner mit den
      waffen zu schlagen, die es bei ihnen gibt.
      es ist dabei moeglich, alle araber und freunde ebenso für die gleiche angelegenheit
      zu benutzen
      almarafiq"

- 2 -

# The Language Link of Connecticut
Translation, DTP and Foreign Language Typesetting

-2-

2. 26.03.86 – 13.15 from Tripoli (almarafiq) to East Berlin (Volksbüro (Libyan People's Office)
   "to the Libyan representation in Berlin. You said you are ready. Wait for the instructions. How will the agreement become visible? Almarafiq"

3. 26.03.86 from East Berlin (Volksbüro (Libyan People's Office) to Tripoli (almarafiq)
   "to Engineer Said. Today Brother Jihad Amin Hifawy will arrive at your place. He is sent by us to explain the issue on the European theatre. We ask you to welcome him and meet with him. Volksbüro (Libyan People's Office) Berlin."

4. 04.04.86 from East Berlin (Volksbüro (Libyan People's Office) to Tripoli (almarafiq)
   "to Engineer Said. Expect the result tomorrow morning, God willing (Note: Text cut here) Volksbüro (Libyan People's Office) Berlin."

5. 05.04.86 from East Berlin (Volksbüro (Libyan People's Office) to Tripoli (almarafiq)
   "at 1.30 in the morning an action was carried out successful, without leaving any trace. Volksbüro (Libyan People's Office) Berlin."

Behind the term "almarafiq" most probably the name of the Libyan Intelligence Service center in Tripoli/Lybia is hidden.
Beside the Telex communications above which include the period from 25.03.83 until 05.04.86, the Federal Intelligence Service (BND) has no further finding from the technical investigation to the attack in the disco "La Belle"

Regards,

To proxy

(Dr. Keßelring)

354 Main Street, Suite 8, Newington, CT  06111 • 860-561-5438 • fax 425-988-7688
www.aptranslation.com • languagelink@cox.net

69

- 2 -

2.  26.03.86, 13.15 Uhr, von Tripolis (almarafiq) an Berlin-Ost (LVB)
    "an die libysche vertretung in berlin.
    sie haben gesagt, sie seien bereit. warten sie die anweisungen ab.
    wie wird die absprache sichtbar?
    almarafiq"

3.  26.03.86, von Berlin-Ost (LVB) an Tripolis (almarafiq)
    "zur aufmerksamkeit des ingenieurs said.
    es wird bei ihnen heute bruder jihad amin hifawy eintreffen. er ist von uns
    geschickt, um angelegenheiten auf der europaeischen buehne zu eroertern. es wird
    gebeten, ihn zu empfangen und sich mit ihm zu treffen
    das volksbuero berlin "

4.  04.04.86, von Berlin-Ost (LVB) an Tripolis (almarafiq)
    "zur aufmerksamkeit des ingenieurs said
    erwarten sie das ergebnis morgen frueh, so gott will (Anmerkung:Text bricht hier
    ab)
    das volksbuero in berlin"

5.  05.04.86, von Berlin-Ost (LVB) an Tripolis (almarafiq)
    "um 1.30 uhr heute frueh hat die durchfuehrung einer der aktionen mit erfolg
    stattgefunden, ohne irgendeine spur zu hinterlassen.
    das volksbuero in berlin"

Hinter dem Begriff "almarafiq" verbirgt sich mit großer Wahrscheinlichkeit die
Bezeichnung der libyschen Nachrichtendienstzentrale in Tripolis/Libyen
Außer den o. a. Telex-Verkehren, die den Zeitraum vom 25.03.83 bis 05.04.86
umfassen, verfügt der BND über keine weiteren Erkenntnisse aus der technischen
Aufklärung zum Anschlag auf die Diskothek "La Belle"

Mit freundlichem Gruß
In Vertretung


(Dr. Keßelring)

# EXHIBIT 1(f)

# The Language Link of Connecticut

Translation, DTP and Foreign Language Typesetting

Local Court Tiergarten

Arrest Warrant

Against the accused

1. Mohamed Abdullah Said Rashid.
   Born July 17th 1949 in Tripoli, Libya.
   Present domicile unknown.

2. Elamin A. Elamin.
   Born 1938 in Mezdah / Libya
   Present domicile unknown.

3. Ali Ibrahim O Keshlaf
   Born 1952 in S Kames/ Libya
   Present domicile unknown.

4. Souad Chraidi
   Born 1954 in Beirut/ Libya
   Living in Saida District Abra / Lebanon with Al Famawi

5. Musbah Al Abani
   Born 1955 in Tagura/ Libya
   Present domicile unknown.

354 Main Street, Suite 8, Newington, CT  06111 • 860-561-5438 • fax 425-988-7688
www.aptranslation.com • languagelink@cox.net

72

**Amtsgericht Tiergarten**

Berlin-Tiergarten, Turmstraße 91 Wilsnacker Straße 4
Fernruf bei direkte Durchwahl nebenanschluss
Fernruf (Vermittlg.) 39 79 - 1  Intern (9 3 1)
Telefax-Nr. 181 799 kiamg d. Telefax-Nr. (030) 39 79 - 29 16
Postscheckkto der Amtskasse Berlin
Bla 3 52 - 1-8 - BLZ 100 1 ht 10.

☎

Datum

─────────────────────

Gesch.-Nr        ( 39 79  001_          )
bitte stets
angeben


# Haftbefehl


Gegen die Beschuldigten


1. Mohamed Abdullah **Said Rashid**,

   geboren am 17. Juli 1949 in Tripolis/Libyen

   derzeitiger Aufenthalt unbekannt.


2. Elamin A. **Elamin**,

   geboren 1938 in Mezdah/Libyen

   derzeitiger Aufenthalt unbekannt.


3. Ali Ibrahim O. **Keshlaf**,

   geboren 1952 in S. Kames/Libyen

   derzeitiger Aufenthalt unbekannt


4. Souad **Chraidi**,

   geboren 1954 in Beirut/Libanon

   wohnhaft in Saida Stadtteil Abra/Libanon bei **Al Famawi**


5. Musbah **Al Abani**,

   geboren 1955 in Tagura/Libyen

   derzeitiger Aufenthalt unbekannt

# *The Language Link of Connecticut*
Translation, DTP and Foreign Language Typesetting

2

remand will be ordered.

They will be charged,

In Berlin and Tripoli / Libya
In the night of April 5th 1986 and before

1.   The accused Rashid, Elamin and Keshlaf are

Collectively charged with
Premeditated murder with means dangerous to public safety, and at the same time of causing an explosion and through this frivolously causing the deaths of persons and putting at risk valuable third party property.

2.   The accused Alabani and Souad Chraidi are

Charged as accessories to the above mentioned crime

At the end of March 1986, as senior member of the Libyan Intelligence Service in Tripoli / Libya the accused Said Rashid instructed the members of the Libyan Embassy in East Berlin as well as the Intelligence Service agent Elamin to carry out a terrorist attack on one facility of the American Army in West Berlin as soon as possible. As many people as possible should be killed during this attack. For this objective and with knowledge of the attack plans the accused Alabani transported weapons (including machine pistols and hand grenades) and about 12 kg explosives as diplomat luggage to the Libyan Embassy in East Berlin.

After Elamin and embassy secretary Keshlaf, who is directly responsible to Elamin, abandoned the plan which was devised together with the accused Joussef Chraidi and Ali Chanaa with participation of the accused Eter, to fire at a US military bus, they decided to carry out an attack with explosives.

2

wird die Untersuchungshaft angeordnet

Sie werden beschuldigt,

in Berlin und Tripolis/Libyen
in der Nacht zum 05. April 1986 und davor

1. die Beschuldigten **Rashid, Elamin** und **Keshlaf**

gemeinschaftlich
heimtückisch und mit gemeingefährlichen Mitteln Menschen getötet zu haben.
hierdurch zugleich
durch Sprengstoff eine Explosion herbeigeführt und hierdurch leichtfertig den Tod von
Menschen verursacht und fremde Sachen von bedeutendem Wert gefährdet zu haben.

II Die Beschuldigten **Alabani** und Souad **Chraidi**

vorsätzlich zu vorgenannter Tat Hilfe geleistet zu haben

Als leitender Angehöriger der libyschen Geheimdienstzentrale in Tripolis/Libyen wies der
Beschuldigte Said **Rashid** Ende März 1986 den Angehörigen der libyschen Botschaft in
Berlin (Ost) und gleichfalls Geheimdienstangehörigen ~~Keshlaf~~ an, baldmöglichst einen
Terroranschlag auf eine Einrichtung der amerikanischen Streitkräfte in Berlin (West), bei
dem möglichst viele Menschen getötet werden sollten, zu begehen. Zu diesem Zweck und
in Kenntnis der Anschlagsplanung transportierte der Beschuldigte **Alabani** als Diploma-
tengepäck Waffen, darunter Maschinenpistolen und Handgranaten und rund 12 kg Spreng-
stoff in die libysche Botschaft in Berlin (Ost)

Nachdem **Elamin** und der ihm unterstellte beschuldigte Botschaftssekretär **Keshlaf** den
gemeinsam mit den Beschuldigten Joussef **Chraidi** und Ali **Chanaa** unter Beteiligung des
Beschuldigten Eter gefaßten Plan, einen U. S. Militärbus zu beschießen, aufgegeben hat-
ten, entschlossen sie sich zur Begehung eines Sprengstoffanschlages

# The Language Link of Connecticut
Translation, DTP and Foreign Language Typesetting

3

With the participation of Verena Chanaa, an acitve participant in the action, they chose to attack the disco "La Belle", Hauptstrasse 78-79 in Schöneberg.

To this end and with knowledge of the attack plans, the accused Souad Chraidi transported the individual parts of the bomb which would be used. The parts were handed over to her by Keshlaf. Souad Chraidi brought the parts over the inner-city border to the apartment of the married couple Chanaa, Lindenstrasse 115 in Kreuzberg.

On the evening of April 4th 1986, in the above mentioned apartment and in the presence of the accused Ali and Verena Chanaa, Chraidi and Eter, the bomb which contained 3kg explosives mixed with metal parts and an electronic time fuse was activated.

The accused Verena Chanaa and her sister Andrea Häusler, who also knew about the planned attack, went to the disco "La Belle" together. As agreed in advance, she placed, with the consent of her sister, the bomb which was hidden in her hand bag on a bench close to the bar. After which both of the accused left the disco.

The bomb detonated on April 5 at about 1:40. The explosion tore a hole about 1 sqm in the floor, destroyed parts of the ceiling and pressed the front of the disco out toward the street. The 28 year old Turkish citizen Haney and the 21 year old US Military member Ford sustained severe injuries and died at the crime scene. The 25 year old US soldier Goins died on June 7th 1986 due to his injuries. Many additional guests received severe injuries (burns, fractures, dismemberment) and were partly permanently deformed. About 100 injured received a perforated eardrum as a resultof the explosion pressure.

Crimes based on §§ 221, 311, 25 Chapter 2, 27, 52 StGB (German Penal Code)

354 Main Street, Suite 8, Newington, CT  06111 • 860-561-5438 • fax 425-988-7688
www.aptranslation.com • languagelink@cox.net

3

Unter Beteiligung der unmittelbar tatausführenden Verena **Chanaa** wählten sie für den durchzuführenden Anschlag die Disco,nek „La Belle", Hauptstraße 78 - 79 in Schöneberg, aus.

Zu diesem Zweck transportierte die Beschuldigte Souad **Chraidi** in Kenntnis der Anschlagsplanung die ihr von **Keshlaf** übergebenen Einzelteile der zur Verwendung kommenden Bombe über die innerstädtische Grenze in die Wohnung der Eheleute **Chanaa**, Lindenstraße 115 in Kreuzberg

Am Abend des 04 April 1986 wurde die aus ca 3 kg mit Metallteilen versetztem Sprengstoff und einem elektronischen Zeitzünder versehene Bombe in vorgenannter Wohnung im Beisein der Beschuldigten Ali und Verena **Chanaa**, **Chraidi** und **Eter** scharf gemacht

Die Beschuldigte Verena **Chanaa** begab sich sodann gemeinsam mit der von ihr in den Tatplan eingeweihten Schwester Andrea **Häusler** in die Discothek „La Belle" Wie zuvor verabredet, legte sie den dort in ihrer Handtasche versteckten Sprengsatz mit Einverständnis ihrer Schwester auf einer Sitzbank in der Nähe der Bar ab Anschließend verließen beide Beschuldigte das Lokal

Der Sprengsatz zündete am 05 April gegen 01.40 Uhr Die Explosion riß ein etwa 1 qm großes Loch in den Fußboden, zerstörte Teile der Decke und drückte die Vorderfront auf die Straße Die 28jährige türkische Staatsangehörige **Haney** und der 21jährige U S. Militärangehörige **Ford** erlitten schwere Verletzungen, an denen sie noch am Tatort verstarben. Der 25jährige U.S Soldat **Goins** verstarb am 07 Juni 1986 an seinen Verletzungen. Zahlreiche weitere Besucher erlitten schwerste Verletzungen (Verbrennungen, Knochenbrüche, Verlust von Gliedmaßen) und wurden teilweise dauerhaft entstellt Rund 100 Verletzten platzten durch den Explosionsdruck die Trommelfelle

Verbrechen, gemäß §§ 211, 311, 25 Abs 2, 27, 52 StGB

# The Language Link of Connecticut

Translation, DTP and Foreign Language Typesetting

4

The accused are strongly suspected of committing this crime based on the credible confession by the also accused Eter, and also by many additional items of supporting evidence.

The external course of events results from the other investigations by police and prosecution as well as the autopsy report.

Detention is warranted because of § 112 Chapter 3 StPO   (Code of Criminal Procedure). All of the accused should expect life sentences.

4

Die Beschuldigten sind dieser Tat dringend verdächtig aufgrund des glaubhaften Geständ-
nisses des Mitbeschuldigten **Eter**, welches wiederum durch zahlreiche weitere Beweismit-
tel bestätigt wird

Der äußere Tathergang ergibt sich aus den übrigen polizeilichen und staatsanwaltschaftli-
chen Ermittlungen, sowie den Obduktionsgutachten.

Es besteht der Haftgrund des § 112 Abs 3 StPO  Alle Beschuldigte haben mit der Verhän-
gung lebenslanger Freiheitsstrafe zu rechnen

Langfristiger

Ebson
Richter am Amtsgericht

Ausgefertigt

Justizangestellte

# EXHIBIT 2

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ROBERT LEE BEECHAM, et al.       :

                                :

        **Plaintiffs**        :

                                :     **Civil Action No. 01-2243**

     v.                        :     **(RWR)**

                                :

SOCIALIST PEOPLE'S LIBYAN   :

ARAB JAMAHIRIYA, et al.      :

                                :

        **Defendants**     :

## DECLARATION OF DAVID LONG, Ph. D.

I, David Long, Ph. D., hereby affirm and swear as follows:

1.    I am over 18 years of age and have personal knowledge of the following facts:

2.    I served in the U.S. Foreign Service from 1962 to 1993, specializing in the Middle East and was a Deputy Director of the State Department's Office of Counterterrorism for Regional Affairs in the 1980s, including the time period relevant to this case.

3.    During and since that time, I taught at several universities, including Georgetown University where I was the first Executive Director of the Center for Contemporary Arab Studies, the Johns Hopkins University School of Advanced International Studies, the University of Pennsylvania and the US Coast Guard Academy where I was Acting Head of the Humanities Department. I have also lectured extensively in the United States and abroad.

4.    My published works include *The Government and Politics of the Middle East and North Africa* (co-editor with Bernard Reich and Mark Gasiowarski), 5th ed. (2007), *The Culture and Customs of Saudi Arabia* (2005), *Gulf Security in the Twenty-First Century* (co-editor with Christian Koch, 1998), *The Kingdom of Saudi Arabia* (1997), *The Anatomy of Terrorism* (1990), *The United States and Saudi Arabia: Ambivalent Allies* (1985), and *The Hajj Today: A Survey of the Contemporary Makkah Pilgrimage* (1979).

5.    By the time of the LaBelle disco bombing on April 5, 1986, the Qaddafi regime had long been a major concern to the United States, not only for its terrorist activities but also for its close relations with the Soviet Union. In the wake of the Libyan-supported Rome and Vienna airport terrorist attacks by the Abu Nidal Organization the previous December, senior members of the Reagan Administration considered military reprisals against Libya for the loss of life of American citizens.

6.    The decision was made first to invoke economic sanctions against Libya based on the International Emergency Economic Powers Act, but to warn Qaddafi that the United States would deal harshly with any subsequent Libyan terrorist activities. Defense Department planners began immediately preparing for such a contingency, and intelligence surveillance of Libyan covert activities continued at a high level.

7.    The United States, as well as Britain, Germany and other NATO allies, had access to Libyan diplomatic cable traffic through communications intelligence. On March 25, intercepted cables from Libya's intelligence service to Libyan diplomatic missions in Europe instructed them to carry out terrorist attacks against Americans. These instructions were corroborated by subsequent intelligence of Libyan plans to attack

targets in East Berlin, Bonn, Ankara, Paris, and in Yugoslavia, Switzerland and Italy.

Further intercepted cable traffic between the Libyan diplomatic mission in East Berlin

and Libya linked the Libyan government directly to the commission of the LaBelle

Discotheque bombing.

8.    I personally viewed these communication intercepts and they left no doubt in

my mind that Libya ordered its agents in Germany to commit the terrorist attack

commonly referred to as the LaBelle Discotheque bombing.  I would have no hesitation

in testifying in a court of law that the government of Libya ordered its intelligence

personnel located in the Libyan embassy in East Germany to carry out the LaBelle

Discotheque bombing.

9.    Attached hereto is an English translation of the intercepted cable traffic

referenced in paragraphs 7-8 of this Declaration.  The English translation accurately

depicts the substance of the intercepted cable traffic that I reviewed as set forth in

paragraphs 7-8 of this Declaration.

10.    Following the reunification of Germany, formerly classified East German

secret police (Stasi) files were made available, resulting in the conviction in Germany of

employees of the Libyan mission and accomplices for their role in the LaBelle

Discotheque bombing.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on  _September 27, 2007_                    _David Long, Ph. D._

# The Language Link of Connecticut
Translation, DTP and Foreign Language Typesetting

Federal Intelligence Service (BND)

82049 Pullach, 9 October 1996

The President

Prosecution of the
Superior Court of Justice Berlin
C/o Mrs. Senior Prosecutor Mehlis
Elszholz Strasse 30-33

10781 Berlin

RE: Attack in the disco "La Belle" at 04.04.86
   Here: Wording of the Telex communication between the Volksbüro (Libyan People's Office) in East Berlin and the Libyan Intelligence Service center in Tripoli / Libya

Dear Mr. Senior Prosecutor,

The Federal Intelligence Service (BND) came to the knowledge of the following Telex communication (original language Arabic) during the investigation of the complex "La Belle":

1.  25.03.86 - 11.30 from Tripoli (almarafiq) to East Berlin (Volksbüro (Libyan People's Office)
    "to the Volksbüro (Libyan People's Office) in Berlin, to Alamin Abdallah. It is only possible with the path [help] of the Palestinians to hit the Americans with the weapons, which they have. At the same time it is possible, to use all Arabs and friends likewise for the same issue. Almarafiq"

354 Main Street, Suite 8, Newington, CT  06111 • 860-561-5438 • fax 425-988-7688
www.aptranslation.com • languagelink@cox.net

# The Language Link of Connecticut
Translation, DTP and Foreign Language Typesetting

-2-

2.  26.03.86 – 13.15 from Tripoli (almarafiq) to East Berlin (Volksbüro (Libyan People's Office)
    "to the Libyan representation in Berlin. You said you are ready. Wait for the instructions. How will
    the agreement become visible? Almarafiq"

3.  26.03.86 from East Berlin (Volksbüro (Libyan People's Office) to Tripoli (almarafiq)
    "to Engineer Said. Today Brother Jihad Amin Hifawy will arrive at your place. He is sent by us to
    explain the issue on the European theatre. We ask you to welcome him and meet with him.
    Volksbüro (Libyan People's Office) Berlin."

4.  04.04.86 from East Berlin (Volksbüro (Libyan People's Office) to Tripoli (almarafiq)
    "to Engineer Said. Expect the result tomorrow morning, God willing (Note: Text cut here)
    Volksbüro (Libyan People's Office) Berlin."

5.  05.04.86 from East Berlin (Volksbüro (Libyan People's Office) to Tripoli (almarafiq)
    "at 1.30 in the morning an action was carried out successful, without leaving any trace. Volksbüro
    (Libyan People's Office) Berlin."

Behind the term "almarafiq" most probably the name of the Libyan Intelligence Service center in
Tripoli/Lybia is hidden.
Beside the Telex communications above which include the period from 25.03.83 until 05.04.86, the
Federal Intelligence Service (BND) has no further finding from the technical investigation to the attack in
the disco "La Belle"


Regards,

To proxy

(Dr. Keßelring)

354 Main Street, Suite 8, Newington, CT  06111 • 860-561-5438 • fax 425-988-7688
www.aptranslation.com • languagelink@cox.net

85

# EXHIBIT 3

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ROBERT LEE BEECHAM, et al.              :
                                        :
                                        :
                  Plaintiffs            :
                                        :        Civil Action No. 01-2243
        v.                              :        (RWR)
                                        :
                                        :
SOCIALIST PEOPLE'S LIBYAN               :
ARAB JAMAHIRIYA, et al.                 :
                                        :
                                        :
                  Defendants            :

## DECLARATION OF AMBASSADOR ROBERT OAKLEY

I, Ambassador Robert Oakley, hereby affirm and swear as follows:

1.    I am over 18 years of age and have personal knowledge of the following facts:

2.    I served in the U.S. Foreign Service from 1957 to 1991. My assignments included embassies in a number of countries, including Lebanon, Somalia and Palestine, where terrorist operations were prevented. From 1984 to 1986, I was the Coordinator for Counterterrorism, following which, from 1986 to 1988, I was Special Assistant to the President for the Middle East and South Asia on the staff of the National Security Counsel. In the later two assignments, Libya and Libyan involvement in terrorism was a major issue to which I paid particular attention. This included U.S. policy, plans and actions toward Libya, preceding, during and after the events of this case.

3.    I have been also associated with the United States Institute of Peace and the National Defense University, working on issues involving the Middle East and South

Asia. From 1992 to 1993 and again from 1993 to 1994 I was the President's Special Envoy for Somalia.

4.    During the early 1980s Libya and Libyan-supported terrorism were a major concern for the United States. During this period Libya conducted terrorist activities in the United States and there were intelligence reports of attacks they planned against senior officials, including the Secretary of State. In 1984 and 1985 the Reagan Administration applied economic sanctions as well as making diplomatic representations in an effort to bring about a cessation of those Libyan activities. There were high level efforts to convince governments in Europe of the legitimacy of US concerns and to join us in applying economic sanctions. The Europeans rebuffed all U.S. representations while Libyan terrorist activities increased.

5.    In 1985 the Libyan government began large scale support of the powerful Palestinian terrorist Abu Nidal Organization. It conducted a number of terrorist attacks in Western Europe and Turkey, culminating in the December 1985 bombing of Rome and Vienna airports.

6.    At that point in order to generate more muscular support for greater pressure upon Libya, my office published an unclassified "White Paper" authored by David Long, Ph. D., detailing Abu Nidal activities and Libyan support for them.

7.    This still failed to generate European pressure upon Libya. The Reagan Administration, at the urging of Secretary of State Schultz, stepped up its own pressure by deploying the 6th Fleet to the Gulf of Sidra, off Libyan coastal waters, over which Qaddafi claimed to exercise sovereignty, contrary to international law. Qaddafi responded by ordering the Libyan navy and airforce to attack the U.S. Navy. Several

Libyan missile boats and aircraft were destroyed, as were the radar installations which guided them.

8.    Qaddafi decided to retaliate against the United States. Instructions were issued to Libyan Peoples Bureaus in East Berlin, France, Turkey and a number of other countries to carry out attacks against Americans. The United States intercepted those Libyan communications, which it had been doing for several years. The Reagan Administration shared this intelligence with the governments in question. In France and Turkey their intelligence services detected and placed under surveillance Libyan "hit teams" coming in from Tripoli, tracked them to Libyan Peoples Bureaus, and then to U.S. embassies. They were arrested before carrying out the planned attacks. In West Berlin, no target was specified in the instructions from Tripoli and it was not possible to detect the Libyan "hit team" which infiltrated from East Berlin.

9.    After LaBelle Discotheque was bombed, the Libyan Peoples Bureau in East Berlin sent a message to Tripoli, "mission accomplished."

10.    The magnitude of the planned Libyan attacks as well as the bombing of the LaBelle Discotheque caused the Reagan Administration to decide upon military action against Libya. Military and civilian government targets in Tripoli and Benghazi were selected for their involvement in Libyan terrorist activities. In order to maximize support from European governments the White House decided to share with Newsweek Magazine selected intercepts of Libyan communications.

11.    Several weeks after the raids upon Tripoli and Benghazi, I went to a meeting of the European Union Ministers of Justice and Interior, together with Attorney-General Meese and FBI Director Webster. The EU Ministers told us that the bombing raids had

caused them to review for the first time, at the senior level, all available intelligence on Libyan terrorism. Their conclusion was that the threat was even worse than the U.S. had been telling them.

12. I testify that these communication intercepts left no doubt that Libya ordered its agents in Germany to commit the terrorist attack commonly referred to as the LaBelle Discotheque bombing.

I declare under penalty of perjury that the foregoing is true and correct.


Executed on ___S︋ep︎l. 27, 2007___          _Robert B Oakley_
                                                                    Ambassador Robert Oakley

# EXHIBIT 4

# Address to the Nation on the United States Air Strike Against Libya

## April 14, 1986

My fellow Americans:

At 7 o'clock this evening eastern time air and naval forces of the United States launched a series of strikes against the headquarters, terrorist facilities, and military assets that support Mu`ammar Qadhafi's subversive activities. The attacks were concentrated and carefully targeted to minimize casualties among the Libyan people with whom we have no quarrel. From initial reports, our forces have succeeded in their mission.

Several weeks ago in New Orleans, I warned Colonel Qadhafi we would hold his regime accountable for any new terrorist attacks launched against American citizens. More recently I made it clear we would respond as soon as we determined conclusively who was responsible for such attacks. On April 5th in West Berlin a terrorist bomb exploded in a nightclub frequented by American servicemen. Sergeant Kenneth Ford and a young Turkish woman were killed and 230 others were wounded, among them some 50 American military personnel. This monstrous brutality is but the latest act in Colonel Qadhafi's reign of terror. The evidence is now conclusive that the terrorist bombing of La Belle discotheque was planned and executed under the direct orders of the Libyan regime. On March 25th, more than a week before the attack, orders were sent from Tripoli to the Libyan People's Bureau in East Berlin to conduct a terrorist attack against Americans to cause maximum and indiscriminate casualties. Libya's agents then planted the bomb. On April 4th the People's Bureau alerted Tripoli that the attack would be carried out the following morning. The next day they reported back to Tripoli on the great success of their mission.

Our evidence is direct; it is precise; it is irrefutable. We have solid evidence about other attacks Qadhafi has planned against the United States installations and diplomats and even American tourists. Thanks to close cooperation with our friends, some of these have been prevented. With the help of French authorities, we recently aborted one such attack: a planned massacre, using grenades and small arms, of civilians waiting in line for visas at an American Embassy.

Colonel Qadhafi is not only an enemy of the United States. His record of subversion and aggression against the neighboring States in Africa is well documented and well known. He has ordered the murder of fellow Libyans in countless countries. He has sanctioned acts of terror in Africa, Europe, and the Middle East, as well as the Western Hemisphere. Today we have done what we had to do. If necessary, we shall do it again. It gives me no pleasure to say that, and I wish it were otherwise. Before Qadhafi seized power in 1969, the people of Libya had been friends of the United States. And I'm sure that today most Libyans are ashamed and disgusted that this man has made their country a synonym for barbarism around the world. The Libyan people are a decent people caught in the grip of a tyrant.

To our friends and allies in Europe who cooperated in today's mission, I would only say you have the permanent gratitude of the American people. Europeans who remember history understand better than most that there is no security, no safety, in the appeasement of evil. It must be the core of Western policy that there be no sanctuary for terror. And to sustain such a policy, free men and free nations must unite and work together. Sometimes it is said that by imposing sanctions against Colonel Qadhafi or by striking at his terrorist installations we only magnify the man's importance, that the proper way to deal with him is to ignore him. I do not agree.

92

Long before I came into this office, Colonel Qadhafi had engaged in acts of international terror, acts that put him outside the company of civilized men. For years, however, he suffered no economic or political or military sanction; and the atrocities mounted in number, as did the innocent dead and wounded. And for us to ignore by inaction the slaughter of American civilians and American soldiers, whether in nightclubs or airline terminals, is simply not in the American tradition. When our citizens are abused or attacked anywhere in the world on the direct orders of a hostile regime, we will respond so long as I'm in this Oval Office. Self-defense is not only our right, it is our duty. It is the purpose behind the mission undertaken tonight, a mission fully consistent with Article 51 of the United Nations Charter.

We believe that this preemptive action against his terrorist installations will not only diminish Colonel Qadhafi's capacity to export terror, it will provide him with incentives and reasons to alter his criminal behavior. I have no illusion that tonight's action will ring down the curtain on Qadhafi's reign of terror. But this mission, violent though it was, can bring closer a safer and more secure world for decent men and women. We will persevere. This afternoon we consulted with the leaders of Congress regarding what we were about to do and why. Tonight I salute the skill and professionalism of the men and women of our Armed Forces who carried out this mission. It's an honor to be your Commander in Chief.

We Americans are slow to anger. We always seek peaceful avenues before resorting to the use of force -- and we did. We tried quiet diplomacy, public condemnation, economic sanctions, and demonstrations of military force. None succeeded. Despite our repeated warnings, Qadhafi continued his reckless policy of intimidation, his relentless pursuit of terror. He counted on America to be passive. He counted wrong. I warned that there should be no place on Earth where terrorists can rest and train and practice their deadly skills. I meant it. I said that we would act with others, if possible, and alone if necessary to ensure that terrorists have no sanctuary anywhere. Tonight, we have.

Thank you, and God bless you.

*Note: The President spoke at 9 p.m. from the Oval Office at the White House. The address was broadcast live on nationwide radio and television.*

# EXHIBIT 5

# Letter to the Speaker of the House of Representatives and the President Pro Tempore of the Senate on the United States Air Strike Against Libya

## April 16, 1986

Dear Mr. Speaker: (Dear Mr. President:)

Commencing at about 7:00 p.m. (EST) on April 14, air and naval forces of the United States conducted simultaneous bombing strikes on headquarters, terrorist facilities and military installations that support Libyan subversive activities. These strikes were completed by approximately 7:30 p.m. (EST).

The United States Air Force element, which launched from bases in the United Kingdom, struck targets at Tripoli Military Air Field, Tarabulus (Aziziyah) Barracks, and Sidi Bilal Terrorist Training Camp. The United States Navy element, which launched from the USS Coral Sea and the USS America, struck targets at Benina Military Air Field and Benghazi Military Barracks. One F - 111 with its two crew members is missing. These targets were carefully chosen, both for their direct linkage to Libyan support of terrorist activities and for the purpose of minimizing collateral damage and injury to innocent civilians.

These strikes were conducted in the exercise of our right of self-defense under Article 51 of the United Nations Charter. This necessary and appropriate action was a preemptive strike, directed against the Libyan terrorist infrastructure and designed to deter acts of terrorism by Libya, such as the Libyan-ordered bombing of a discotheque in West Berlin on April 5. Libya's cowardly and murderous act resulted in the death of two innocent people -- an American soldier and a young Turkish woman -- and the wounding of 50 United States Armed Forces personnel and 180 other innocent persons. This was the latest in a long series of terrorist attacks against United States installations, diplomats and citizens carried out or attempted with the support and direction of Muammar Qadhafi.

Should Libyan-sponsored terrorist attacks against United States citizens not cease, we will take appropriate measures necessary to protect United States citizens in the exercise of our right of self-defense.

In accordance with my desire that Congress be informed on this matter, and consistent with the War Powers Resolution, I am providing this report on the employment of the United States Armed Forces. These self-defense measures were undertaken pursuant to my authority under the Constitution, including my authority as Commander in Chief of United States Armed Forces.

Sincerely,

Ronald Reagan

*Note: Identical letters were sent to Thomas P. O'Neill, Jr., Speaker of the House of Representatives, and Strom Thurmond, President pro tempore of the Senate.*

95

# EXHIBIT 6

# Statement by Principal Deputy Press Secretary Speakes on the United States Air Strike Against Libya

## April 14, 1986

U.S. military forces this evening have executed a series of carefully planned air strikes against terrorist-related targets in Libya. These strikes have been completed and our aircraft are returning. Libya bears direct responsibility for the bombing in West Berlin on April 5 that resulted in the death of Army Sergeant Kenneth Ford and injury to a number of American servicemen and others. In light of this reprehensible act of violence and clear evidence that Libya is planning future attacks, the United States has chosen to exercise its right of self-defense. It is our hope this action will preempt and discourage Libyan attacks against innocent civilians in the future.

U.S. forces struck targets that were part of Qadhafi's terrorist infrastructure: the command and control systems, intelligence, communications, logistics, and training facilities. These are sites which allow Qadhafi to perpetrate terrorist acts. In addition to the strikes at terrorist centers, the President also authorized limited defense suppression missions in order to defend our own forces engaged in this mission. Every effort was made to avoid civilian casualties and limit collateral damage and to avoid casualties to those American servicemen who are participating. The President will address the Nation from the Oval Office at 9 p.m., eastern standard time.

*Note: Larry M. Speakes read the statement to reporters at 7:22 p.m. in the Briefing Room at the White House.*

# EXHIBIT 7

# Statement by Principal Deputy Press Secretary Speakes on the United States Air Strike Against Libya

## April 15, 1986

As of this morning, 16 of the 18 F - 111 fighter bombers have returned to their base in Mildenhall, England. One plane, which developed mechanical problems en route, has landed in Spain. One F - 111 remains unaccounted for. A naval and air search operation is currently underway to locate this aircraft. All carrier-based aircraft have returned safely to the carriers without incident.

In our assessment of the situation, we believe that we have struck a blow against terrorism. We have sent a message to Qadhafi. Our objective was to inflict damage to Qadhafi's capability to direct and control the export of international terrorism.

The United States, and for that matter all freedom-loving peoples of the world, cannot tolerate terrorism. When we can clearly identify those responsible for terrorist acts, we will hold them accountable. The goal, therefore, was to strike targets in a way that would damage Qadhafi's ability to perpetrate terrorist acts. We wanted to show that such attacks are a consequence of undertaking terrorist actions, that terrorism cannot be supported without incurring a heavy price. We have successfully accomplished both objectives. We hope this action will deter future terrorist attacks. It was to send a clear message that we will no longer tolerate death of innocent Americans and others. We are confident this message was heard and understood.

*Note: Larry M. Speakes read the statement to reporters at 9:26 a.m. in the Briefing Room at the White House.*

# EXHIBIT 8



  Go

# TEXT: NEUMANN'S SENATE TESTIMONY ON U.S. POLICY TOWARD LIBYA
## (Asst. Secy says U.S. policy toward Libya remains consistent)

### May 4, 2000

American Embassy
Press Section

71 Hayarkon Street
Tel Aviv 63903
Israel
Tel: 972-3-5197575

"U.S. policy and policy goals vis-a-vis Libya have remained consistent through three Administrations," Ronald E. Neumann, deputy assistant secretary of state for Near Eastern Affairs, told Congress May 4.

"Our goals have been to end Libyan support for terrorism, prevent Tripoli's ability to obtain weapons of mass destruction and contain Qadhafi's regional ambitions," Neumann said in testimony before the Senate Foreign Relations Subcommittee for Near Eastern and South Asian Affairs.

[Feedback]

[e-mail]

He added that an additional aim of the U.S. is to bring to justice the persons responsible for the bombing more than 11 years ago of Pan Am Flight 103 over Lockerbie, Scotland. The trial of two Libyans accused of the terrorist act that killed 270 people opened May 3 in the Netherlands. Neumann pointed out that Libya's surrender of the suspects came as a result of intensive efforts by the U.S. to bring them to trial.

Since Muammar Qadhafi's 1969 coup, the U.S. policy agenda towards Libya has been focused on Libya's sponsorship of terrorism, support for groups violently opposed to Israel and the Peace Process, preventing Tripoli's efforts to obtain weapons of mass destruction and unhelpful activities in neighboring African states, Neumann said.

Neumann testified that Libya no longer poses the threat it once did on terrorism, opposition to Middle East peace, and regional intervention and U.S. efforts to impede Libya's WMD and missile programs have had substantial success.

However, he said, "we must continue to watch Libya closely and will maintain pressure until all of these concerns are fully addressed." The U.S. will continue to oppose lifting UN sanctions against Libya "until we are satisfied that Libya has met all the

relevant UN Security Council requirements."

Neumann also said the provisions of the Iran and Libya Sanctions Act regarding investment in Libya's petroleum sector will continue to be considered until, as the statute prescribes, the President has determined and certified to Congress that the UNSCR requirements have been met. "Also until that time, we expect to maintain core unilateral economic sanctions prohibiting U.S.-Libyan business."

Following is the text of Neumann's testimony:

(Begin text)

Testimony before the Senate Foreign Relations Subcommittee for Near Eastern and South Asian Affairs
Deputy Assistant Secretary of State
for Near Eastern Affairs
Ronald E. Neumann
May 4, 2000

I appreciate the invitation to speak to you on current U.S. policy towards Libya and welcome the opportunity to address a topic of interest to many members. We have achieved significant success in meeting long established goals, but this is a continuing story whose ending is as yet unclear.

U.S. policy and policy goals vis-a-vis Libya have remained consistent through three Administrations. Our goals have been to end Libyan support for terrorism, prevent Tripoli's ability to obtain weapons of mass destruction and contain Qadhafi's regional ambitions. Since Lockerbie, we have added additional aims, including bringing the persons responsible to justice. I would like to discuss current developments in the context of U.S. policy goals and unilateral and multilateral efforts on behalf of these goals, and consider what remains to be done.

Prior to the Qadhafi regime, we enjoyed a generally warm relationship with the Libyans and pursued policies centered on our interests in operations at Wheelus air force base with its 4,600 Americans the considerable U.S. oil interests, and other key issues.

After Qadhafi's 1969 coup, the relationship quickly soured.

Concerns about Libya's foreign policies came to dominate our policymaking. Chief among these concerns are state sponsorship of terrorism, support for groups violently opposed to Israel and the Peace Process, preventing of Tripoli's efforts to obtain weapons of mass destruction and unhelpful activities in neighboring African states. Since that time, the U.S. policy agenda towards Libya has been focused on these concerns.

Although our commercial relationship with Libya flourished throughout the 1970s, the political relationship deteriorated, marked by confrontation and by intermittent reconciliation attempts on both sides. In the 1980s, we ended the long-standing commercial relationship and rejected any possibility of reconciliation so long as Libya pursued its policies of concern. We imposed sanctions piece-by-piece in response to Libyan support for terrorism, beginning with the disapproval of all further military sales to Libya and the designation of Libya as a state sponsor of terrorism in 1979. We ultimately imposed comprehensive sanctions on all commercial and financial transactions with Libya under an executive order in 1986. The unilateral sanctions regime against Libya has remained one of the most comprehensive.

Also, in 1986, we identified Libya as responsible for the La Belle Disco bombing and in retaliation bombed select military and terrorist-related targets in Tripoli and Benghazi. Our judgment on Libyan responsibility for the bombing was recently given additional credibility by new testimony in the Berlin trial of the La Belle bombing suspects.

In the wake of the La Belle bombing, our European allies finally began to coordinate efforts against Libya. The EU resolved to reduce Libyan diplomatic presence abroad, embargo arms sales to Libya and encourage policy and security cooperation against Libyan support for terrorism.

We obtained UN Security Council support against Libya for its sponsorship of terrorism following evidence of Libyan involvement in the tragic 1988 Pan Am 103 and 1989 UTA 772 bombings. In 1992 and 1993, the Security Council passed a series of resolutions calling on Libya to surrender the suspects, accept responsibility for the actions of its officials, pay appropriate compensation, disclose all it knew of the crime and cooperate with the criminal investigation, cease all forms of terrorist action

and assistance to terrorist groups, and prove its renunciation of terrorism by concrete actions. The Security Council imposed civil aviation, financial, and diplomatic sanctions against Libya.

Carefully targeted, UN sanctions against Libya were for many years one of the most successful multilateral sanctions regimes. Rigorously observed sanctions succeeded in isolating Libya and limiting its access to dollars and other hard currencies for almost a decade. However, two years ago, support for the international sanctions began to fade. Deliberate violations by some states were increasing. We found little support to upgrade or even maintain the international sanctions.

For ten years, the United States made every effort to bring the perpetrators of the terrorist bombing of Pan Am 103 to justice. Libya's surrender of the Pan Am 103 suspects came as a result of our intensive efforts to bring them to trial. Beginning in the fall of 1997, along with the British and the Dutch, we developed a detailed plan for a trial before a Scottish court seated in the Netherlands. After we unveiled the plan in August 1998, the UN Security Council unanimously endorsed the initiative and again urged Libya to surrender the suspects. International opinion welcomed this proposal, Libya finally turned over the suspects, under the terms we had laid out. The U.S. engaged in no negotiations and placed no restrictions on the prosecutors' freedom to follow the evidence. The Scottish trial in the Netherlands will be a genuine criminal proceeding, conforming with the rules and traditions of Scottish jurisprudence, and the prosecution will follow the evidence wherever it leads. Since the Libyan suspects' surrender, they have awaited trial in a Scottish jail in the Netherlands. The trial began yesterday and is expected to take some time.

Over time, faced with UN and U.S. sanctions, as well as the attendant political isolation, Libya has reduced its support for terrorism and sought to distance itself from terrorist groups. As reported in Patterns of Global Terrorism for the last two years, Libya has not been implicated in any international terrorist act for several years and has taken important steps.

Libya has expelled the Abu Nidal Organization, uprooting its infrastructure and seeking to eliminate any ANO presence in Libya. It has cooperated with other intelligence services in the region to deport remaining ANO members from Libya. Ironically,

104

the ANO has publicly threatened terrorist retaliation against Libya.

In addition to withdrawing its support from Palestinian groups that oppose the Peace Process, Libya has thrown its support to Chairman Arafat and the Palestinian Authority. The Libyan Government has told all Palestinians that the Palestinian Authority is the only address for their concerns. Given Libya's status as one of the original Arab radical states, this support for the Palestinian Authority represents an historic policy shift toward peace that we should all welcome.

In the last year, Libya has imposed visa restrictions to limit the ability of terrorists to enter its territory as a haven.

Libya has also cooperated with Egypt, Jordan and Yemen against terrorist groups. In the context of the Arab League Interior Ministers' agreement to cooperate on counter-terrorism, we have seen the extradition of a number of suspected terrorists between Libya and Jordan and Libya and Yemen.

While we recognize positive steps Libya has taken, a number of issues remain on which Libya must act. One key question is what else remains for Libya to do on terrorism to show that the break is permanent and not just opportunistic. Libya should comply with the U.N. Security Council Resolutions, including payment of appropriate compensation, acceptance of responsibility for the actions of its officials, renunciation of and an end to support for terrorism, and cooperation with the Pan Am 103 investigation and trial. In October 1999, Libya allowed the Scottish investigators to travel to Libya and obtain access to requested witnesses and documents. We will insist that any similar, future requests be granted and that Libyan witnesses be able to testify in The Netherlands unimpeded. Such Libyan cooperation is an explicit UN Security Council requirement, before UN sanctions are lifted. It is also a concrete way for Libya to demonstrate that it has changed its policy, not just its rhetoric, on terrorism.

We want to see Libya sever all remaining ties with and support for terrorist groups. That would include terminating all contacts, travel on Libyan soil, and financial assistance. We also seek clear and concrete Libyan support for the Peace Process, including the underlying principles of the Madrid process. Such steps would be a concrete, definitive way for Libya to demonstrate its

abandonment of violent opposition to the Peace Process and cessation of its support for opponents of peace. In this regard, we are closely watching Libya's talks with the EU and possible participation, with Israel and the Palestinian Authority, in the Barcelona Process. Looking to the future, we would like Libya to join and comply with certain international anti-terrorism conventions, which it has indicated a willingness to do.

We remain concerned about Libyan programs to develop weapons of mass destruction (WMD) and missile delivery systems. British authorities at London's Gatwick Airport recently intercepted Scud missile parts interdicted at Gatwick bound for Libya. We seek to prevent Libya's efforts to acquire WMD and delivery systems and encourage other countries to do the same. Multilateral efforts to contain these Libyan programs have, thus far, achieved substantial success. We would like to see Libya join the Chemical Weapons Convention and comply with the CWC and the Biological Weapons Convention. These actions would signal its seriousness of purpose and be an important, concrete step toward more responsible behavior.

Libya's recent record on intervention outside its borders is less clear and requires close attention. Libya continues to be deeply engaged in Africa, including Sierra Leone, Congo, Ethiopia-Eritrea, and Sudan. We want to see it play a constructive role. For example, Libya has joined with Egypt to push for a negotiated resolution of the longstanding conflict in Sudan. We support the mediation efforts led by East African states under the Inter-Governmental Authority on Development, because its Declaration of Principles spells out the key issues which must be resolved for achievement of a just, lasting settlement. At same time, we have stepped up effort to cooperate with Egypt in the search for peace, as a single, unified process stands the best chance of achieving a settlement in Sudan. However, given the long history of dangerous intervention by Libya outside its borders as well as more recent reports of providing arms throughout the region, we will continue to take steps to ensure that Libya seeks to r esolve, rather than aggravate, regional conflicts.

There has been intense press speculation and some Congressional interest about possible changes to travel-related restrictions for Libya. In March, the Secretary authorized a consular trip to Libya for the specific, limited purpose of assessing whether there continues to be an "imminent danger" to U.S. travelers. An

"imminent danger" was the factual, legal basis for imposing a restriction on the use of an U.S. passport for travel to, in, or through Libya in 1981. Based on all reports, we believed it was appropriate to assess the situation on the ground for ourselves. The Department is still reviewing the trip findings as well as other relevant information, including reports from European diplomats, our Protecting Power, and travelers to Libya. Speculation about the outcome of this review would be premature; however, knowing of your interest in the matter, we will continue to stay in close contact with you on this issue.

On our key concerns -- terrorism, opposition to Middle East peace, and regional intervention -- Libya no longer poses the threat it once did. On WMD and missiles, our efforts to impede Libya's programs have had substantial success. That said, we must continue to watch Libya closely and will maintain pressure until all of these concerns are fully addressed. Our goal continues to be to deter Libyan policies of concern. An improved bilateral relationship is not, in itself, an end. We will oppose lifting UN sanctions against Libya until we are satisfied that Libya has met all the relevant UN Security Council requirements. The provisions of the Iran and Libya Sanctions Act regarding investment in Libya's petroleum sector will continue to be considered until, as the statute prescribes, the President has determined and certified to Congress that the UNSCR requirements have been met. Also until that time, we expect to maintain core unilateral economic sanctions prohibiting U.S.-Libyan business.

Again I would like to thank you, Mr. Chairman, for this opportunity to appear in front of the Subcommittee on these important issues, and would welcome the opportunity to address any specific questions you might have.

(End text)

(Distributed by the Office of International Information Programs, U.S. Department of State. Web site: http://usinfo.state.gov)

NNNN

# EXHIBIT 9

United States Department of State

# Patterns of Global
Terrorism: 1986

January 1988

**MIPT**
**National Memorial Institute**
**for the Prevention of Terrorism**
**in Oklahoma City**

# Contents

|  | Page |
|---|---|
| The Year in Review | 1 |
| The State Support Issue | 4 |
| Terrorist Spillover From the Middle East | 11 |
| Target USA | 15 |
| Regional Patterns | 20 |
|     The Middle East | 20 |
|     Latin America | 24 |
|     Western Europe | 27 |
|     Asia | 29 |
|     Sub-Saharan Africa | 32 |

**Appendixes**

| | | |
|---|---|---|
| A. | Chronology of Significant Terrorist Events, 1986 | 33 |
| B. | International Terrorist Incidents, 1986 | foldout |

i

## Patterns of Global
## Terrorism: 1986

### The Year in Review

*The level of international terrorist activity remained high in 1986, despite a slight decline in the total number of incidents.*[1] This halts, at least temporarily, the dramatic upward trend in the number of incidents experienced in the previous two years. In the first part of 1986, terrorism continued to rise, but increased counter-terrorist cooperation among Western nations undoubtedly played an important role in checking the escalation of terrorism for the rest of the year. US military action against Libya in April and subsequent European diplomatic and security actions against Libya and Syria for their involve-ment in some of the year's major attacks helped to curb activities by terrorists supported by those countries after midyear. Nevertheless, the overall high level of activity combined with the continuing increase in attacks aimed at innocent bystanders and intended to cause mass casual-ties keep international terrorism as a priority item for concern.

*In 1986, we recorded some 774 international terrorist incidents, a very slight decrease from the record level of 782 incidents in 1985.* More than a quarter of these incidents resulted in casualties. Fewer persons were killed in international terrorist incidents in 1986 than in 1985 (576 and 825 persons, respectively), and more were wounded— 1,708 versus 1,217—yielding a slightly greater total number of casualties in 1986. The decline in number of deaths is deceptive without looking behind the figures. The difference between 1985 and 1986 represents one incident—329 deaths from the Air India bombing. Moreover, 1986 could have included as many as 800 more deaths if several attempted aircraft bombings had succeeded.

[1] Our statistics cover only international terrorist incidents (as defined on the inside front cover). Our information data base on domestic terrorism is sizable but is not comprehensive enough to permit us to provide statistical data with the same degree of confidence as we do on international terrorism.

*Although there were fewer international attacks in 1986, a greater number were conducted against US targets—204 versus 170 in 1985—increasing the share to 26 percent in 1986 versus 22 percent in 1985.* Total US casualties fell almost 43 percent, however, and US deaths alone fell 68 percent, returning to the levels of earlier in the decade. The totals would have been much greater, however, if the bombing of TWA Flight 840 had caused the plane to crash and if two attempted bombings of El Al aircraft had succeeded.

About 55 percent of the 1986 incidents involving US targets occurred in Latin America, an increase over the previous year's 45 percent. Although only about a quarter of anti-US attacks took place in Western Europe (a decline from one-third in 1985), the majority of US casualties last year stemmed from attacks there, most as a result of attacks by Middle Eastern rather than European terrorists. Slightly more anti-US attacks were registered in the Middle East (21 versus 17) last year, but the number of such attacks in Lebanon dropped in terms of both absolute numbers (10) and as a percentage (50 per-cent) of anti-US attacks in the Middle East—versus 13 and nearly 80 percent, respectively, in 1985.

*A region-by-region comparison of the 1986 data with those of 1985 reveals no worldwide pattern, but rather the interplay of local conditions.* In 1986 more international terrorist incidents—360—were recorded in the Middle East than in any other part of the world, virtually unchanged from the 1985 figure of 357. If the number of attacks conducted by Middle Eastern terrorists elsewhere in the world is included, Middle Eastern terror-ism accounted for 404, or about 52 percent of all interna-tional incidents, down slightly from 441 and 56 percent in 1985. Latin America, with 159 attacks and the bulk of the anti-American incidents, was the second most frequent venue for international terrorist attacks in 1986, slightly more than Western Europe, where the number of incidents continued to drop, down to 156 attacks in 1986.

1

regional confines of the Middle East. The nature and level of state involvement in terrorism vary. Sometimes the state is directly involved, using its own agents or working jointly with international terrorist groups on operations. In other cases, states may provide close support to particular terrorist groups but may not be directly involved in specific operations. A third type of support is more general: logistic, financial, weapons, and training support, as well as allowing terrorists to maintain offices and training camps, permitting safehaven and transit through the state's territory for operations.

In 1986, Libya, Syria, and Iran continued to be the most active state sponsors of international terrorist groups. Evidence of direct Libyan involvement in the West Berlin discotheque bombing and the Syrian role in an attempted bombing of an El Al airliner in London led to strong action against these two states by the United States and its European allies. Other states, including several Warsaw Pact countries, continued to provide weapons, training, and other support for a variety of terrorist groups.

## Libya

Libyan leader Muammar Qadhafi has long been the world leader most closely identified with sponsorship of terrorist groups. His revolutionary philosophy and anti-Western orientation lead him to aid virtually any group that opposes his perceived enemies. Qadhafi's beneficiaries include some of the most extreme terrorists, as well as a variety of insurgent and other dissident groups. He aids groups not only in the Middle East, Europe, and nearby African states, but also in the Caribbean, South America, and Asia. At least 19 terrorist attacks in 1986 had some degree of Libyan involvement.

Qadhafi's anti-Western attacks in 1986 focused primarily on the United States and the United Kingdom. Information in late 1985 and early 1986 indicated a greater likelihood of anti-US targeting by Tripoli, including the suspicion of Libyan involvement in the Rome and Vienna airport attacks of December 1985. This led to a largely unsuccessful effort by the United States to persuade other countries to join in peaceful economic and political measures against Libya.

Against a backdrop of tension that increased after US naval maneuvers in the central Mediterranean in January and March, Qadhafi's bellicose attitude climaxed in the Libyan-instigated attack against the La Belle discotheque in West Berlin. Libyan willingness to target US citizens directly was a dramatic new turn in Libyan terrorism. The discotheque was a nightclub popular with off-duty US servicemen. The powerful bomb that exploded there on the morning of 5 April killed three persons (including two American soldiers) and wounded more than 200 others (including more than 70 US citizens). Following the attack, the US Government announced that it had incontrovertible proof of Libyan complicity and on 15 April launched retaliatory airstrikes against Tripoli and Benghazi. Qadhafi responded with a series of terrorist attacks against the United States and also against the United Kingdom, where some of the US planes were based:

- On 15 April, a US Embassy communications officer was shot in Khartoum; circumstantial evidence points to Libyan agents.

- On 17 April, two British teachers and American hostage Peter Kilburn were discovered murdered in Beirut. British Foreign Secretary Howe publicly linked Libya to the murders. Another British hostage, journalist Alec Collett, was allegedly killed about the same time, but his body has not been found.

- On 18 April, authorities in Ankara apprehended two Libyans with handgrenades as they approached a US officers club, where a wedding reception was being held. The pair later admitted they received the grenades from the Libyan People's Bureau (LPB).

- On 25 April, a US Embassy communications officer was wounded in Sanaa, North Yemen. Libya is believed to have instigated the attack.

The level of Libyan-sponsored terrorist activity fell after late April. The reduction was probably the result of several factors. Qadhafi was apparently stunned by the US air raid and probably curtailed operations, in part, to avoid



Authorities survey damage to La Belle discotheque in West Berlin, after 5 April bombing that killed three and wounded more than 200.

further military reprisals. Libya also experienced increased internal unrest after the raid and was forced to focus temporarily on domestic matters. Qadhafi's ability to direct terrorism overseas via the LPBs was seriously damaged when more than 100 Libyan diplomats were expelled from Europe. Finally, heightened security measures taken by the United States and other Western nations undoubtedly also contributed to the lull.

Libya resumed terrorist activity in July. At least nine nationals from Togo and Benin were arrested in July for participation in a plot to attack the US Embassy and a market in Lome. They reportedly confessed to having received a pistol, grenades, and explosive devices from the LPB in Cotonou, Benin. The suspects alleged that official Libyan facilities in Burkina and Ghana were also involved in the plot.

On 3 August, gunmen attacked the UK base at Akrotiri, Cyprus, with mortars, rocket-propelled grenades, and small arms fire. Although they did not penetrate the base's perimeter, the attackers wounded two women before withdrawing. Available information strongly links Libya to

the attack, which was undoubtedly undertaken in retaliation for UK support of the US April airstrikes. Qadhafi had publicly vowed to strike back against the United Kingdom after the US air raid. He claimed the base at Akrotiri had been used by US aircraft involved in the raid. In claiming responsibility for the attack, the Unified Nasserite Organization invoked the Omar al-Mukhtar Martyr Group, named after a Libyan hero who opposed colonial occupation earlier in the century. A group using a similar name claimed responsibility for a rocket attack on the British Ambassador's residence in Beirut two days after the US raid.

On 5 September, four Abu Nidal organization (ANO) terrorists attempted to hijack Pan Am Flight 73 in Karachi, Pakistan. Before the incident was resolved, the terrorists had killed 21 persons, including two Americans; an additional 120 persons were wounded. The four terrorists who seized the aircraft were captured at the scene. A fifth suspect arrested later in the case has ties to Libya and probably provided logistic support to the hijackers.

6

113

*Pan Am Flight 73 sits at Karachi airport on 6 September, after an abortive hijacking that began the previous day left 21 dead and 100 wounded.*



 

leftist groups there have been more violent than English-speaking groups. Initially disappointed by the lack of support he received after the US airstrikes, by late summer Qadhafi had renewed his efforts to collect intelligence, undermine US influence in the region, and establish his bona fides as a worldwide revolutionary leader.

Qadhafi's activities in the Western Hemisphere have not been totally successful. Tripoli provides money and some training to groups it supports, although Qadhafi frequently fails to deliver the aid he promises. Some local security forces were successful in countering terrorist plans. Local groups also resent Qadhafi's insensitivity to their problems. Cuban opposition to Libya's indiscriminate exhortations to violence has somewhat undercut Qadhafi's ability to gain influence among local radical groups.

Libyan activity in Africa reached a peak after the US airstrikes in April. Qadhafi reacted to the raid by pressuring many of the groups he had supported to mount attacks against US personnel and facilities. Libya was behind many anti-US demonstrations and threats in the region immediately after the April operation. As elsewhere, Libyan activity in Africa slowed after April, resuming in July with the aforementioned incident in Benin.

Sudan remained a hotbed of Libyan terrorist activity. Several notorious Libyan terrorists visited Sudan during 1986. One purpose of the visits was to maintain contact with the pro-Libyan Sudanese Revolutionary Committees. These committees give Tripoli a network that can be used for either subversive activities or terrorism.

### Syria

Syria continued its role as a major sponsor of international terrorism in 1986, and, for the first time since 1982, Syrian personnel were implicated directly in terrorist operations. Damascus used terrorism as a foreign policy tool and to intimidate political opposition to the regime. In 1986, Syrian-sponsored terrorism was generally directed against pro-Arafat Palestinians, anti-Syrian Lebanese leaders, Syrian opponents of the Assad regime, and Jordanian, Turkish, Iraqi, and Israeli targets. Damascus provided several groups engaged in terrorism with base camps in Syria or in Syrian-controlled portions of Lebanon, training facilities, arms, travel assistance, intelligence, and funds. The best known groups linked to Syria are the Abu Nidal organization, the Popular Front for the Liberation of Palestine (PFLP), Abu Musa's Fatah rebels, the Kurdish Workers' Party (PKK), and the Armenian Secret Army for the Liberation of Armenia (ASALA).

8

year from 1980 to 1983, climbed to 61 in 1984, and reached 74 in 1985. In 1986 the number returned to the earlier level, declining almost 50 percent to 39. Most of the decline occurred in Mediterranean littoral states: Greece saw five Middle East–related terrorist incidents, as opposed to 14 the year before; Italy experienced only two after 11 the previous year; and only one such attack occurred in Cyprus in 1986 after 12 in 1985. France, by contrast, suffered a significant increase—from six to 16—accounting for 40 percent of all such attacks, nearly twice the percentage previously recorded for any West European country.

The 1986 terrorist attacks in Europe with a Middle Eastern connection that captured the most attention were those involving Libya and Syria. (For more detail on incidents involving these and other state sponsors of terrorism, see previous section.) *Libyan* involvement in early 1986 was a continuation of Libya's actions in late 1985 when Tripoli provided Tunisian passports to the Abu Nidal organization terrorists responsible for the 27 December 1985 attack on the El Al counter at Vienna airport. In 1986, Libya is known or suspected to have been behind five incidents aimed at US or British targets in Europe: the April bombing of a West Berlin discotheque; the April attempted grenade attack on a US officers' club in Ankara, Turkey; an April bombing in London that damaged offices of British Airways and American Express; a May attempted bombing of the Bank of America office in Madrid; and the August attack by three teams of gunmen against the British base at Akrotiri, Cyprus.

Also included among the Middle Eastern spillover incidents in Europe were attacks by Libyan operatives against Qadhafi's Libyan opponents—a radio station owner in Rome and a businessman in a Paris suburb.

Libya was implicated in the most violent Middle East–related event to occur in Asia in 1986—the 5 September attempted hijacking of Pan Am Flight 73 in Karachi that left 21 persons dead, two of them Americans.

*Syria*'s support of Middle Eastern terrorist groups that operate in Europe, including radical Palestinian factions, has long been a contributor to the Middle Eastern spillover problem there. In 1986, Syrian personnel were implicated

directly in three events in Western Europe—the April attempt to bomb an El Al jetliner in London; the March bombing of the German-Arab Friendship Union building in West Berlin; and the June attempt against El Al in Madrid. Like Libya, Syria curtailed its operations in Europe during the second half of 1986, contributing to the decline in Middle Eastern terrorism there.

*Iran* traditionally has been circumspect in sponsoring terrorist attacks in Western Europe, and its surrogates have not been implicated in the kind of spectacular, mass casualty attacks in Europe associated with Arab and Palestinian terrorism. French police believe, however, that Hizballah-linked terrorists were involved in a series of bombing attacks in Paris in September 1986. The Khomeini regime continued its attacks against Iranian dissidents in 1986, making an abortive attempt to assassinate former Admiral Madani in Paris in January, bombing the Paris home of exile leader Masud Rajavi in April, and murdering an Iranian dissident former Army colonel in Istanbul in October. No suspects were arrested in any of these attacks.

### Palestinian Activity
Palestinian terrorist groups were responsible for fewer terrorist attacks in Western Europe in 1986 than in 1985. The breakdown of the Arafat-Hussein peace initiative virtually ended the round of anti-Jordanian and anti-PLO terrorism—much of it by the Abu Nidal organization—in Europe and elsewhere that was an important feature of the scene in 1985. Two high-ranking Palestinian officials were assassinated by unknown assailants in Athens in June and October, but the most significant Palestinian attacks in Europe were those noted above that were undertaken with assistance from Libya or Syria. The anti-Arafat Abu Musa group, which is backed by Syria, committed its first attack in Western Europe last year, the previously mentioned attempt to bomb an El Al airliner in Madrid in June.[3]

---

[3] Altogether, eight of the 39 Middle Eastern terrorist attacks in Western Europe in 1986 were directed at airports, aircraft, or airline offices and could have killed more than 800 persons. The actual casualty toll for those eight attacks was four killed and 18 wounded.

13

| | |
|---|---|
| 29 March | *Lebanon*<br>British citizens Leigh Douglas and Philip Padfield were kidnaped as they dined in West Beirut. They were found murdered three weeks later. Libya is believed responsible. |
| 30 March | *West Berlin*<br>A bomb destroyed the German-Arab Friendship Association, injuring seven persons. A Jordanian later convicted in the case admitted receiving the bomb from the Syrian Embassy in East Berlin. West Germany temporarily recalled its Ambassador to Damascus over the incident. |
| 2 April | *Greece*<br>A bomb exploded aboard TWA Flight 840 as it approached Athens airport, killing four American citizens. The device was similar to bombs used earlier in the decade by the Palestinian 15 May Organization, and a Lebanese woman who left the plane at an earlier stop is the leading suspect. |
| 5 April | *West Berlin*<br>A bomb exploded in a crowded discotheque, killing two American soldiers and a Turkish woman and wounding more than 200 others, including more than 70 Americans. Evidence of Libyan complicity led to the US bombing raids on Tripoli and Benghazi on 15 April. |
| 11 April | *Lebanon*<br>Unidentified gunmen abducted Brian Keenan, an Irish lecturer at the American University of Beirut. No group claimed responsibility, and his fate is unknown. |
| 17 April | *United Kingdom*<br>An Irish woman boarding an El Al jet in London was found to have a bomb in her carry-on luggage. Her Jordanian boyfriend was convicted in the attempt and implicated the Syrian Ambassador and his staff, who provided the bomb. Britain broke diplomatic relations with Syria over the incident. |
| 17 April | *Sudan*<br>A communications officer of the American Embassy was shot and severely wounded in Khartoum. Libya is believed to have sponsored the attack in retaliation for the 15 April raids. |

34

# EXHIBIT 10

STATEMENT OF MAJOR GENERAL JOHN H. MITCHELL,
U.S. ARMY (RETIRED)

I, John H. Mitchell, Major General, U.S. Army (Ret.) declare that:

1. In April, 1986, I was United States Commander cf Berlin. As such, I exercised a dual role in the American Sector. Concerning the security of the sector, I reported through U.S. Army channels; concerning diplomatic and representational responsibilities, I reported through the U.S. Ambassador to the Federal Republic of Germany to the United States Secretary of State. Consequently, in the course of my duties, I was authorized access to intelligence information of the United States through both military and diplomatic channels. This information was classified under Executive Order 12356, which was issued in 1982 by the President of the United States, and cannot be disclosed except with specific authorization.

2. I have been specifically authorized to make this statement concerning U.S. national defense information about the activities of the Government of Libya in connection with the bombing of the "La Belle" discotheque in Berlin in 1986 and to provide testimony except for information which would cause identifiable damage to U.S. intelligence sources or methods.

3. The statements in this declaration are based on my personal knowledge of U.S. national defense information, the policies which apply to disclosure of such information, my review of the reports in question, and legal advice of attorneys for the United States.

4. At the time of the bombing, I received classified national defense information from different sources available to the United States in the form of

written reports based on the information received from the sources. At the time, I knew that the information in such reports was carefully reviewed to ensure that it accurately reported the information received from the source before the reports were submitted to U.S. Government officials responsible for the conduct of U.S. foreign relations and U.S. military operations.

5. One U.S. report from a source of proven reliability indicated that on March 25, 1986, orders were sent from the Libyan government in Tripoli to the Libyan People's Bureau in East Berlin to conduct a terrorist attack against Americans.

6.On March 27, 1986, another U.S. report, from a source of undetermined reliability, stated that, as a result of the tense and fast-breaking military confrontation between the U.S. and Libyan forces in the Mediterranean, the Libyan People's Bureau in East Berlin had been placed on an alert. The members of the Libyan People's Bureau in East Berlin were awaiting further instructions from the Libyan government on what actions they were to take. This particular report indicated that, if the situation in the Mediterranean worsened, the Libyan People's Bureau in East Berlin was prepared to carry out terrorist attacks against otherwise unidentified U.S. installations in either West Berlin, West Germany, or elsewhere in Western Europe. The Libyan People's Bureau already had the necessary trained personnel on hand in East Germany to carry out the attacks. Although this report was from a source of unproven reliability, it was consistent with the first report and with the other reports which I received.

7. Another U.S. report from a source of proven reliability indicated that on April 4, 1986, a Libyan government agent of the Libyan People's Bureau alerted a

senior Libyan intelligence officer in Tripoli that the attack would be carried out the following morning, April 5th.

8. Finally, another U.S. report from a source of proven reliability indicated that on April 5, 1986, in the early morning hours following the bombing of the La Belle discotheque, the Libyan government agent of the Libyan People's Bureau reported back to Tripoli that one of a number of its operations was successfully carried out.

9. I recall receiving the first two reports prior to traveling to Rome, Italy, on April 3, 1986, and receiving the third and fourth reports after I returned to Berlin on April 5, 1986.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 24th day of September 1996.

J. H. MITCHELL
Major General, U.S. Army (Ret.)

Sworn and subscribed to me on 24 September 1996

Stephanie Berreford
Notary Public

My Commission expires:
October 13, 1999

120

# EXHIBIT 11

STATEMENT OF LIEUTENANT GENERAL THOMAS N. GRIFFIN, JR.,
U.S. ARMY (RETIRED)

I, Thomas N. Griffin, Jr., Lieutenant General, U.S. Army (Ret.) declare that:

1. In April, 1986, I was Commander of the United States Army Berlin Brigade and Commander of the U.S. Berlin Military Community, under Headquarters, United States Army Europe. At that time, I was responsible for the security of U.S. military personnel and all U.S. facilities in the occupied city of Berlin in Germany and, in the course of my duties, was authorized access to national defense information of the United States pertaining to the security of U.S. military personnel in the occupied city of Berlin in 1986. This information was classified under Executive Order 12356, which was issued in 1982 by the President of the United States, and can not be disclosed except with specific authorization.

2. I have been specifically authorized to make this statement concerning U.S. national defense information about the activities of the Government of Libya in connection with the bombing of the "La Belle" discotheque in Berlin in 1986 and to provide testimony except for information which would cause identifiable damage to U.S. intelligence sources or methods.

3. The statements in this declaration are based on my personal knowledge of U.S. national defense information, the policies which apply to disclosure of such information, my review of the reports in question, and legal advice of attorneys for the United States.

4. At the time of the bombing, I received classified national defense information from different sources available to the United States in the form of

written reports based on the information received from the sources. At the time, I knew that the information in such reports was carefully reviewed to ensure that it accurately reported the information received from the source before the reports were submitted to U.S. Government officials responsible for the conduct of U.S. foreign relations and U.S. military operations.

5. One U.S. report from a source of proven reliability indicated that on March 25, 1986, orders were sent from the Libyan government in Tripoli to the Libyan People's Bureau in East Berlin to conduct a terrorist attack against Americans.

6. On March 27, 1986, another U.S. report, from a source of undetermined reliability, stated that, as a result of the tense and fast-breaking military confrontation between the U.S. and Libyan forces in the Mediterranean, the Libyan People's Bureau in East Berlin had been placed on an alert. The members of the Libyan People's Bureau in East Berlin were awaiting further instructions from the Libyan government on what actions they were to take. This particular report indicated that, if the situation in the Mediterranean worsened, the Libyan People's Bureau in East Berlin was prepared to carry out terrorist attacks against otherwise unidentified U.S. installations in either West Berlin, West Germany, or elsewhere in Western Europe. The Libyan People's Bureau already had the necessary trained personnel on hand in East Germany to carry out the attacks. Although this report was from a source of unproven reliability, it was consistent with the first report and with the other reports which I received.

7. Another U.S. report from a source of proven reliability indicated that on

123

April 4, 1986, a Libyan government agent of the Libyan People's Bureau alerted a senior Libyan intelligence officer in Tripoli that the attack would be carried out the following morning, April 5th.

8. Finally, another U.S. report from a source of proven reliability indicated that on April 5, 1986, in the early morning hours following the bombing of the La Belle discotheque, the Libyan government agent of the Libyan People's Bureau reported back to Tripoli that one of a number of its operations was successfully carried out.

9. I recall receiving the first three reports prior to the bombing of the "La Belle" discotheque in the early morning of April 5, 1986, and receiving the fourth report soon after.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 24th day of September 1996.

THOMAS N. GRIFFIN, JR.
Lieutenant General, U.S. Army (Ret.)

Sworn and subscribed to me on 24 September 1996.

Stephanie Bonneford
Notary Public

My Commission expires:
October 13, 1999

124