# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Daryal V. Clay | : |
| | : |
| et al. | : |
| | : |
|        Plaintiffs | : |
| | : |
| | : |
|    v. | : |
| | :   CV 06-0707 (RWR) |
| SOCIALIST PEOPLE'S LIBYAN | : |
| ARAB JAMAHIRIYA (Libya) | : |
| | : |
| et al. | : |
| | : |
|     Defendants | : |
| | : |

## PLAINTIFFS' OPPOSITION TO LIBYAN DEFENDANTS' MOTION TO DISMISS

## TABLE OF CONTENTS

**Page No.**

PROCEDURAL BACKGROUND ....................................................................3

STATEMENT OF FACTS ............................................................................4

SUMMARY OF ARGUMENT.......................................................................9

ARGUMENT.................................................................................................9

    **I.**    **PLAINTIFFS MAY BRING THEIR CASE UNDER THE FOREIGN SOVEREIGN IMMUNITES ACT AS AMENDED BY SECTION 1083 OF THE DEFENSE AUTHORIZATION ACT FOR FISCAL YEAR 2008**.................................................................................................9

    **A.**    **Section 1083 Of The Defense Authorization Act For Fiscal Year 2008 Explicitly Allows Plaintiffs To File Their Amended Complaint Under 28 U.S.C. § 1605A**.. ...........................................................................9

    **B.**    **This Case Was Timely Filed Under 28 U.S.C. § 1605(f)**. ..........................13

    **C.**    **Defendant Failed To Raise The Statute Of Limitations Defense, Which Is An Affirmative Defense**..........................................................................19

    **II.**    **LIBYA'S PECULIAR INTERPRETATION OF 28 U.S.C. § 1605A(a)(1) DEFIES LOGIC, THE EXPLICIT LANGAUGE OF THE STATUTE AND ITS LEGISLATIVE HISTORY** .....................................................23

    **III.**    **PLAINTIFF JOHN DOES ARE PROPERLY LISTED IN PLAINTIFFS' COMPLAINT** ............................................................................27

CONCLUSION .............................................................................................28

COME NOW the Plaintiffs, by and through counsel, and hereby file this Memorandum of Law with Points and Authorities in Opposition to Libyan Defendants' Motion to Dismiss.  In opposition to said Motion, Plaintiffs rely on the following Memorandum.

## **PROCEDURAL BACKGROUND**

This case springs from the same set of events and includes the same Defendants (but not the same Plaintiffs) as Beecham v. Socialist People's Libyan Arab Jamahiriya, 01-cv-02243 (RWR).

The complaint in this case was filed on April 21, 2006 and the complaint and summons were served on July 6, 2006.  Defendants' initial deadline to respond was September 6, 2006.

This case was thereafter stayed while government-to-government talks proceeded with the aim of settling Beecham, which would or would not resolve this case.  As the Court is aware Beecham has been stayed on occasion while the parties entered into settlement negotiations either directly or through government-to-government talks.

On January 28, 2008 Congress amended the Foreign Sovereign Immunities Act ("FSIA") and created a viable and uniform claim for damages under federal law by passing the National Defense Authorization Act for Fiscal Year 2008.  Pub. L. No. 110-181, § 1083 (2008).  ("DAA 2008").  Section 1083 of the DAA 2008, attached as Exhibit 1, amends the FSIA by deleting 28 U.S.C. § 1605(a)(7), which was previously known as, the "state-sponsored terrorism" exception to sovereign immunity, and under which this case was brought, and replacing it with 28 U.S.C. § 1605A.  Section 1083 of the DAA 2008 also deleted 28 U.S.C. § 1605(f), the statute of limitations provision for the former state-sponsored terrorism exception and replaced it with 28 U.S.C. § 1605A(b).

Pursuant to Fed. R. Civ. P. 15(a), Plaintiffs moved the Court for leave to amend their complaint based upon a change in controlling law and to deny Defendants' pending Motion to Dismiss.  On March 3, 2008 the Court granted Plaintiffs' Motion to Amend the Complaint and denied Defendants' Motion to Dismiss, without prejudice, as moot.  On April 12, 2008, Defendants filed a motion to dismiss the Amended Complaint.  On May 5, 2008, the Court granted Plaintiffs' unopposed request for an extension of time to respond and reset the deadline for their time to respond to May 16, 2008.

Plaintiffs respectfully request a hearing on Defendant's Motion to Dismiss.

## STATEMENT OF FACTS

On April 5th, 1986 a bomb exploded within the La Belle Discotheque, which was well-known as a spot where off-duty U.S. service personnel congregated, resulting in the deaths of three persons, including two Americans, and injuries to an additional 230 other people.  Hundreds of persons received various injuries including blunt force concussions, cuts from shrapnel, burns, and crush injuries from the walls and ceiling which collapsed from the force of the explosives. (Amended Complaint ¶3-4). Several persons were trapped in the rubble until the fire brigade could extinguish the blaze and extricate them.

Lorenzo Alexander Harris was at the discothèque at the time of the attack and suffered permanent breathing abnormalities.  He died four years later as a result of this physical injury.  (Amended Complaint ¶3.  From the time of the attack until before his death, Lorenzo Alexander Harris suffered permanent physical injury and physical suffering and mental anguish and suffering, entitling his estate to compensatory damages.  (Amended Complaint ¶21).  Lorenzo Alexander Harris' death was caused by a willful and deliberate act of extra judicial killing and torture organized planned and facilitated by Defendants

Libya and JSO during the course of their terrorist act of bombing the discotheque. (Amended Complaint ¶24).

The bombing was carried out at the direction of Colonel Muammar Abu Minar al-Qadhafi, the de-facto head of the Libyan government, by and through its officials, employees and agents, Libyan government sponsored terrorist groups and Libyan government agents of Libyan and German nationality.  (Amended Complaint ¶6-7).  Libya sponsored the perpetrators, within the meaning of 28 U.S.C. § 1605(a)(7) and 28 U.S.C. § 1605 note, by providing them with funding, planning, direction, and training for their terrorist activities.  (Amended Complaint ¶6).  Al-Qadhafi provided material support and resources to those directly involved in the attack through the provision of funding, planning, direction, and training.  (Amended Complaint ¶6-7).

All of the Defendants participated in a conspiracy to commit the state-sponsored terrorist bomb attack at the LaBelle Discotheque, and in the execution thereof.  Each of the Defendants acted through their officials, employees and agents, including the named individuals.  (Amended Complaint ¶6-7).  The attack itself was carried out by persons associated with the Libyan secret intelligence service, the Jamahiriya Security Organization (JSO), including JSO member Musbah Abulgasem Eter.  (Amended Complaint ¶6). Among the overt acts committed in furtherance of the conspiracy and the execution thereof were:

In furtherance of this planned attack a Libyan intelligence service courier, transported sub-machine guns, hand grenades and approximately 12 kg of explosives from Tripoli to East Berlin as diplomatic luggage.  (Amended Complaint ¶8).

Defendants selected the LaBelle Discotheque in West Berlin, known to be frequented by large numbers of United States military personnel, as the target of the terrorist attack.  (Amended Complaint ¶3).

On April 4, 1986, in preparation of the terrorist attack, Souad Chraidi transported approximately 3 kg of plastic explosive loaded with iron parts, a detonator and a delay timing device (timer) from the Libyan embassy in East Berlin to the apartment of Ali and Verena Chanaa in West Berlin.  (Amended Complaint ¶8).  On April 4, 1986 at around 9:00 p.m. Yasser Chraidi, Ali Chanaa, Verena Chanaa and Eter made the final preparations for the terrorist attack at which time the detonator and timer were fitted into the explosive. (Amended Complaint ¶9).  The explosive was concealed in a bag.  (Amended Complaint ¶9).  After this, Eter said, "This is the answer to the Americans, a gift from Gadhafi to Reagan."  (Amended Complaint ¶9).

At around 11:00 p.m. Verena Chanaa and Andrea Häusler brought the bomb to be detonated into the LaBelle Discotheque, where the electrical delay timing device of the explosive was activated.  (Amended Complaint ¶10).  The bag containing the bomb was placed at a seat in the center of the dance floor.  (Amended Complaint ¶10).  On April 5, 1986 at around 1:35 a.m. Verena Chanaa and Andrea Häusler left the LaBelle Discotheque. (Amended Complaint ¶10).  There were approximately 260 people in the discotheque at the time.  (Amended Complaint ¶10).

The bomb exploded with great and destructive force at approximately 1:40 a.m. Three persons--Kenneth Terence Ford, James E. Goins, and Nermin Haney, a female Turkish citizen[1]--were killed.  (Amended Complaint ¶11).  The explosive pressure tore off Mr. Ford's genitals, and separated his left lower-leg and his left arm from the trunk of his

body.  (Amended Complaint ¶11).  He sustained severe burns on his face and body.

(Amended Complaint ¶11).  He died of shock and loss of blood.  (Amended Complaint

¶11).  Both of Mr. Goins' lower-legs were ripped open and his bones shattered.  (Amended

Complaint ¶11).  Metal parts of the bomb penetrated his body and he sustained severe burns

on his face and body.  (Amended Complaint ¶11).  Despite an emergency operation, in

which both legs were amputated, he later died from his injuries.  Nermin Haney had her left

eye torn out and her left lower-leg cut to pieces by the explosion.  She bled to death at the

scene.  At least 229 persons suffered severe personal injuries as a result of the bomb

explosion.  (Amended Complaint ¶11).

     Both before and after the terrorist bomb attack on the LaBelle Discotheque, the telex

communications between the Libyan intelligence service switchboard in Tripoli and the

Libyan embassy in East Berlin record that the officials, employees and agents of Libya,

MFIS, JSO and ESO were responsible for the planning, preparation and execution of this

terrorist act.  (Amended Complaint ¶12).  Immediately after this terrorist bomb attack, the

Libyan embassy in East Berlin sent a message to the Libyan government stating that the

execution of this terrorist act had been carried out successfully.  (Amended Complaint ¶12).

The communication stated that "at 1:30 early this morning the performance of one of the

actions took place with success, without leaving behind any clues . . . . "  (Amended

Complaint ¶12).

     In April 1986 Major General John H. Mitchell was the United States Commander in

Berlin.  (Amended Complaint ¶13).  He received secret national defense information from

reliable sources.  (Amended Complaint ¶13).  He learned that before the LaBelle bomb

attack, instructions had been sent from the Libyan government in Tripoli to the Libyan

---

[1] The estate of Ms. Haney is not a party to this action.  On September 3, 2004, Libya entered into an

People's Office in East Berlin to perform terrorist attacks against Americans and that the Libyan People's Office in East Berlin communicated to the Libyan government in Tripoli immediately after the bomb attack that the operation had been successfully performed. (Amended Complaint ¶13).

On September 10, 1996, Eter visited the German embassy in Malta. During questioning in the presence of the German ambassador, Eter made a detailed confession by disclosing the planning, preparation and execution of the terrorist attack on La Belle; his own actions; and the actions of the other perpetrators, as set forth above. (Amended Complaint ¶14). During further questioning conducted by the senior state prosecutor in Berlin, Eter described in detail the execution of the LaBelle terrorist act by officials, employees and agents of Libya, MFIS, JSO and ESO. (Amended Complaint ¶14).

On March 17, 2001, al-Qadhafi, in a secret meeting in Tripoli, Libya, admitted to Mr. Steiner, the foreign policy adviser to German Federal Chancellor Schroeder that Libya and he (Al-Ghaddafi) participated in the terrorist bomb attack at the LaBelle Discotheque as well as the "Lockerbie" terrorist act. (Amended Complaint ¶15). On March 29, 2001, at a meeting in Washington, D.C. between the leaders of Germany and the United States, Mr. Steiner reported to President George W. Bush, Secretary of State Colin Powell, and National Security Advisor Condoleezza Rice these admissions of al-Qadhafi. (Amended Complaint ¶15).

---

agreement that settled the personal injury and property claims of all European nationals killed, injured, or otherwise damaged by the LaBelle Discotheque bombing.

## SUMMARY OF ARGUMENT

Libya seeks to escape liability for its bombing of the LaBelle Discotheque by arguing that Section 1083 of the DAA 2008, despite its contrary, explicit language, does not apply to this case. The original Complaint in this case was timely brought under 28 U.S.C. § 1605(f) and Section 1083 of the DAA 2008, codified at 28 U.S.C. § 1605A and 28 U.S.C. § 1605A note, applies to this case. In any event, Libya waived its right to raise the affirmative defense of statute of limitations by failing to raise it in its first motion to dismiss.

Libya also seeks to escape liability by arguing that the state-sponsorship terrorism exception precludes recovery for the victims who suffer personal injuries and survive large-scale, infamous acts of terrorism such despite the plain face of the statute, its legislative history, the wealth of applicable precedent that dictates otherwise, and the operation of simple logic.

## ARGUMENT

I. **PLAINTIFFS MAY BRING THEIR CASE UNDER THE FOREIGN SOVEREIGN IMMUNITES ACT AS AMENDED BY SECTION 1083 OF THE DEFENSE AUTHORIZATION ACT FOR FISCAL YEAR 2008**

   A. **Section 1083 Of The Defense Authorization Act For Fiscal Year 2008 Explicitly Allows Plaintiffs To File Their Amended Complaint Under 28 U.S.C. § 1605A**

Plaintiffs have an explicit right to bring an action under 28 U.S.C. § 1605A. Section 1083(c)(2)(A) of the newly enacted Defense Authorization Act for Fiscal Year 2008, ("DAA 2008"), Pub. L. No. 110-181, § 1083, 122 Stat. 3, 338-344 (2008), provides for retroactive application to pending cases, such as this one:

> (2) Prior actions.
>   (A) In general. With respect to any action that--
>     (i) was brought under section 1605(a)(7) of title 28, United States Code, or section 589 of the Foreign Operations, Export Financing, and

Related Programs Appropriations Act, 1997 (as contained in section
101(c) of division A of Public Law 104-208) [28 USCS § 1605 note],
before the date of the enactment of this Act,

   (ii) relied upon either such provision as creating a cause of action,
   (iii) has been adversely affected on the grounds that either or both of
these provisions fail to create a cause of action against the state, and
   (iv) as of such date of enactment, is before the courts in any form,
including on appeal or motion under rule 60(b) of the Federal Rules of
Civil Procedure,

   that action, and any judgment in the action shall, on motion made by
plaintiffs to the United States district court where the action was initially
brought, or judgment in the action was initially entered, be given effect as
if the action had originally been filed under section 1605A(c) of title 28,
United States Code.

28 U.S.C. § 1605A, note. Section 1083 of the DAA 2008 should be retroactively applied to

this case, as it was:

  i.    originally brought under 28 U.S.C. § 1605(a)(7) on April 19, 2006, before the date

        of the enactment of the DAA 2008;

 ii.    relied upon "section 589 of the Foreign Operations, Export Financing, and Related

        Programs Appropriations Act, 1997 (as contained in section 101(c) of division A of

        Public Law 104-208) [28 USCS § 1605 note]", also known as the Flatow

        Amendment, to create a cause of action, (Original Complaint ¶23-28);

iii.    was adversely affected by the Libya's argument that such provision did not create a

        cause of action and the D.C. Circuit's decision that the Flatow Amendment did not

        create such an action.  Cicippio-Puleo v. Islamic Republic of Iran, 353 F.3d 1024,

        1033 (D.C. Cir. 2004);

iv.     and was before this Court on the date of the enactment of the DAA 2008.

Section 1083(c)(2)(B) further provides that a defense of a limitation period is waived:

        (i) in any action with respect to which a motion is made under
        subparagraph (A), or
        (ii) in any action that was originally brought, before the date of the
        enactment of this Act, under section 1605(a)(7) of title 28, United States
        Code, or section 589 of the Foreign Operations, Export Financing, and

Related Programs Appropriations Act, 1997 (as contained in section
101(c) of division A of Public Law 104-208) [28 USCS § 1605 note], and
is refiled under section 1605A(c) of title 28, United States Code,

Section 1083 of the DAA 2008 therefore applies to this case as Plaintiffs filed a motion to

refile their complaint under the new law on January 31, 2008, and thereby complied with

both sections 1083(c)(2)(B)(i) by making a "motion under subparagraph (A)" and (ii) as

this is an action originally brought before the date of the enactment of this act "under

section 1605(a)(7) of title 28, United States Code" and refilling under "under section

1605A(c) of title 28, United States Code".

Nowhere in relevant portions of Section 1083 of the DAA 2008 is the issue of

timeliness of the original complaint raised as a necessary precondition for the application of

the Section 1083 of the DAA 2008 to an existing 28 U.S.C. § 1605(a)(7) action.  Section

1083 of the DAA 2008 does make the timeliness of the existing 28 U.S.C. § 1605(a)(7)

action a necessary precondition at Section 1083(c)(3) in a subsection entitled "Related

Actions" found in the section entitled "Application to pending cases."  28 U.S.C. § 1605A,

note.  Where Congress uses specific language of limitation in one section, but not in another

section in the same law, the choice of usage can not be overlooked.  Pa. Dep't of Pub.

Welfare v. Davenport, 495 U.S. 552, 561 (1990) ("Our cases express a deep reluctance to

interpret a statutory provision so as to render superfluous other provisions in the same

enactment.") (citing Mackey v. Lanier Collection Agency & Service, Inc., 486 U.S. 825,

837 (1988)); United States ex rel. Totten v. Bombardier Corp., 380 F.3d 488, 502 (D.C. Cir.

2004) (Roberts, J.) ("The dissent's contrary conclusion -- that subsection (a)(2) does not

require any presentment that may be required under subsection (a)(1) -- has tellingly little

support.  The dissent's reading of (a)(2) would make the presentment requirement in (a)(1),

which the dissent does not challenge head-on, largely meaningless."); National Ass'n of

Mfrs. v. United States DOI, 134 F.3d 1095, 1107 (D.C. Cir. 1998) ("As we have repeatedly counseled, such HN27an interpretation, which essentially deprives one provision of its meaning and effect so that another provision can be read as broadly as its language will permit, is inconsistent with the Congress's intent . . . ."). When Congress drafted Section 1083(c)(2)(A), it did not include the phrase "timely commenced", which was included in Section 1083(c)(3). To read a "timely commenced" requirement into Section 1083(c)(2)(A) would render a portion of Section 1083(c)(3) meaningless.

Congress's intent regarding the statute of limitations provision in the state-sponsorship of terrorism exception to foreign sovereign immunity, codified at 28 U.S.C. § 1605A by Section 1083 of the DAA 2008, is revealed by a floor statement by Senator Frank Lautenberg. Senator Lautenberg was one of the primary sponsors of the bill that became Section 1083 of the DAA 2008. He introduced S.1944, the bill that became Section 1083 of the DAA 2008[2] and described the intent of the bill in a floor statement:

> Another problem is that courts have mistakenly interpreted the statute of limitations provision that Congress created in 1996. In cases such as Vine v. Republic of Iraq and later Buonocore v. Socialist People's Libyan Arab Jamahiriya, the court interpreted the statute to begin to run at the time of the attack, contrary to our intent. It was our intent to provide a 10-year period from the date of enactment of the legislation for all acts that had occurred at anytime prior to its passage in 1996. We also intended to provide a period of 10 years from the time of any attack which might occur after 1996. My provision clarifies this intent.

154 Cong. Rec. S54 (January 22, 2008) (statement of Sen. Lautenberg). This may shed light on why the timeliness requirement was waived for motions filed under Section 1083(c)(2)(A).

In any event, 28 U.S.C. § 1605A(b) further provides for the maintenance of this case under § 1605A:

> (b) Limitations. An action may be brought or maintained under this
> section if the action is commenced, or a related action was commenced
> under section 1605(a)(7) (before the date of the enactment of this section)
> or section 589 of the Foreign Operations, Export Financing, and Related
> Programs Appropriations Act, 1997 (as contained in section 101(c) of
> division A of Public Law 104-208) [28 USCS § 1605 note] not later than
> the latter of--
>> (1) 10 years after April 24, 1996; or
>> (2) 10 years after the date on which the cause of action arose.

28 U.S.C. § 1605A(b).  Plaintiffs in this case commenced an action under "section

1605(a)(7) (before the date of the enactment of this section)" on April 19, 2006, or within

"10 years after April 24, 1996" and now seek to maintain the case under § 1605A, as

contemplated by the explicit language of Section 1083 of the DAA 2008.

### B.  This Case Was Timely Filed Under 28 U.S.C. § 1605(f)

Libya raises an argument regarding the timeliness of Plaintiffs' original complaint.

(Mot. Dismiss at 2-3).  Plaintiffs' original complaint was filed within the applicable statute

of limitations for actions brought under section 1605(a)(7):

> No action shall be maintained under subsection (a)(7)
> unless the action is commenced not later than 10 years
> after the date on which the cause of action arose. <u>All
> principles of equitable tolling, including the period during
> which the foreign state was immune from suit, shall apply</u>
> in calculating this limitation period.

28 U.S.C. § 1605(f) (emphasis added).  This broadly worded provision favors a liberal

approach to the calculation of statute of limitations for cases brought against state-sponsors

of terrorism in order to effectuate the purpose of the statute.  "A 'statute should ordinarily

be read to effectuate its purposes rather than frustrate them.'"  United States v. Barnes, 295

F.3d 1354, 1364 (D.C. Cir. 2002) (quoting Motor Vehicle Mfrs. Ass'n of U.S., Inc. v.

Ruckelshaus, 719 F.2d 1159, 1165 (D.C. Cir. 1983)).  This is also true of accompanying

---

[2] The Library of Congress, Thomas website, http://thomas.loc.gov/cgi-bin/bdquery/z?d110:SN01944:@@@P (last visited May 15, 2008).

equitable tolling provisions.  <u>Arce v. Garcia</u> found the applicable statute of limitation is

defined by the statute the case is brought under:

> We look to the relevant statute for guidance in determining whether
> equitable tolling is appropriate in a given situation. "The basic question to be
> answered in determining whether, under a given set of facts, a statute of
> limitations is to be tolled, is one 'of legislative intent whether the right shall
> be enforceable . . . after the prescribed time.'"

<u>Arce</u>, 434 F.3d at 1261 (holding that "[i]n order to determine congressional intent [on the

question of equitable tolling], we must examine the purposes and policies underlying the

limitation provision, the Act itself, and the remedial scheme developed for the enforcement

of the rights given by the Act.") (<u>quoting</u> <u>Burnett v. New York C. R. Co.</u>, 380 U.S. 424, 426

(1965)).  The interpretation of § 1605(f) should effectuate its expansive and remedial

legislative intent.

Congress passed the "state-sponsored terrorism exception" to the FSIA for the

purpose of to deterring and punishing state-sponsored terrorism.  <u>Price v. Socialist People's</u>

<u>Libyan Arab Jamahiriya</u>, 294 F.3d 82, 88 (D.C. Cir. 2002); Pub. L. No. 104-132 § 221 (a),

(Apr. 24 1996), 110 Stat. 1214.  Congress also sought to create a judicial forum so that the

victims of state-sponsored terrorism could seek full compensation.  <u>Daliberti v. Republic of</u>

<u>Iraq</u>, 97 F. Supp. 2d 38, 50 (D.D.C. 2000).  The state-sponsored terrorism exception to the

FSIA, which was passed for the purposes of deterring state-sponsored terrorism and

compensating its victims, requires a more expansive interpretation when a court calculates

the applicable statute of limitations.

Defendants' acts that led to the deaths and injuries described in the complaint

occurred on April 5, 1986, at a time when the Defendants enjoyed sovereign immunity in

United States courts for such acts.  Defendants' sovereign immunity created a complete

disability to the filing of a lawsuit by Plaintiffs.  Subsection 1605(f) therefore tolled or

halted the operation of the statute of limitations while this disability was in place; the years when Libya was immune from suit must be entirely excluded from the statute of limitations calculation.  "Accordingly, the statute of limitations for the plaintiffs' claims must be tolled to begin when the defendants were stripped of their immunity with the 1996 enactment of 28 U.S.C. § 1605(a)(7)."  Collett v. Socialist People's Libyan Arab Jamahiriya, 362 F. Supp. 2d 230, 242 (D.D.C. 2005); Wyatt v. Syrian Arab Republic, 362 F. Supp. 2d 103, 145 (D.D.C. 2005) (holding that the plaintiffs claims were not time-barred because "[u]nder the terms of § 1605(f), all claims brought under § 1605(a)(7) are tolled up to April 24, 1996, the date of passage of § 1605(a)(7) and the first date that any foreign state's immunity was waived."); Peterson v. Islamic Republic of Iran, 264 F. Supp. 2d 46, 60 (D.D.C. 2003) (holding that the plaintiffs' actions were not time-barred because "28 U.S.C. § 1605(f) provides for a statute of limitations of '10 years after the date on which the cause of action arose,' and provides for equitable tolling during the 'period during which the foreign state was immune from suit.' . . . [and] [t]he state of Iran was immune from suit until passage of Pub. L. 104-132 . . . on April 24, 1996.") (quoting 18 U.S.C. § 1605(f)); Flatow v. Islamic Republic of Iran, 999 F. Supp. 1, 23 (D.D.C. 1998) (ruling that "as a matter of law that the earliest possible date for the statute of limitations to expire for any action brought pursuant to 28 U.S.C. § 1605(a)(7) and 28 U.S.C.A. § 1605 note will be April 24, 2006").  Until the enactment of the subsection of the FSIA that stripped the Defendants of that immunity, which occurred on April 24, 1996, the ten year statute of limitations was not running.  The statute halted the running of the ten-year statute of limitations prescribed and allowed Plaintiffs to file this lawsuit at any time until at least April 24, 2006, ten years from the passing by Congress of § 1605(f), instead of ten years from the actual terrorist attack.

Relying on the settled precedent in this Circuit, this suit was filed on April 19, 2006, within ten years from April 24, 1996, the date Congress passed the subsection of the FSIA that stripped the Defendants of their immunity.  Accordingly, the Plaintiffs' Complaint was timely filed and is not time barred.

Two contrary decisions in this circuit, Vine v. Republic of Iraq, 459 F. Supp. 2d 10, 24 (D.D.C. 2006) and Buonocore v. Socialist People's Libyan Arab Jamahiriya, No. 06-727 (GK), 2007 LEXIS 49031 at *5-10 (D.D.C. 2007), interpreted 28 U.S.C. § 1605(f) in a way that would result in the dismissal of this case.  Vine and Buonocore interpreted the ten year period in 28 U.S.C. § 1605(f) to begin running on the date of the terrorist attack.  459 F. Supp. 2d at 24; 2007 LEXIS 49031 at *9.  Vine and Buonocore concluded that the equitable tolling principles codified in 28 U.S.C. § 1605(f) operated to only allow victims a "reasonable time" after the expiration of the ten year period.  459 F. Supp. 2d at 24, 2007 LEXIS 49031 at *10.  These decisions were expressly repudiated in a floor statement by Senator Frank Lautenberg, one of the primary sponsors of original sponsors of the state-sponsor of terrorism exception and the bill that became Section 1083 of the DAA 2008.  He introduced S.1944, the bill that became Section 1083 of the DA and described the intent of the bill in a floor statement:

> Another problem is that courts have mistakenly interpreted the statute of limitations provision that Congress created in 1996. In cases such as Vine v. Republic of Iraq and later Buonocore v. Socialist People's Libyan Arab Jamahiriya, the court interpreted the statute to begin to run at the time of the attack, contrary to our intent. It was our intent to provide a 10-year period from the date of enactment of the legislation for all acts that had occurred at anytime prior to its passage in 1996. We also intended to provide a period of 10 years from the time of any attack which might occur after 1996. My provision clarifies this intent.

154 Cong. Rec. S54 (January 22, 2008) (statement of Sen. Lautenberg).  There can be no clearer repudiation of Vine and Buonocore and expression of Congressional intent in

support of the operation of 28 U.S.C. § 1605(f) as described by <u>Collett</u>, <u>Wyatt</u>, <u>Peterson</u>, and <u>Flatow</u>.

If this Court adopts the <u>Vine</u> and <u>Buonocore</u> interpretation of 28 U.S.C. § 1605(f), which is explicitly repudiated in a floor statement to the DAA 2008 by the original cosponsor of the state-sponsor of terrorism exception, rather than the <u>Collett</u>, <u>Wyatt</u>, <u>Peterson</u>, and <u>Flatow</u> interpretation, the ten year limitations period would have began to run on the date of the bombing, April 6, 1985, and therefore expired on April 6, 1995. Under the equitable tolling principles codified in 28 U.S.C. § 1605(f), Plaintiffs would have a "reasonable time" after April 6, 1995 expiration date to file their lawsuit. As Libya retained sovereign immunity until the passage of the state-sponsored terrorism exception 28 U.S.C. § 1605(a)(7) on April 24, 1996, presumably the Plaintiffs would have had a short period within which to file after April 24, 1996. If this Court adopts the <u>Collett</u>, <u>Wyatt</u>, <u>Peterson</u>, and <u>Flatow</u> interpretation of 28 U.S.C. § 1605(f), which is explicitly advocated in a floor statement to the DAA 2008 by the original cosponsor of the state-sponsor of terrorism exception, rather than the <u>Vine</u> and <u>Buonocore</u> interpretation, the ten year limitations period would have began to run on the date that Congress passed a law that created an exception to Libya' sovereign immunity for cats such as the LaBelle Discothèque bombing.

The incorrect interpretation of 28 U.S.C. § 1605(f) found in <u>Vine</u> and <u>Buonocore</u> springs from a mistaken reliance on <u>Phillips v. Heine</u>, 984 F.2d 489 (D.C. Cir. 1993). <u>Phillips</u> ruled that when a disability to suit is lifted, a plaintiff may have a "reasonable period after the tolling circumstance mended" to file; meaning a plaintiff may have must immediately file if the ten year period had passed unless there are further obstacles that are judicially cognizable under equitable tolling principles. 984 F.2d at 492. In support of the "reasonable time" test, <u>Phillips</u> cites <u>Cada v. Baxter Healthcare Corp.</u>, 920 F.2d 446, 452

(7th Cir. 1990), a single case to support the <u>Phillips</u> "reasonable time" test. 984 F.2d at

492. <u>Cada</u> does not cite a single case, treatise or law review in support of its interpretation

of equitable tolling principles. 920 F.2d 446. The isolation of <u>Cada</u>'s interpretation, and

therefore <u>Phillips</u>, is spelled out by <u>Socop-Gonzalez v. INS</u>, 272 F.3d 1176, 1195 (9th Cir.

Cal. 2001). <u>Socop-Gonzalez v. INS</u> explicitly rejected <u>Cada:</u> "We believe, and the

following discussion will demonstrate, that this approach to tolling is needlessly difficult to

administer, runs counter to Supreme Court precedent, and undermines the policy objectives

of the statutes of limitations." <u>Id.</u> <u>Socop-Gonzalez v. INS</u> found <u>Cada</u> contrary to the

Supreme Court decision in <u>Burnett v. New York C. R. Co.</u>, 380 U.S. 424, 435-36 (1965)

which "explicitly rejected" an approach that allowed a "reasonable time" after the disability

to the filing of a lawsuit had been lifted, rather than tolling the operation of the statute of

limitations while the disability to the filing existed.

      The inapplicability of <u>Phillips</u> to cases brought under 28 U.S.C. § 1605(a)(7) also

derives from the limitations provision at issue in <u>Phillips.</u> As noted above, a statute of

limitations must be interpreted in accordance with the statute's congressional intent. The

<u>Phillips</u> decision, drawn from the conservative Death on the High Seas Act ("DOHSA")

legislative scheme, is not a useful guide to 28 U.S.C. § 1605(f). "The legislative history of

the Death on the High Seas Act discloses a clear congressional purpose to leave

'unimpaired the rights under State statutes as to deaths on waters within the territorial

jurisdiction of the States.'" <u>Gillespie v. United States Steel Corp.</u>, 379 U.S. 148, 165

(1964) (citation omitted). The DOHSA was intended to maintain the status quo by leaving

existing state remedies in place and creating a federal remedy only where there was not

coverage by already-existing remedies. <u>Moragne v. States Marine Lines</u>, 398 U.S. 375,

398 (1970). The existing state remedies were usually more generous than the new and less-

substantial federal right created under the DOHSA. In re Air Crash off Long Island, 209

F.3d 200, 209 (2d Cir. 2000). The conservative nature of the DOHSA's provisions and its

equally conservative Congressional purpose stand in sharp contrast to the explicit and

expansive wording of the state-sponsorship of terrorism exception's tolling provision and

its broad, remedial, legislative purpose.

Decisions that analyze equitable tolling principles under the Torture Victim

Protection Act's[3] statute of limitations may be instructive to the Court because the TVPA

and the FSIA are similar in purpose and legislative intent. Arce, 434 F.3d at 1261-62

(noting that the TVPA was enacted to address serious violations of international human

rights abroad). Both the TVPA and the state-sponsorship of terrorism exception have

broad, remedial purposes. Such remedial statutes must be broadly construed, consistent

with their plain meaning. Reyton v. Rowe, 391 U.S. 54 (1968). Courts deciding the

application of equitable tolling to TVPA cases, like the courts that have decided equitable

tolling in FSIA cases, have excluded periods of immunity from the statute of limitations

calculation. Arce, 434 F.3d at 1264; Jean v. Dorelien, 431 F.3d 776, 780 (11th Cir. 2005)

(approving the Collett court's interpretation of § 1605(f) that found "the statute of

limitations for the plaintiffs' claims must be tolled to begin when the defendants were

stripped of their immunity."); Hilao v. Estate of Marcos, 103 F.3d 767, 773 (9th Cir. 1996).

The Court should do the same here.

### C. Defendant Failed To Raise The Statute Of Limitations Defense, Which Is An Affirmative Defense

Defendant also argues that Plaintiffs can not now seek retroactive application of

Section 1083 of the DAA 2008 to this case as the case was not originally brought under

28 U.S.C. § 1605(a)(7) in a timely manner. (Mot. Dismiss at 1-4). A statute of limitations defense however is an affirmative defense, Fed. R. Civ. P. 8(c), and is waived unless raised by the defendant. Colbert v. Potter, 471 F.3d 158, 167 (D.C. Cir. 2006) (citations omitted) (finding "[t]he filing time limit imposed by Title VII, 42 U.S.C. § 2000e-16(c), 'is not a jurisdictional requirement but rather is similar to a statute of limitations.'"). This remains true for cases brought under 28 U.S.C. § 1605(a)(7). Rux v. Republic of Sudan, 2005 U.S. Dist. LEXIS 36575 at *82 (E.D. Va. August 26, 2005)[4] ("The statute of limitations is an affirmative defense. Fed. R. Civ. P. 8(c)."); see Morris v. People's Republic of China, 478 F. Supp. 2d 561, 566 (S.D.N.Y. 2007) (a court ruling on a statute of limitations defense in FSIA case found "[w]here the dates in a complaint show that an action is barred by a statute of limitations, a defendant may raise the affirmative defense in a pre-answer motion to dismiss[, which] is properly treated as a Rule 12(b)(6) motion to dismiss."). The statute of limitations is an affirmative defense rather than a jurisdictional one. Libya did not raise this defense in its motion to dismiss the case brought under 28 U.S.C. § 1605(a)(7) and so has waived the defense.

Libya cites John R. Sand & Gravel Co. v. United States, 128 S. Ct. 750, 753 (2008) for the proposition that the limitations defense offered by 28 U.S.C. § 1605(f) is jurisdictional in nature and can not be waived by a defendant. (Mot. Dismiss at 3). The John R. Sand decision however only found that the specific statute of limitations provision under review, 28 U.S.C. § 2501,[5] is a jurisdictional provision. Id.

---

[3] 28 U.S.C. § 1350. The TVPA was instructive to the drafters of the state-sponsor terrorism exception to sovereign immunity, 28 U.S.C. § 1605(a)(7) and now 28 U.S.C. § 1605A, who relied upon the TVPA for the definition of "extrajudicial killing", "torture" and "hostage-taking."

[4] The Rux case was vigorously defended by counsel representing the defendants in that case, through an appeal to the Supreme Court. Republic of Sudan v. Rux, 127 S. Ct. 1325 (2007).

[5] "Every claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." 28 U.S.C. § 2501. The language of this provision could not be more different than 28 U.S.C. § 1605(f), which contains an explicit equitable tolling provision.

> The question presented is whether a court must raise on its own the
> timeliness of a lawsuit filed in the Court of Federal Claims, despite the
> Government's waiver of the issue. <u>We hold that the special statute of
> limitations governing the Court of Federal Claims</u> requires that sua sponte
> consideration.

<u>Id.</u> at 752 (emphasis added); <u>see</u> <u>Irwin v. Department of Veterans Affairs</u>, 498 U.S. 89, 96

(U.S. 1990) (finding that the waiver of U.S. sovereign immunity found in Title VII, and

codified at 42 U. S. C. § 2000e-16 (c), was not jurisdictional and allowed for the

application of equitable tolling by a court).  The <u>John R. Sand</u> ruling does not apply to the

limitations provision at issue in this case, which was a procedural limitations provision and

not a jurisdictional provision.  The Court in <u>John R. Sand</u> reached its conclusion by

drawing a distinction between statute of limitations provisions that were affirmative

defenses, requiring a defendant to raise the defense or waive it, and limitations provisions

that were jurisdictional in nature, requiring a court to raise the defense even if a defendant

did not.  128 S. Ct. at 753.  The jurisdictional limitation on foreign state sovereignty is

found in 28 U.S.C. § 1605(a)(7), not 28 U.S.C. § 1605(f).  "A clause that supplies a

statutory time limit is not itself a waiver of sovereign immunity; it is rather a condition

subsequent that the Congress may place upon the waiver."  <u>Brown v. Secretary of the</u>

<u>Army</u>, 86 F.3d 225, 227 (D.C. Cir. 1996).  28 U.S.C. § 1605(f) was a "condition

subsequent" to the waiver of sovereign immunity found at 28 U.S.C. § 1605(a)(7) and was

not a jurisdictional provision.

　　　The Court in <u>John R. Sand</u> primarily based its decision on its longstanding

precedent on the issue: for over a century the Court has consistently read 28 U.S.C. § 2501

to be a jurisdictional statute.  128 S. Ct. at 754 (citations omitted) ("Over the years, the

Court has reiterated in various contexts this or similar views about the more absolute nature

of [28 U.S.C. § 2501] the court of claims limitations statute.").  At least one federal court

of appeals has held that the holding of <u>John R. Sand</u> is restricted to 28 U.S.C. § 2501, the

limitations provision that was before the Court in that case:

> The Court there noted that <u>most limitations periods are non-jurisdictional</u>
> <u>affirmative defenses</u> and are subject to equitable tolling, see id. at   , 169
> L. Ed.2d 591, 2008 WL at *3, and viewed the limitations period governing
> suits against the United States in the Court of Federal Claims as
> jurisdictional only because a long line of prior decisions had so held and
> were entitled to adherence under principles of stare decisis, see id. at   ,
> 169 L. Ed.2d 591, 2008 WL at *6.

<u>Diaz v. Kelly</u>, 515 F.3d 149, 153-154 (2d Cir. 2008) (emphasis added).  28 U.S.C. §

1605(f) however has never been interpreted to be a jurisdictional provision and § 1605(f)'s

particular construction, which subjects it to equitable tolling, further distinguishes this case

from <u>John R. Sand</u>.

The <u>John R. Sand</u> decision also noted that a jurisdictional limitations provision

forbids a court from considering "whether certain equitable considerations warrant

extending a limitations period."  128 S. Ct. at 753 (<u>citing</u> <u>Bowles v. Russell</u>, 127 S. Ct.

2360, 168 L. Ed. 2d 96, 103 (2007)).  The Court also noted that procedural limitations

provisions, which can be waived by defendant, "typically permit courts to toll the

limitations period in light of special equitable considerations."  128 S. Ct. at 753 (citations

omitted).  The Court in <u>John R. Sand</u> would have ruled differently if 28 U.S.C. § 2501 had

contained an equitable tolling provision.  <u>Id.</u>  In stark contrast to limitations provision the

Court found to be jurisdictional in <u>John R. Sand</u>, 28 U.S.C. § 1605(f) was written with an

explicit provision for equitable tolling:

> All principles of equitable tolling, including the period
> during which the foreign state was immune from suit,
> shall apply in calculating this limitation period.

28 U.S.C. § 1605(f).  An equitable tolling provision allows complaints to be filed outside

the specified time limit, which means the limitations provision can not qualify as a

jurisdictional provision.  See Colbert v. Potter, 471 F.3d 158, 167 (D.C. Cir. 2006) (recognizing that Title VII's jurisdictional statutes do not limit jurisdiction to timely filed complaints ) (citing Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 393 (1982)).  This further supports Plaintiffs' argument that 28 U.S.C. § 1605(f) is a procedural limitations provision, which can be waived if not affirmatively raised.

Finally, a waiver of U.S. sovereign immunity and a waiver of foreign sovereign immunity must be analyzed differently due to the vastly different policy considerations at play.  A court must consider the "the special governmental interest in protecting public funds" when it construes limitations provisions for waivers of U.S. sovereign immunity. John R. Sand, at 756.  The policy goal that motivated Congress when it created 28 U.S.C. § 1605(a)(7) was quite different.  "In enacting this provision [28 U.S.C. § 1605(a)(7)], Congress sought to create a judicial forum for compensating the victims of terrorism, and in so doing to punish foreign states who have committed or sponsored such acts and deter them from doing so in the future."  (Price v. Socialist People's Libyan Arab Jamahiriya, 294 F.3d 82, 89 (D.C. Cir. 2002) (citing Daliberti v. Republic of Iraq, 97 F. Supp. 2d 38, 50 (D.D.C. 2000)).  Libya therefore waived its limitations defense in 28 U.S.C. § 1605(f) and section 1083 of the DAA 2008 clearly applies, allowing its retroactive effect to this lawsuit.

## II.    LIBYA'S PECULIAR INTERPRETATION OF 28 U.S.C. § 1605A(a)(1) DEFIES LOGIC, THE EXPLICIT LANGAUGE OF THE STATUTE AND ITS LEGISLATIVE HISTORY

Libya also seeks to escape liability for its bombing of the LaBelle Discotheque by arguing that the phrase "extra-judicial killing" as used in 28 U.S.C. § 1605A(a)(1) does not allow for recovery by persons injured in terrorist attacks that qualify as "extra-judicial killings."  (Mot. Dismiss at 4). Libya's argument notwithstanding, it can not seriously dispute that its bombing of the LaBelle Discotheque, which resulted in 3 deaths and

hundreds of horrible injuries, constituted an act of "extrajudicial killing" within the meaning of the statute.  The statute holds state-sponsors of terrorism for a "personal injury" "caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking or the provision of material support for such an act."  28 U.S.C. § 1605A(a)(1).  Plaintiffs' complaints clearly describe Libya's provision of material support for the LaBelle Discotheque bombing, which qualifies as an extrajudicial killing and caused Plaintiffs' injuries.  28 U.S.C. § 1605A(h)(7) defines extra-judicial killing with the same meaning as found in the Torture Victims Protection Act ("TVPA"), 28 U.S.C. § 1350:

> Extrajudicial killing. For the purposes of this Act, the term 'extrajudicial killing' means a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples. Such term, however, does not include any such killing that, under international law, is lawfully carried out under the authority of a foreign nation.

Libya can not point to language in the statute itself that would preclude recovery by claimants who suffered a "personal injury" caused by an extrajudicial killing; rather Libya refers to the legislative history for a bill that was not passed.  (Mot. Dismiss at 4-8).  Such an arbitrary distinction, which finds no support in the language of any statute, would undermine the legislative intent of Congress when it passed the original state-sponsorship of terrorism exception.

The legislative history of Section 1083 of the DAA 2008, which created 28 U.S.C. § 1605A, is more instructive on this point than the legislative history of a bill from 1994 that was not passed, which Libya cites repeatedly.  The purpose of 28 U.S.C. § 1605(a)(7) is straightforward.  "In enacting this provision [28 U.S.C. § 1605(a)(7)], Congress sought to create a judicial forum for compensating the victims of terrorism, and in so doing to punish foreign states who have committed or sponsored such acts and deter them from doing so in

the future."  (Price v. Socialist People's Libyan Arab Jamahiriya, 294 F.3d 82, 89 (D.C. Cir.

2002) (citing Daliberti v. Republic of Iraq, 97 F. Supp. 2d 38, 50 (D.D.C. 2000)).  The same

intent serves as the foundation Section 1083 of the DAA 2008.  Senator Frank Lautenberg

introduced S.1944, the bill that became Section 1083 of the DAA.  He described the intent

of the bill in a floor statement:  "I believe this legislation is essential to providing justice to

those who have suffered at the hands of terrorists and is an important tool designed to deter

future state-sponsored terrorism."  154 Cong. Rec. S54 (January 22, 2008) (statement of

Sen. Lautenberg).  In Senator Lautenberg's floor statement, he explicitly singled out the

case Peterson v. Islamic Republic of Iran, CA 01-2094 (RCL) (D.D.C. filed October 3,

2001) as the "inspiration for this new legislation."  Id. at S55.

Peterson v. Islamic Republic of Iran is an action arising from the October 23, 1983,

bombing of a United States Marine barracks in Beirut, Lebanon, in which 241 American

servicemen" were murdered, brought by nearly one thousand plaintiffs" including "many of

the family members and estates of the 241 servicemen killed in the attack."  515 F. Supp.

2d 25, 36-37 (D.D.C. 2007).  This act of terrorism is precisely the type of terrorism that

Libya's interpretation of "extrajudicial killing" would immunize.  The Peterson court found

the actions of the terrorists who killed the 241 servicemen to be an "extra-judicial killing."

Id. at 61.  The Peterson court also recognized family members as suffering a "personal

injury" caused by this extra-judicial killing and awarded damages to compensate them for

their emotional suffering.  Id. at 37.  Senator Lautenberg's Floor Statement went on to note

the new legislation would now empower the victims of this terrorist attack "to pursue

Iranian assets to obtain this just compensation for their suffering."  154 Cong. Rec. S55.

Compensation for claimants who were suffered a personal injury as a result of the

indiscriminate bombing of a civilian population therefore were in the minds of the drafters of section 1083 of the DAA 2008 when they created the law.

In analyzing whether conduct constitutes an "extrajudicial killing" and warrants the lifting of sovereign immunity, courts look to the attack as a whole rather than its impact on each individual plaintiff and his or her resulting injuries.  See e.g., Pugh v. Socialist People's Libyan Arab Jamahiriya, 2006 WL 2384915 at * 9 (D.D.C. 2006)[6] (finding that the bombing of UTA Flight 772 was an extrajudicial killing that removed Libya's sovereign immunity under the FSIA, thus permitting the estates of the Americans killed and their families to proceed with their causes of action).  The provision of support for a bombing of civilians constitutes an extra-judicial killing or a ""deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court".  E.g., Sisso v. Islamic Republic of Iran, 2007 U.S. Dist. LEXIS 48627 at *18-19 (D.D.C. July 5, 2007) ("Furthermore, the facts demonstrate that plaintiff's injury was caused by the provision by Iran and MOIS of material support or resources for an act of extrajudicial killing. The September 19 bombing qualifies as an act of extrajudicial killing."); Rux v. Republic of Sudan, 495 F. Supp. 2d 541, 555 (E.D. Va. 2007) (finding "[t]he deliberate murder of the seventeen American sailors" by a suicide bomber "qualifies as an 'extrajudicial killing.'").  The state-sponsored terrorism exception explicitly provides subject matter jurisdiction for US national claims for " . . . personal injury or death that was caused by an act of torture, extrajudicial killing. . . ."  28 U.S.C. § 1605(a)(7) (emphasis added).  It is irrelevant, therefore, whether everyone in the crowd is killed or some are merely injured, so long as the Plaintiffs' injuries were "caused by" the extrajudicial killing.

---

[6] Libya has been represented by counsel in the Pugh case and continues to be represented.

In this case Libya provided material support to terrorists for the purpose of carrying terrorist attacks against U.S. targets in East Berlin.  "In furtherance of this planned attack a Libyan intelligence service courier, transported sub-machine guns, hand grenades and approximately 12 kg of explosives from Tripoli to East Berlin as diplomatic luggage." (Amended Complaint ¶8).  Libya provided 12 kg of explosives to the terrorists on its payroll so that they could make bombs to kill Americans.  To this end, a bomb was placed in a packed discothèque, and the explosive force killed three persons.  (Amended Complaint ¶11).  This constitutes an extra-judicial killing, which caused hundreds of personal injuries.

### III.    PLAINTIFF JOHN DOES ARE PROPERLY LISTED IN PLAINTIFFS' COMPLAINT

The night of the bombing the Criminal Investigative Division of the U.S. Army developed a list of every serviceman and woman and military dependent sufficiently injured such that they required hospitalization.  There are men and women who are on that official casualty list who cannot be located.  The U.S. Army has agreed that if these cases are settled or a judgment is awarded, they will help locate these individuals.  The names John Doe are place holders for the individuals that are on the official casualty list who have not been found and whose interests need to be protected.  The Court should do just that.

## CONCLUSION

For the foregoing reasons, the Court should deny Libya's Motion to Dismiss.

Plaintiffs respectfully request a hearing on this motion.


Dated:  May 16, 2008                          Respectfully submitted,


                                              **/s/ Steven R. Perles**_____
                                              Steven R. Perles
                                              Perles Law Firm, PC
                                              1146 19th Street, NW, Fifth Floor
                                              Washington, DC  20036
                                              Telephone:  202-955-9055
                                              Telefax:  202-955-3806

                                              Counsel for Plaintiffs